# EXHIBIT A
# (Part 1)





Civil Docket Report

A $5 Convenience fee will be added to the transaction at checkout.

## Case Description

| | |
|---|---|
| **Case ID:** | 210602213 |
| **Case Caption:** | CARANCI ETAL VS MONSANTO COMPANY ETAL |
| **Filing Date:** | Tuesday , June 29th, 2021 |
| **Court:** | MASS TORT |
| **Location:** | CITY HALL |
| **Jury:** | JURY |
| **Case Type:** | MT - ROUNDUP PRODUCTS |
| **Status:** | WAITING FOR LISTING MASS TORT |

## Related Cases

*No related cases were found.*

## Case Event Schedule

*No case events were found.*

## Case motions

| Motion | Assign/Date | Control No | Date/Received | Judge |
|---|---|---|---|---|
| MOT-FOR ADMISSION PRO HAC VICE | *pending* | 23032609 | 13-MAR-2023 | FLETMAN, ABBE F |

## Case Parties

| Seq # | | Assoc | Expn Date | Type | Name |
|---|---|---|---|---|---|
| 1 | | | | ATTORNEY FOR PLAINTIFF | BOSWORTH ESQ, THOMAS E |
| **Address:** | BOSWORTH LAW 123 SOUTH BROAD STREET SUITE 2040 PHILADELPHIA PA 19109 (267)212-4177 tom@tombosworthlaw.com | | **Aliases:** | *none* | |
| | | | | | |
| 2 | | 1 | | PLAINTIFF | CARANCI, ERNEST |
| **Address:** | 1235 SEROTA PLACE | | **Aliases:** | *none* | |

| | | | | |
|---|---|---|---|---|
| | PHILADELPHIA PA 19115 | | | |

| | | | | |
|---|---|---|---|---|
| 3 | 1 | | PLAINTIFF | CARANCI, CARMELA |
| **Address:** | 1235 SEROTA PLACE PHILADELPHIA PA 19115 | **Aliases:** | *none* | |

| | | | | |
|---|---|---|---|---|
| 4 | 10 | | DEFENDANT | MONSANTO COMPANY |
| **Address:** | 800 N. LINDBERGH BOULEVARD ST. LOUIS MO 63167 | **Aliases:** | *none* | |

| | | | | |
|---|---|---|---|---|
| 5 | | 20-APR-2022 | DEFENDANT | BAYER AG |
| **Address:** | 100 BAYER BOULEVARD WHIPPANY NJ 07981 | **Aliases:** | *none* | |

| | | | | |
|---|---|---|---|---|
| 6 | | 20-APR-2022 | DEFENDANT | S&H HARDWARE & SUPPLY COMPANY |
| **Address:** | 6700 CASTOR AVENUE PHILADELPHIA PA 19149 | **Aliases:** | *none* | |

| | | | | |
|---|---|---|---|---|
| 7 | | | DEFENDANT | PENN HARDWARE INC |
| **Address:** | 7404 FRANKFORD AVENUE PHILADELPHIA PA 19136 | **Aliases:** | *none* | |

| | | | | |
|---|---|---|---|---|
| 8 | 14 | | DEFENDANT | PENN HARDWARE TWO INC |
| **Address:** | 7404 FRANKFORD AVENUE PHILADELPHIA PA 19136 | **Aliases:** | *none* | |

| | | | | |
|---|---|---|---|---|
| 9 | | 30-NOV-2021 | TEAM LEADER | ANDERS, DANIEL J |
| **Address:** | 529 CITY HALL PHILADELPHIA PA 19107 | **Aliases:** | *none* | |

| | | | | |
|---|---|---|---|---|
| 10 | | | ATTORNEY FOR DEFENDANT | BLUM, JOSEPH H |

| Address: | TWO COMMERCE SQUARE<br>2001 MARKET STREET<br>SUITE 3000<br>PHILADELPHIA PA 19103<br>(215)575-3115<br>jblum@shb.com | Aliases: | *none* | |
|---|---|---|---|---|
| 11 | 10 | | ATTORNEY<br>FOR<br>DEFENDANT | LEFFLER, ERIN L |
| Address: | SHOOK HARDY & BACON, LLP<br>2001 MARKET STREET<br>SUITE 3000<br>PHILADELPHIA PA 19103<br>(215)575-3116<br>eleffler@shb.com | Aliases: | *none* | |
| 12 | 10 | | ATTORNEY<br>FOR<br>DEFENDANT | ROGIERS,<br>KASANDRA N |
| Address: | SHOOK HARDY & BACON LLP<br>TWO COMMERCE SQ<br>2001 MARKET ST SUITE 3000<br>PHILADELPHIA PA 19103<br>(215)278-2555<br>krogiers@shb.com | Aliases: | *none* | |
| 13 | 1 | 02-AUG-<br>2022 | ATTORNEY<br>FOR PLAINTIFF | BALDWIN, KILA B |
| Address: | 130 N. 18TH STREET<br>SUITE 1600<br>PHILADELPHIA PA 19103<br>(215)313-9858<br>kbaldwin@anapolweiss.com | Aliases: | *none* | |
| 14 | | | ATTORNEY<br>FOR<br>DEFENDANT | MCMEEKIN II,<br>JOHN C |
| Address: | RAWLE & HENDERSON<br>THE WIDENER BUILDING<br>ONE SOUTH PENN SQ. 16TH<br>FLOOR<br>PHILADELPHIA PA 19107<br>(215)575-4200<br>toxictortefs@rawle.com | Aliases: | *none* | |

| 15 | | 14 | | ATTORNEY FOR DEFENDANT | ABRAHAM ESQ, ANISHA S |
|---|---|---|---|---|---|
| **Address:** | RAWLE & HENDERSON THE WIDENER BUILDING ONE SOUTH PENN SQ. 16TH FLOOR PHILADELPHIA PA 19103 (215)575-4287 aabraham@rawle.com | | **Aliases:** | *none* | |

| 16 | | 1 | | ATTORNEY FOR PLAINTIFF | KLINE, THOMAS R |
|---|---|---|---|---|---|
| **Address:** | KLINE & SPECTER 1525 LOCUST ST., 19TH FL. PHILADELPHIA PA 19102 (215)772-1000 tom.kline@klinespecter.com | | **Aliases:** | *none* | |

| 17 | | 14 | | ATTORNEY FOR DEFENDANT | KURTZMAN, JEFFREY |
|---|---|---|---|---|---|
| **Address:** | KURTZMAN STEADY LLC 555 CITY AVENUE SUITE 480 BALA CYNWYD PA 19004 (215)839-1222 Kurtzman@kurtzmansteady.com | | **Aliases:** | *none* | |

| 18 | | 14 | | ATTORNEY FOR DEFENDANT | REMICK, BRADLEY D |
|---|---|---|---|---|---|
| **Address:** | 2000 MARKET STREET SUITE 2300 PHILADELPHIA PA 19103 (215)575-2762 tmgrace@mdwcg.com | | **Aliases:** | *none* | |

| 19 | | 11-MAY-2022 | TEAM LEADER | COHEN, DENIS P |
|---|---|---|---|---|
| **Address:** | 656 CITY HALL PHILADELPHIA PA 19107 | **Aliases:** | *none* | |

| 20 | | 1 | | ATTORNEY FOR PLAINTIFF | DONNELLY, LORRAINE |
|---|---|---|---|---|---|
| **Address:** | 1525 LOCUST ST<br>PHILADELPHIA PA 19102<br>(215)772-1000<br>lorraine.donnelly@klinespecter.com | | **Aliases:** | *none* | |
| | | | | | |
| 21 | | 1 | | ATTORNEY FOR PLAINTIFF | LAWLESS, HELEN A |
| **Address:** | KLINE & SPECTER, P.C.<br>1525 LOCUST STREET<br>PHILADELPHIA PA 19102<br>(215)772-0547<br>helen.lawless@klinespecter.com | | **Aliases:** | *none* | |
| | | | | | |
| 22 | | 1 | | ATTORNEY FOR PLAINTIFF | MILLROOD, TOBIAS L |
| **Address:** | KLINE & SPECTER<br>1525 LOCUST ST.<br>19TH FLOOR<br>PHILADELPHIA PA 19102<br>(215)772-1358<br>Tobi.Millrood@klinespecter.com | | **Aliases:** | *none* | |
| | | | | | |
| 23 | | | | TEAM LEADER | FLETMAN, ABBE F |
| **Address:** | 229A CITY HALL<br>PHILADELPHIA PA 19107<br>(215)686-2636 | | **Aliases:** | *none* | |
| | | | | | |
| 24 | | 10 | | ATTORNEY FOR DEFENDANT | SCHURKO ESQUIRE, NICOLAI A |
| **Address:** | SHOOK HARDY & BACON<br>2001 MARKET ST<br>30TH FLOOR<br>PHILADELPHIA PA 19103<br>(215)575-3129<br>nschurko@shb.com | | **Aliases:** | *none* | |
| | | | | | |
| 25 | | 10 | | ATTORNEY FOR DEFENDANT | ROMEO, KATELYN A |
| **Address:** | TWO COMMERCE SQUARE<br>2001 MARKET STREET | | **Aliases:** | *none* | |

| | | | | |
|---|---|---|---|---|
| | SUITE 3000<br>PHILADELPHIA PA 19103-4196<br>(215)278-2555<br>kromeo@shb.com | | | |

| 26 | 10 | | ATTORNEY<br>FOR<br>DEFENDANT | SULLIVAN ESQ,<br>THOMAS J |
|---|---|---|---|---|
| **Address:** | SHOOK HARDY & BACON LLP<br>TWO COMMERCE SQUARE<br>2001 MARKET ST SUITE 3000<br>PHILADELPHIA PA 19103<br>(215)278-2555<br>tsullivan@shb.com | **Aliases:** | *none* | |

| 27 | 1 | | ATTORNEY<br>FOR PLAINTIFF | GOMEZ,<br>CHRISTOPHER A |
|---|---|---|---|---|
| **Address:** | 1525 LOCUST STREET<br>19TH FLOOR<br>PHILADELPHIA PA 19102<br>(215)772-1000<br>chris.gomez@klinespecter.com | **Aliases:** | *none* | |

| 28 | | | ATTORNEY<br>PRO HAC VICE | MOTT, DALTON R |
|---|---|---|---|---|
| **Address:** | SHOOK, HARDY & BACON LLP<br>2555 GRAND BOULEVARD<br>KANSAS CITY MO 64108 | **Aliases:** | *none* | |

| 29 | 1 | | ATTORNEY<br>FOR PLAINTIFF | MERK, MELISSA A |
|---|---|---|---|---|
| **Address:** | KLINE & SPECTER, PC<br>1525 LOCUST ST.<br>PHILADELPHIA PA 19102<br>(215)792-5618<br>Melissa.Merk@klinespecter.com | **Aliases:** | *none* | |

## Docket Entries

| Filing<br>Date/Time | Docket Type | Filing Party | Disposition<br>Amount |
|---|---|---|---|
| 29-JUN-2021<br>02:01 PM | ACTIVE CASE | | |

| Docket Entry: | E-Filing Number: 2106055896 | | |
|---|---|---|---|
| | | | |
| 29-JUN-2021 02:01 PM | COMMENCEMENT CIVIL ACTION JURY | BOSWORTH ESQ, THOMAS E | |
| Documents: | Final Cover | | |
| Docket Entry: | *none.* | | |
| | | | |
| 29-JUN-2021 02:01 PM | COMPLAINT FILED NOTICE GIVEN | BOSWORTH ESQ, THOMAS E | |
| Documents: | COMPLAINT.pdf | | |
| Docket Entry: | COMPLAINT WITH NOTICE TO DEFEND WITHIN TWENTY (20) DAYS AFTER SERVICE IN ACCORDANCE WITH RULE 1018.1 FILED. | | |
| | | | |
| 29-JUN-2021 02:01 PM | JURY TRIAL PERFECTED | BOSWORTH ESQ, THOMAS E | |
| Docket Entry: | 12 JURORS REQUESTED. | | |
| | | | |
| 29-JUN-2021 02:01 PM | WAITING TO LIST CASE MGMT CONF | BOSWORTH ESQ, THOMAS E | |
| Docket Entry: | *none.* | | |
| | | | |
| 30-JUN-2021 04:13 PM | ENTRY OF APPEARANCE-CO COUNSEL | BOSWORTH ESQ, THOMAS E | |
| Documents: | EOA (TRK).pdf | | |
| Docket Entry: | ENTRY OF APPEARANCE OF THOMAS E BOSWORTH AS CO-COUNSEL FILED. (FILED ON BEHALF OF CARMELA CARANCI AND ERNEST CARANCI) | | |
| | | | |
| 01-JUL-2021 01:56 PM | AFFIDAVIT OF SERVICE FILED | BOSWORTH ESQ, THOMAS E | |
| Documents: | AOS - Bayer AG.pdf | | |
| Docket Entry: | AFFIDAVIT OF SERVICE OF PLAINTIFF'S COMPLAINT UPON BAYER AG BY PERSONAL SERVICE ON 06/30/2021 FILED. (FILED ON BEHALF OF CARMELA CARANCI AND ERNEST CARANCI) | | |
| | | | |

| 02-JUL-2021 07:39 AM | AFFIDAVIT OF SERVICE FILED | | |
|---|---|---|---|
| **Documents:** | 180315.01_AFFIDAVIT_61AD006F-DA15-274F-96BC-72DC35F66C33.pdf | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF CIVIL ACTION COMPLAINT UPON S&H HARDWARE & SUPPLY COMPANY BY PERSONAL SERVICE ON 06/29/2021 FILED. | | |

| 02-JUL-2021 07:43 AM | AFFIDAVIT OF SERVICE FILED | | |
|---|---|---|---|
| **Documents:** | 180315.02_AFFIDAVIT_BEAD5BE1-52B0-8C41-B013-693093621C28.pdf | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF CIVIL ACTION COMPLAINT UPON PENN HARDWARE INC BY PERSONAL SERVICE ON 06/29/2021 FILED. | | |

| 02-JUL-2021 07:47 AM | AFFIDAVIT OF SERVICE FILED | | |
|---|---|---|---|
| **Documents:** | 180315.03_AFFIDAVIT_739D01CF-764E-FD4A-892B-63F5CFC6C650.pdf | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF CIVIL ACTION COMPLAINT UPON PENN HARDWARE TWO INC BY PERSONAL SERVICE ON 06/29/2021 FILED. | | |

| 02-JUL-2021 04:42 PM | AFFIDAVIT OF SERVICE FILED | BOSWORTH ESQ, THOMAS E | |
|---|---|---|---|
| **Documents:** | AOS - Monsanto Company.pdf | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF PLAINTIFF'S COMPLAINT UPON MONSANTO COMPANY BY PERSONAL SERVICE ON 06/29/2021 FILED. (FILED ON BEHALF OF CARMELA CARANCI AND ERNEST CARANCI) | | |

| 19-JUL-2021 03:11 PM | ANSWER TO COMPLAINT FILED | BLUM, JOSEPH H | |
|---|---|---|---|
| **Documents:** | CARANCI-Monsanto Answer to Complaint.pdf | | |
| **Docket Entry:** | ANSWER WITH NEW MATTER TO PLAINTIFF'S COMPLAINT FILED. (FILED ON BEHALF OF MONSANTO COMPANY) ENTRY OF APPEARANCE FILED ON BEHALF OF MONSANTO COMPANY. | | |

| 19-JUL-2021 03:11 PM | JURY TRIAL PERFECTED | BLUM, JOSEPH H | |
|---|---|---|---|
| **Docket Entry:** | 12 JURORS REQUESTED. | | |

| 19-JUL-2021 05:32 PM | ENTRY OF APPEARANCE | LEFFLER, ERIN L | |
|---|---|---|---|
| **Documents:** | Leffler Appearance.pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF ERIN L LEFFLER FILED. (FILED ON BEHALF OF MONSANTO COMPANY) | | |
| | | | |
| 19-JUL-2021 05:34 PM | ENTRY OF APPEARANCE | ROGIERS, KASANDRA N | |
| **Documents:** | Rogiers Appearance.pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF KASANDRA N ROGIERS FILED. (FILED ON BEHALF OF MONSANTO COMPANY) | | |
| | | | |
| 28-JUL-2021 02:14 PM | ENTRY OF APPEARANCE-CO COUNSEL | BALDWIN, KILA B | |
| **Documents:** | Entry of Appearance as Co-Counsel for Plaintiffs (Kila B, Baldwin).pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF KILA B BALDWIN AS CO-COUNSEL FILED. (FILED ON BEHALF OF CARMELA CARANCI AND ERNEST CARANCI) | | |
| | | | |
| 29-JUL-2021 01:06 PM | ENTRY OF APPEARANCE | MCMEEKIN II, JOHN C | |
| **Documents:** | Caranci - Penn Hardware Two, Inc. EOA.pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF JOHN C MCMEEKIN AND ANISHA S ABRAHAM FILED. (FILED ON BEHALF OF PENN HARDWARE TWO INC) | | |
| | | | |
| 30-JUL-2021 10:08 AM | PRAECIPE TO REINSTATE CMPLT | BALDWIN, KILA B | |
| **Documents:** | Praecipe to Reinstate Complaint.pdf | | |
| **Docket Entry:** | COMPLAINT WITH NOTICE TO DEFEND WITHIN TWENTY (20) DAYS AFTER SERVICE IN ACCORDANCE WITH RULE 1018.1 REINSTATED. (FILED ON BEHALF OF CARMELA CARANCI AND ERNEST CARANCI) | | |
| | | | |
| 30-JUL-2021 10:52 AM | ENTRY OF APPEARANCE-CO COUNSEL | KLINE, THOMAS R | |
| **Documents:** | EOA - Thomas R, Kline.pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF THOMAS R KLINE AS CO-COUNSEL FILED. (FILED ON BEHALF OF CARMELA CARANCI AND ERNEST CARANCI) | | |
| | | | |

| 30-JUL-2021 04:23 PM | PRELIMINARY OBJECTIONS | MCMEEKIN II, JOHN C | |
|---|---|---|---|
| **Documents:** | Caranci - Penn Hardware Two Inc PO to Pltf Complaint.pdf | | |
| **Docket Entry:** | 07-21076807 PRELIMINARY OBJECTIONS TO PLAINTIFFS' COMPLAINT FILED. RESPONSE DATE: 08/19/2021 (FILED ON BEHALF OF PENN HARDWARE TWO INC) | | |
| | | | |
| 05-AUG-2021 12:06 PM | REPLY TO NEW MATTER | BALDWIN, KILA B | |
| **Documents:** | Pl Reply to Deft Monsanto Company New Matter.pdf | | |
| **Docket Entry:** | REPLY TO NEW MATTER OF MONSANTO COMPANY FILED. (FILED ON BEHALF OF CARMELA CARANCI AND ERNEST CARANCI) | | |
| | | | |
| 19-AUG-2021 11:23 AM | AMENDED COMPLAINT FILED | BALDWIN, KILA B | |
| **Documents:** | Amended Complaint .pdf | | |
| **Docket Entry:** | AMENDED COMPLAINT WITH NOTICE TO DEFEND WITHIN TWENTY(20) DAYS AFTER SERVICE IN ACCORDANCE WITH RULE 1018.1 FILED. (FILED ON BEHALF OF CARMELA CARANCI AND ERNEST CARANCI) | | |
| | | | |
| 23-AUG-2021 10:40 AM | PRELIM OBJECTIONS-MARKED MOOT | | |
| **Docket Entry:** | 07-21076807 AMENDED COMPLAINT FILED 08/19/21 | | |
| | | | |
| 23-AUG-2021 02:50 PM | DEFERRED - BANKRUPTCY | KURTZMAN, JEFFREY | |
| **Documents:** | SH Hardware - Suggestion of Bankruptcy - Caranci copy.pdf | | |
| **Docket Entry:** | PRAECIPE TO DEFER CASE DUE TO PENDING BANKRUPTCY ACTION UNDER CASE NUMBER: NONE (FILED ON BEHALF OF S&H HARDWARE & SUPPLY COMPANY) | | |
| | | | |
| 26-AUG-2021 08:38 AM | PRAECIPE TO REINSTATE CMPLT | BALDWIN, KILA B | |
| **Documents:** | Praecipe to Reinstate Complaint 8.25.21 w-attachment.pdf | | |
| **Docket Entry:** | COMPLAINT WITH NOTICE TO DEFEND WITHIN TWENTY (20) DAYS AFTER SERVICE IN ACCORDANCE WITH RULE 1018.1 REINSTATED. (FILED ON BEHALF OF CARMELA CARANCI AND ERNEST CARANCI) | | |

| 26-AUG-2021 08:41 AM | PRAECIPE TO REINSTATE CMPLT | BALDWIN, KILA B | |
| --- | --- | --- | --- |
| **Documents:** | Praecipe to Reinstate Amended CP w-attachment.pdf | | |
| **Docket Entry:** | AMENDED COMPLAINT WITH NOTICE TO DEFEND WITHIN TWENTY (20) DAYS AFTER SERVICE IN ACCORDANCE WITH RULE 1018.1 REINSTATED. (FILED ON BEHALF OF CARMELA CARANCI AND ERNEST CARANCI) | | |

| 07-SEP-2021 03:01 PM | ENTRY OF APPEARANCE | BLUM, JOSEPH H | |
| --- | --- | --- | --- |
| **Documents:** | Blum Appearance.pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF JOSEPH H BLUM FILED. (FILED ON BEHALF OF PENN HARDWARE TWO INC) | | |

| 07-SEP-2021 03:07 PM | ENTRY OF APPEARANCE | LEFFLER, ERIN L | |
| --- | --- | --- | --- |
| **Documents:** | Leffler Appearance.pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF ERIN L LEFFLER FILED. (FILED ON BEHALF OF PENN HARDWARE TWO INC) | | |

| 07-SEP-2021 03:10 PM | ENTRY OF APPEARANCE | ROGIERS, KASANDRA N | |
| --- | --- | --- | --- |
| **Documents:** | Rogiers Appearance.pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF KASANDRA N ROGIERS FILED. (FILED ON BEHALF OF PENN HARDWARE TWO INC) | | |

| 28-OCT-2021 04:42 PM | STIPULATION FILED | BLUM, JOSEPH H | |
| --- | --- | --- | --- |
| **Documents:** | Joint Stipulation.pdf | | |
| **Docket Entry:** | 88-21105288 STIPULATION TO ENTER THREE PROPOSED ORDERS FILED. AWAITING JUDICIAL APPROVAL (FILED ON BEHALF OF PENN HARDWARE TWO INC AND MONSANTO COMPANY) | | |

| 29-OCT-2021 10:14 AM | ENTRY OF APPEARANCE | REMICK, BRADLEY D | |
| --- | --- | --- | --- |
| **Documents:** | Caranci Entry of Appearance.pdf | | |
| **Docket** | ENTRY OF APPEARANCE OF BRADLEY D REMICK FILED. (FILED ON BEHALF | | |

| | | | |
|---|---|---|---|
| **Entry:** | OF PENN HARDWARE TWO INC) | | |

| | | | |
|---|---|---|---|
| 29-OCT-2021 10:14 AM | JURY TRIAL PERFECTED | REMICK, BRADLEY D | |
| **Docket Entry:** | 12 JURORS REQUESTED. | | |

| | | | |
|---|---|---|---|
| 29-OCT-2021 02:06 PM | STIPULATION ASSIGNED | | |
| **Docket Entry:** | 88-21105288 STIPULATION FILED ASSIGNED TO JUDGE: ANDERS, DANIEL J. ON DATE: OCTOBER 29, 2021 | | |

| | | | |
|---|---|---|---|
| 08-NOV-2021 06:30 AM | STIPULATION APPROVED | ANDERS, DANIEL J | |
| **Documents:** | STPAP_34.pdf | | |
| **Docket Entry:** | 88-21105288 THE STIPUATION AS TO CONFIDENTIALITY AND PROTECTIVE ORDER, ORDER GOVENING PRIVILEGE LOGS, AND ORDER GOVERNING PROTOCOLS FOR DISCOVERY OF ELECTRONICALLY STORED INFORMATION, IS APPROVED AS SET FORTH IN STIPULATION. SEE STIPULATION FOR FURTHER DETAILS. ...BY THE COURT; ANDERS, J. 10-29-21 | | |

| | | | |
|---|---|---|---|
| 08-NOV-2021 06:30 AM | NOTICE GIVEN UNDER RULE 236 | | |
| **Docket Entry:** | NOTICE GIVEN ON 12-NOV-2021 OF STIPULATION APPROVED ENTERED ON 08-NOV-2021. | | |

| | | | |
|---|---|---|---|
| 19-NOV-2021 08:29 AM | PRAECIPE TO REINSTATE CMPLT | BALDWIN, KILA B | |
| **Documents:** | Praecipe to Reinstate Complaint - 11.19.21.pdf | | |
| **Docket Entry:** | COMPLAINT WITH NOTICE TO DEFEND WITHIN TWENTY (20) DAYS AFTER SERVICE IN ACCORDANCE WITH RULE 1018.1 REINSTATED. (FILED ON BEHALF OF CARMELA CARANCI AND ERNEST CARANCI) | | |

| | | | |
|---|---|---|---|
| 18-FEB-2022 03:44 PM | PRAECIPE TO REINSTATE CMPLT | BALDWIN, KILA B | |
| **Documents:** | Praecipe to Reinstate CP 2.18.22.pdf | | |
| **Docket Entry:** | COMPLAINT WITH NOTICE TO DEFEND WITHIN TWENTY (20) DAYS AFTER SERVICE IN ACCORDANCE WITH RULE 1018.1 REINSTATED. (FILED ON BEHALF OF CARMELA CARANCI AND ERNEST CARANCI) | | |

| 09-MAR-2022 07:59 AM | ENTRY OF APPEARANCE-CO COUNSEL | DONNELLY, LORRAINE | |
|---|---|---|---|
| **Documents:** | Caranci - Praecipe to Enter Appearance as Co-Counsel for Plts (Lorraine Donnelly).pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF LORRAINE DONNELLY AS CO-COUNSEL FILED. (FILED ON BEHALF OF CARMELA CARANCI AND ERNEST CARANCI) | | |

| 22-MAR-2022 03:59 PM | ENTRY OF APPEARANCE-CO COUNSEL | LAWLESS, HELEN A | |
|---|---|---|---|
| **Documents:** | Carancini Praecipe to Enter Appearance as Co Counsel for Pltf - HAL.pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF HELEN A LAWLESS AS CO-COUNSEL FILED. (FILED ON BEHALF OF CARMELA CARANCI AND ERNEST CARANCI) | | |

| 20-APR-2022 10:36 AM | ENTRY OF APPEARANCE-CO COUNSEL | MILLROOD, TOBIAS L | |
|---|---|---|---|
| **Documents:** | Praecipe to Enter Appearance as Co Counsel for Plaintiff - Caranci.pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF TOBIAS L MILLROOD AS CO-COUNSEL FILED. (FILED ON BEHALF OF CARMELA CARANCI AND ERNEST CARANCI) | | |

| 20-APR-2022 02:54 PM | STIPULATION FILED | BLUM, JOSEPH H | |
|---|---|---|---|
| **Documents:** | Ernest Caranci - Stip to Discontinue Bayer AG (wo prej).pdf | | |
| **Docket Entry:** | STIPULATION TO DISCONTINUE CLAIMS AGAINST DEFENDANT BAYER AG, WITHOUT PREJUDICE FILED. (FILED ON BEHALF OF MONSANTO COMPANY) | | |

| 20-APR-2022 02:57 PM | STIPULATION FILED | BLUM, JOSEPH H | |
|---|---|---|---|
| **Documents:** | Ernest Caranci - Stip to Discontinue SH Hardware (w prej).pdf | | |
| **Docket Entry:** | STIPULATION TO DISCONTINUE CLAIMS AGAINST DEFENDANT S&H HARDWARE & SUPPLY CO., WITH PREJUDICE FILED. (FILED ON BEHALF OF MONSANTO COMPANY) | | |

| 11-MAY-2022 11:53 AM | REMOVED FROM DEFERRED STATUS | | |
|---|---|---|---|
| **Docket Entry:** | CASE REMOVED FROM DEFERRED STATUS. CASE DISCONTINUED AS TO BANKRUPT DEFT. SEE STIPULATION FILED 4/20/22 (JNS/COMPLEX LIT CENTER) | | |

| 11-MAY-2022 11:53 AM | TRANSFERRED TO MASS TORT | | |
|---|---|---|---|
| **Docket Entry:** | CASE TRANSFERRED TO MASS TORT. SEE COORDINATION ORDER UNDER MASTER DOCKET, CASE #220500550 (JNS/COMPLEX LIT CENTER) | | |
| | | | |
| 11-MAY-2022 11:53 AM | WAITING FOR LISTING MASS TORT | | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 02-AUG-2022 04:34 PM | WITHDRAWAL OF APPEARANCE | BALDWIN, KILA B | |
| **Documents:** | Caranci - Withdrawal of Appearance as Co-Counsel for Pltf - Kila Baldwin.pdf | | |
| **Docket Entry:** | WITHDRAWAL OF APPEARANCE OF KILA B. BALDWIN FILED. (FILED ON BEHALF OF CARMELA CARANCI AND ERNEST CARANCI) | | |
| | | | |
| 02-DEC-2022 10:49 AM | ENTRY OF APPEARANCE | SCHURKO ESQUIRE, NICOLAI A | |
| **Documents:** | Caranci-Appearances OBO Defendants.pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF KATELYN A ROMEO AND NICOLAI A SCHURKO FILED. (FILED ON BEHALF OF PENN HARDWARE TWO INC AND MONSANTO COMPANY) | | |
| | | | |
| 02-DEC-2022 10:49 AM | JURY TRIAL PERFECTED | SCHURKO ESQUIRE, NICOLAI A | |
| **Docket Entry:** | 12 JURORS REQUESTED. | | |
| | | | |
| 31-JAN-2023 01:05 PM | COMPLAINT - SHORT FORM | DONNELLY, LORRAINE | |
| **Documents:** | Caranci - Roundup PCCP Short Form Complaint - final filed.pdf | | |
| **Docket Entry:** | COMPLAINT - SHORT FORM FILED. (FILED ON BEHALF OF CARMELA CARANCI AND ERNEST CARANCI) | | |
| | | | |
| 15-FEB-2023 03:36 PM | ENTRY OF APPEARANCE | SULLIVAN ESQ, THOMAS J | |
| **Documents:** | Caranci-Sullivan Appearance OBO Defendants.pdf | | |

| Docket Entry: | ENTRY OF APPEARANCE OF THOMAS J SULLIVAN ESQ FILED. (FILED ON BEHALF OF PENN HARDWARE TWO INC AND MONSANTO COMPANY) | | |
|---|---|---|---|
| | | | |
| 17-FEB-2023 03:34 PM | MOT-FOR ADMISSION PRO HAC VICE | SULLIVAN ESQ, THOMAS J | |
| Documents: | 4-Sullivan-Mott-Caranci.pdf Motion CoverSheet Form | | |
| Docket Entry: | 72-23023872 RESPONSE DATE 03/09/2023. (FILED ON BEHALF OF PENN HARDWARE TWO INC AND MONSANTO COMPANY) | | |
| | | | |
| 02-MAR-2023 02:16 PM | MOTION ASSIGNED | | |
| Docket Entry: | 72-23023872 MOT-FOR ADMISSION PRO HAC VICE ASSIGNED TO JUDGE: FLETMAN, ABBE F. ON DATE: MARCH 02, 2023 | | |
| | | | |
| 02-MAR-2023 03:06 PM | ORDER ENTERED/236 NOTICE GIVEN | FLETMAN, ABBE F | |
| Documents: | ORDER_53.pdf | | |
| Docket Entry: | 72-23023872 IT IS HEREBY ORDERED THAT THE MOTION FOR PRO HAC VICE IS GRANTED AND DALTON R. MOTT, ESQUIRE IS HEREBY ADMITTED PRO HAC VICE AS CO-COUNSEL FOR PURPOSES OF THIS MATTER AFTER OBTAINING THE APPROPRIATE CITY OF PHILADELPHIA BUSINESS PRIVILEGE TAX LICENSE, COUNSEL SHALL PAY ALL CITY BUSINESS AND WAGE TAX AS REQUIRED. ...BY THE COURT: FLETMAN, J. 3/2/2023 | | |
| | | | |
| 02-MAR-2023 03:06 PM | NOTICE GIVEN UNDER RULE 236 | | |
| Docket Entry: | NOTICE GIVEN ON 03-MAR-2023 OF ORDER ENTERED/236 NOTICE GIVEN ENTERED ON 02-MAR-2023. | | |
| | | | |
| 03-MAR-2023 11:41 AM | ENTRY OF APPEARANCE-CO COUNSEL | GOMEZ, CHRISTOPHER A | |
| Documents: | Praecipe to Enter Appearance as Co Counsel for Plaintiff - Caranci - CAG.pdf | | |
| Docket Entry: | ENTRY OF APPEARANCE OF CHRISTOPHER A GOMEZ AS CO-COUNSEL FILED. (FILED ON BEHALF OF CARMELA CARANCI AND ERNEST CARANCI) | | |
| | | | |
| 03-MAR-2023 11:49 AM | ENTRY OF APPEARANCE-CO COUNSEL | MERK, MELISSA A | |
| Documents: | Praecipe to Enter Appearance as Co Counsel for Plaintiff - Caranci - Melissa Merk.pdf | | |

| Docket Entry: | ENTRY OF APPEARANCE OF MELISSA A MERK AS CO-COUNSEL FILED. (FILED ON BEHALF OF CARMELA CARANCI AND ERNEST CARANCI) | | |
|---|---|---|---|
| | | | |
| 10-MAR-2023 05:02 PM | MOT-FOR ADMISSION PRO HAC VICE | BLUM, JOSEPH H | |
| Documents: | Joseph Piorkowski PHV-Caranci (Blum).pdf<br>Motion CoverSheet Form | | |
| Docket Entry: | 09-23032609 RESPONSE DATE 04/03/2023. (FILED ON BEHALF OF PENN HARDWARE TWO INC AND MONSANTO COMPANY) | | |

▶ Case Description   ▶ Related Cases   ▶ Event Schedule   ▶ Case Parties   ▶ Docket Entries

[ E-Filing System ]   [ Search Home ]   [ Return to Results ]

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

**For Prothonotary Use Only (Docket Number)**

**JUNE 2021**

E-Filing Number: 2106055896

**002213**

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| ERNEST CARANCI | MONSANTO COMPANY |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 1235 SEROTA PLACE<br>PHILADELPHIA PA 19115 | 800 N. LINDBERGH BOULEVARD<br>ST. LOUIS MO 63167 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| CARMELA CARANCI | BAYER AG |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 1235 SEROTA PLACE<br>PHILADELPHIA PA 19115 | 100 BAYER BOULEVARD<br>WHIPPANY NJ 07981 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | S&H HARDWARE & SUPPLY CO. |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | 6700 CASTOR AVENUE<br>PHILADELPHIA PA 19149 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION | | |
|---|---|---|---|---|
| 2 | 5 | ☒ Complaint | ☐ Petition Action | ☐ Notice of Appeal |
| | | ☐ Writ of Summons | ☐ Transfer From Other Jurisdictions | |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | |
|---|---|---|---|
| ☐ $50,000.00 or less | ☐ Arbitration | ☐ Mass Tort | ☐ Commerce | ☐ Settlement |
| ☒ More than $50,000.00 | ☒ Jury | ☐ Savings Action | ☐ Minor Court Appeal | ☐ Minors |
| | ☐ Non-Jury | ☐ Petition | ☐ Statutory Appeals | ☐ W/D/Survival |
| | ☐ Other: | | | |

**CASE TYPE AND CODE**

2P - PRODUCT LIABILITY

**STATUTORY BASIS FOR CAUSE OF ACTION**

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | | IS CASE SUBJECT TO COORDINATION ORDER? |
|---|---|---|
| | **FILED**<br>**PRO PROTHY**<br><br>JUN **29** 2021<br><br>**M. RUSSO** | YES          NO |

**TO THE PROTHONOTARY:**

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: <u>ERNEST CARANCI , CARMELA CARANCI</u>

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| THOMAS E. BOSWORTH | KLINE & SPECTER, PC<br>1525 LOCUST STREET<br>19TH FL<br>PHILADELPHIA PA 19102 |

| PHONE NUMBER | FAX NUMBER | |
|---|---|---|
| (215)772-1000 | (215)735-5827 | |

| SUPREME COURT IDENTIFICATION NO. | E-MAIL ADDRESS |
|---|---|
| 323350 | thomas.bosworth@klinespecter.com |

| SIGNATURE OF FILING ATTORNEY OR PARTY | DATE SUBMITTED |
|---|---|
| *THOMAS BOSWORTH* | Tuesday, June 29, 2021, 02:01 pm |

FINAL COPY (Approved by the Prothonotary Clerk)

## COMPLETE LIST OF DEFENDANTS:

1. MONSANTO COMPANY
   800 N. LINDBERGH BOULEVARD
   ST. LOUIS MO 63167
2. BAYER AG
   100 BAYER BOULEVARD
   WHIPPANY NJ 07981
3. S&H HARDWARE & SUPPLY CO.
   6700 CASTOR AVENUE
   PHILADELPHIA PA 19149
4. PENN HARDWARE, INC.
   7404 FRANKFORD AVENUE
   PHILADELPHIA PA 19136
5. PENN HARDWARE TWO, INC.
   7404 FRANKFORD AVENUE
   PHILADELPHIA PA 19136

**KLINE & SPECTER, P.C.**
By:    THOMAS R. KLINE, ESQUIRE
       KILA B. BALDWIN, ESQUIRE
       THOMAS E. BOSWORTH, ESQUIRE
       PHILIP M. PASQUARELLO, ESQUIRE
Attorney I.D. Nos. 28895/94430/323350/326263
1525 Locust Street
Philadelphia, PA 19102
(215) 772-1000
Attorneys for Plaintiffs



*Filed and Attested by the Office of Judicial Records 29 JUN 2021 02:01 pm M. RUSSO*

| | |
|---|---|
| **ERNEST CARANCI** and<br>**CARMELA CARANCI,**<br>1235 Serota Place<br>Philadelphia, PA 19115<br><br>       *Plaintiffs*<br><br>  v.<br><br>**MONSANTO COMPANY**<br>800 N. Lindbergh Blvd.<br>St. Louis, MO 63167<br><br>*And*<br><br>**BAYER AG**<br>100 Bayer Blvd.<br>Whippany, NJ 07981<br><br>*And*<br><br>**S&H HARDWARE & SUPPLY CO.**<br>6700 Castor Ave.<br>Philadelphia, PA 19149<br><br>*And*<br><br>**PENN HARDWARE, INC.**<br>7404 Frankford Ave.<br>Philadelphia, PA 19136<br><br>*And* | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY, PENNSYLVANIA**<br><br>**JUNE TERM, 2021**<br><br>**CIVIL ACTION NO.**<br><br>**JURY TRIAL DEMANDED**<br><br>**CIVIL ACTION –<br>PRODUCT LIABILITY**<br><br>**NOTICE TO PLEAD AND COMPLAINT**<br><br><br><br>**(continued on next page)** |

1

Case ID: 210602213

**PENN HARDWARE TWO, INC.**
7404 Frankford Ave.
Philadelphia, PA 19136

*Defendants.*

## NOTICE TO PLEAD

### NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

**Lawyer Referral Service**
**Philadelphia Bar Association**
**1101 Market Street, 11th Floor**
**Philadelphia, PA 19107**
**(215) 238-6338**

### ADVISO

Le han demandado a used en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte pueda decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

**Lawyer Referral Service**
**Philadelphia Bar Association**
**1101 Market Street, 11th Floor**
**Philadelphia, PA 19107**
**(215) 238-6338**

Case ID: 210602213

## COMPLAINT

## INTRODUCTION

Plaintiffs bring this cause of action against Defendants.  Plaintiff, Ernest Caranci, suffered significant injuries, including, but not limited to, Non Hodgkin's Lymphoma ("NHL"), as a direct and proximate result of Defendants' negligent, reckless, willful, and otherwise wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or sale of the product known as Roundup®("Roundup").  Plaintiffs in this action seek recovery for damages as a result of Ernest Caranci's developing NHL and his resulting injuries, damages, and pain and suffering, all of which was directly and proximately caused by such wrongful conduct by Defendants, the unreasonably dangerous and defective nature of Roundup, and its active ingredient, glyphosate, and the attendant effects of developing NHL.

## THE PARTIES

### PLAINTIFFS

1.      Plaintiff, Ernest Caranci, is an adult citizen and resident of the Commonwealth of Pennsylvania, residing at 1235 Serota Place, Philadelphia, Pennsylvania 19115.

2.      Plaintiff, Carmela Caranci, wife of Ernest Caranci, is an adult citizen and resident of the Commonwealth of Pennsylvania, residing at 1235 Serota Place, Philadelphia, Pennsylvania 19115.

3.      Plaintiffs bring this action for personal injuries and damages sustained due to exposure to Roundup containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"). As a direct and proximate result of being exposed to Roundup, Ernest Caranci developed NHL.

4.      Ernest Caranci was exposed to Roundupthroughout the 1990s and 2000s,.

3

Case ID: 210602213

5.     During that time period, Mr. Caranci would spray Roundup, while wearing gloves, two to three times per week for four to six months of each year.

6.     Ernest Caranci purchased the Roundup he used from S&H Hardware & Supply Co.'s, Penn Hardware, Inc.'s, and Penn Hardware Two, Inc.'s stores, all of which were at all times located in Philadelphia County, Pennsylvania.

7.     All of Plaintiff Ernest Caranci's purchases of Roundup were made in and occurred in Philadelphia County, Pennsylvania.

8.     All of Plaintiff Ernest Caranci's usage of Roundup occurred in Philadelphia County, Pennsylvania.

9.     Plaintiff, Ernest Caranci, developed NHL due to his use of Roundup in Philadelphia County.

10.     Following years of routine and repeated usage of Roundup, Ernest Caranci was diagnosed with NHL. Following his diagnosis, Ernest Caranci suffered numerous effects attendant to NHL, including chemotherapy, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup and Defendants' wrongful conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup.

11.     As a direct and proximate result of being exposed to Roundup, plaintiff Ernest Caranci developed NHL.

12.     As a direct and proximate result of these injuries, Ernest Caranci incurred medical expenses, endured pain and suffering and loss of enjoyment of life, lost wages, lost earning capacity, and has otherwise been damaged in a personal and pecuniary nature.

13.     During the entire time that Ernest Caranci was exposed to Roundup, he did not know that exposure to Roundup was injurious to his health or the health of others.

Case ID: 210602213

## DEFENDANTS

### MONSANTO

14.     Defendant, Monsanto Company ("Monsanto"), is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.   At all relevant times, Monsanto regularly conducted, transacted, and solicited business in Pennsylvania, including in Philadelphia County.

15.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

### BAYER AG

16.     Defendant, Bayer AG, is a German multinational corporation with its global headquarters located in Leverkusen, Germany. At all relevant times, Bayer AG regularly conducted, transacted, and solicited business in Pennsylvania, including in Philadelphia County. Bayer AG's U.S. headquarters is located at 100 Bayer Blvd., Whippany, New Jersey. Bayer AG regularly conducts business in the Commonwealth of Pennsylvania, including in Philadelphia County.

17.     In June of 2018, Bayer AG acquired Defendant Monsanto, including its assets and liabilities, which, in turn, include the Roundup brand, for $66 billion. Through the merger, Bayer AG became the sole shareholder of Monsanto.

18.     Although Monsanto has continued to sell, distribute, and market the Roundup products at issue after the Bayer AG acquisition, on information and belief, Bayer AG undercapitalized Monsanto, exerted substantial control over Monsanto, and/or jointly participated in the commission of tortious and/or fraudulent activity with Monsanto, such that recognizing Bayer AG's distinct corporate form and shielding Bayer AG from liability would defeat public

5

Case ID: 210602213

policy and bring about injustices to plaintiffs, like Ernest Caranci herein, and others similarly situated. Alternatively, following the acquisition, Monsanto has been a mere alter-ego of Bayer. Alternatively, Bayer has been named as a successor to Monsanto.

### S&H HARDWARE & SUPPLY CO.

19.     Defendant, S&H Hardware & Supply Co., is a corporation that was and is incorporated under the laws of and in the Commonwealth of Pennsylvania, with its principal place of business and a registered office located at 6700 Castor Avenue, Philadelphia, Pennsylvania 19149. S&H Hardware & Supply Co. engaged in the marketing, sale, and distribution of a product line of herbicide Roundup, which contains the active ingredient glyphosate.

20.     At all relevant times, S&H Hardware & Supply Co. sold Roundup products to users, including Ernest Caranci, within the Commonwealth of Pennsylvania and City of Philadelphia, including this county, and derived substantial revenue from such sales.

21.     At all relevant times, S&H Hardware & Supply Co. regularly conducted business in Philadelphia County.

### PENN HARDWARE INC. AND PENN HARDWARE TWO, INC.

22.     Defendant, Penn Hardware, Inc., was at all times relevant hereto incorporated under the laws of and in the Commonwealth of Pennsylvania, with its principal place of business and a registered office located at 7404 Frankford Avenue, Philadelphia, Pennsylvania 19136.

23.     At all relevant times, Penn Hardware, Inc., sold Roundup products to users, including Ernest Caranci, within the Commonwealth of Pennsylvania and City of Philadelphia, including this county, and derived substantial revenue from such sales.

24.     At all relevant times, Penn Hardware, Inc. regularly conducted business in Philadelphia County.

Case ID: 210602213

25.     Defendant, Penn Hardware Two, Inc., was at all times relevant hereto incorporated under the laws of and in the Commonwealth of Pennsylvania, with its principal place of business and a registered office located at 7404 Frankford Avenue, Philadelphia, Pennsylvania 19136.

26.     At all relevant times, Penn Hardware Two, Inc., sold Roundup products to users, including Ernest Caranci, within the Commonwealth of Pennsylvania and City of Philadelphia, including this county, and derived substantial revenue from such sales.

27.     At all relevant times, Penn Hardware Two, Inc. regularly conducted business in Philadelphia County.

## JURISDICTION AND VENUE

28.     At all relevant times, Monsanto had, and continues to have, regular and systematic contact with and conducts business in and from the Commonwealth of Pennsylvania, such that it has purposefully availed itself of the laws of the Commonwealth and expects to both sue and be sued in Pennsylvania.  Additionally, Monsanto's presence in the Commonwealth of Pennsylvania satisfies the due process requirements for Pennsylvania courts to exercise jurisdiction over it. Additionally, Monsanto has consented to the exercise of jurisdiction over it by Pennsylvania courts by registering to and conducting business from the Commonwealth of Pennsylvania.

29.     At all relevant times, Monsanto has transacted business in the Commonwealth of Pennsylvania including by: (1) selling and distributing products and merchandise, including Roundup products, in the Commonwealth of Pennsylvania for the purpose of realizing pecuniary benefit from those sales and distributions; (2) shipping products and merchandise, including Roundup products, directly into and through the Commonwealth of Pennsylvania; (3) engaging in business in the Commonwealth of Pennsylvania; and/or (4) owning, using, and/or possessing real property situated in the Commonwealth of Pennsylvania.

Case ID: 210602213

30.     At all relevant times, Monsanto has contracted to supply services or things, including Roundup products, in the Commonwealth of Pennsylvania.

31.     At all relevant times, Bayer AG had, and continues to have, regular and systematic contact with and conducts business in and from the Commonwealth of Pennsylvania, such that it has purposefully availed itself of the laws of the Commonwealth and expects to both sue and be sued in Pennsylvania.  Additionally, Bayer AG's presence in the Commonwealth of Pennsylvania satisfies the due process requirements for Pennsylvania courts to exercise jurisdiction over it. Additionally, Bayer AG has consented to the exercise of jurisdiction over it by Pennsylvania courts by registering to and conducting business from the Commonwealth of Pennsylvania.

32.     At all relevant times, Bayer AG has transacted business in the Commonwealth of Pennsylvania including by: (1) selling and distributing products and merchandise, including Roundup products, in the Commonwealth of Pennsylvania for the purpose of realizing pecuniary benefit from those sales and distributions; (2) shipping products and merchandise, including Roundup products, directly into and through the Commonwealth of Pennsylvania; (3) engaging in business in the Commonwealth of Pennsylvania; and/or (4) owning, using, and/or possessing real property situated in the Commonwealth of Pennsylvania.

33.     At all relevant times, Bayer AG has contracted to supply services or things, including Roundup products, in the Commonwealth of Pennsylvania.

34.     At all relevant times, S&H Hardware & Supply Co. had, and continues to have, regular and systematic contact with and conducts business in and from the Commonwealth of Pennsylvania, such that it has purposefully availed itself of the laws of the Commonwealth and expects to both sue and be sued in Pennsylvania.  Additionally, S&H Hardware & Supply Co.'s presence in the Commonwealth of Pennsylvania satisfies the due process requirements for

Case ID: 210602213

Pennsylvania courts to exercise jurisdiction over it.  Additionally, S&H Hardware & Supply Co. has consented to the exercise of jurisdiction over it by Pennsylvania courts by registering to and conducting business from the Commonwealth of Pennsylvania.

35.     At all relevant times, S&H Hardware & Supply Co. has transacted business in the Commonwealth of Pennsylvania including by: (1) selling and distributing products and merchandise, including Roundup products, in the Commonwealth of Pennsylvania for the purpose of realizing pecuniary benefit from those sales and distributions; (2) shipping products and merchandise, including Roundup products, directly into and through the Commonwealth of Pennsylvania; (3) engaging in business in the Commonwealth of Pennsylvania; and/or (4) owning, using, and/or possessing real property situated in the Commonwealth of Pennsylvania.

36.     At all relevant times, S&H Hardware & Supply Co. has contracted to supply services or things, including Roundup products, in the Commonwealth of Pennsylvania.

37.     At all relevant times, Penn Hardware, Inc., had, and continues to have, regular and systematic contact with and conducts business in and from the Commonwealth of Pennsylvania, such that it has purposefully availed itself of the laws of the Commonwealth and expects to both sue and be sued in Pennsylvania.  Additionally, Penn Hardware, Inc.'s presence in the Commonwealth of Pennsylvania satisfies the due process requirements for Pennsylvania courts to exercise jurisdiction over it. Additionally, Penn Hardware, Inc. has consented to the exercise of jurisdiction over it by Pennsylvania courts by registering to and conducting business from the Commonwealth of Pennsylvania.

38.     At all relevant times, Penn Hardware, Inc. has transacted business in the Commonwealth of Pennsylvania including by: (1) selling and distributing products and merchandise, including Roundup products, in the Commonwealth of Pennsylvania for the purpose

Case ID: 210602213

of realizing pecuniary benefit from those sales and distributions; (2) shipping products and merchandise, including Roundup products, directly into and through the Commonwealth of Pennsylvania; (3) engaging in business in the Commonwealth of Pennsylvania; and/or (4) owning, using, and/or possessing real property situated in the Commonwealth of Pennsylvania.

39.     At all relevant times, Penn Hardware, Inc. has contracted to supply services or things, including Roundup products, in the Commonwealth of Pennsylvania.

40.     At all relevant times, Penn Hardware Two, Inc., had, and continues to have, regular and systematic contact with and conducts business in and from the Commonwealth of Pennsylvania, such that it has purposefully availed itself of the laws of the Commonwealth and expects to both sue and be sued in Pennsylvania.  Additionally, Penn Hardware Two, Inc.'s presence in the Commonwealth of Pennsylvania satisfies the due process requirements for Pennsylvania courts to exercise jurisdiction over it. Additionally, Penn Hardware Two, Inc. has consented to the exercise of jurisdiction over it by Pennsylvania courts by registering to and conducting business from the Commonwealth of Pennsylvania.

41.     At all relevant times, Penn Hardware Two, Inc. has transacted business in the Commonwealth of Pennsylvania including by: (1) selling and distributing products and merchandise, including Roundup products, in the Commonwealth of Pennsylvania for the purpose of realizing pecuniary benefit from those sales and distributions; (2) shipping products and merchandise, including Roundup products, directly into and through the Commonwealth of Pennsylvania; (3) engaging in business in the Commonwealth of Pennsylvania; and/or (4) owning, using, and/or possessing real property situated in the Commonwealth of Pennsylvania.

42.     At all relevant times, Penn Hardware Two, Inc. has contracted to supply services or things, including Roundup products, in the Commonwealth of Pennsylvania.

10

Case ID: 210602213

43.     Venue is proper in Philadelphia County under Pennsylvania Rule of Civil Procedure 2179 because: (1) one or more defendants has a registered office and/or principal place of business located in Philadelphia County; (2) one or more defendants regularly conducts business in Philadelphia County; (3) the cause of action in this case arose in Philadelphia County; and/or (4) one or more transactions or occurrences took place in Philadelphia County out of which the cause of action arose.

## LACK OF FEDERAL SUBJECT MATTER JURISDICTION

44.     This case is not removable because Plaintiffs do not make or allege any claims that implicate a federal question. Additionally, the parties are not completely diverse, as is required to make a case removable on the basis of 28 U.S.C. § 1332 and § 1446. And finally, multiple defendants are residents and citizens of the Commonwealth of Pennsylvania. Any attempts to remove this case to federal court would be frivolous and without legal basis.

## ALLEGATIONS COMMON TO ALL COUNTS

45.     In 1970, Defendant Monsanto Company, Inc. ("Monsanto") discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup.  Roundup is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops.  In addition to the active ingredient glyphosate, Roundup contains the surfactant Polyethoxylated tallow amine (POEA) and/or adjuvants and other so-called "inert" ingredients.  In 2001, glyphosate was the most-used pesticide active ingredient in American agriculture with 85–90 million pounds used annually.  That number grew to 185 million pounds in 2007.[1]  As of 2013, glyphosate was the world's most widely used herbicide.

---

1 Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006–2007 Market Estimates* 14 (2011), *available at* http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.

Case ID: 210602213

46.    Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware.  It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2]  The majority of these seeds are of the Roundup Ready® brand.  The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, because glyphosate can be sprayed in the fields during the growing season without harming the crops.  In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States were Roundup Ready®.[3]

47.    Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[4]  They are ubiquitous in the environment.  Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup is used.[5]  It has been found in food,[6] in the urine of agricultural workers,[7] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[8]

---

2 ETC Group, *Who Will Control the Green Economy?* 22 (2011), *available at* http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.

3 William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.

4 Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

5 *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), *available at* http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also* U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *available at* http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

6 Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup®Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), *available at* http://www.sciencedirect.com/science/article/pii/S0308814613019201.

7 John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), *available at* http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

8 Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), *available at* http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

Case ID: 210602213

48.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

49.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

50.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are Non-Hodgkin's Lymphoma ("NHL") and other hematopoietic cancers, including lymphocytic lymphoma / chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[9]

51.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

52.     Nevertheless, Monsanto, since it began selling Roundup, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment.

---

9 *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra.*

Case ID: 210602213

## FACTS

53.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

54.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.  Treated plants generally die within two to three days.  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

55.     For nearly 40 years, farms across the world have used Roundup without knowing of the dangers its use poses.  That is because when Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment.  Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup—glyphosate—is a probable cause of cancer.  Those most at risk are farm workers and other individuals with workplace exposure to Roundup, such as garden center workers, nursery workers, and landscapers. Agricultural workers are, once again, victims of corporate greed.  Monsanto assured the public that Roundup was harmless.  In order to prove this, Monsanto has championed falsified data and has attacked legitimate studies that revealed Roundup's dangers.  Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup is safe.

### The Discovery of Glyphosate and Development of Roundup

56.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the

14

Case ID: 210602213

mid-1970s under the brand name Roundup.[10]  From the outset, Monsanto marketed Roundup as a "safe" general-purpose herbicide for widespread commercial and consumer use.  It still markets Roundup as safe today.[11]

57.     In addition to the active ingredient glyphosate, Roundup formulations also contain adjuvants and other chemicals, such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing.  Growing evidence suggests that these adjuvants and additional components of Roundup formulations are not, in fact, inert and are toxic in their own right.

### Registration of Herbicides under Federal Law

58.     The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.*  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act.  7 U.S.C. § 136a(a).

59.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.  Registration by the EPA, however, is not an assurance or finding of safety.  The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the

---

10 Monsanto, *Backgrounder, History of Monsanto's Glyphosate Herbicide* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

11 Monsanto, *What is Glyphosate?* (Sep. 2, 2015), http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

Case ID: 210602213

product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment."  7 U.S.C. § 136a(c)(5)(D).

60.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide."  7 U.S.C. § 136(bb).  FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted, or a pesticide allowed to continue to be sold in commerce.

61.    The EPA and the State of California registered Roundup for distribution, sale, and manufacture in the United States and the State of California.

62.    FIFRA generally requires that the registrant, Monsanto in the case of Roundup, conducts the health and safety testing of pesticide products.  The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation.  The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

63.    The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time.  The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration."  7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's recent review and evaluation.

64.    In the case of glyphosate, and therefore Roundup, the EPA had planned on releasing its preliminary risk assessment—in relation to the reregistration process—no later than

Case ID: 210602213

July 2015.  The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup

65.     Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985.  After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer:  "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[12]

66.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed fraud.

67.     In the first instance, Monsanto, in seeking initial registration of Roundup by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup.[13]  IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup.

68.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating

---

12 U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.
13 Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

Case ID: 210602213

to the toxicological impacts of glyphosate.  The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup herbicide to be invalid.[14]  An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens from the uterus from male rabbits."[15]

69.     Three top executives of IBT were convicted of fraud in 1983.

70.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup.  In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[16]

71.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup in 115 countries.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

72.     The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace.  Largely due to the success of Roundup sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly.  But with its patent for glyphosate expiring in the United States in the year

---

14 U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru +1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QF ieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles %5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=an onymous&SortMethod=h%7C- &MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=p%7Cf&De fSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyE ntry=1&SeekPage=x&ZyPURL.

15 Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978)).

16 Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories*, *supra.*

Case ID: 210602213

2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

73.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996.  Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds.  It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup herbicide.

74.     Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready® seeds, Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[17]  Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has known for decades that it falsely advertises the safety of Roundup***

75.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products.  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds, and fish.  Among the representations the NYAG found deceptive and

---

17 David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

Case ID: 210602213

misleading about the human and environmental safety of glyphosate and/or Roundup are the following:

a) "Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences ..."

b) "And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem."

c) "Roundup® biodegrades into naturally occurring elements."

d) "Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e) "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f) "You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

g) "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h) "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i) "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j) "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[18]

---

18 Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

Case ID: 210602213

76.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)      its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b)      its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

c)      its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d)      its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e)      glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f)      its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

77.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so today.

78.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup.  The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[19]

---

19 *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

21

Case ID: 210602213

### Classifications and Assessments of Glyphosate

79.     The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent.  Over time, the IARC Monograph program has reviewed 980 agents.  Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

80.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[20]  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

81.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts.  Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members.  One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment.  Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation.  Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in *The Lancet Oncology*, and within a year after the meeting, the finalized Monograph is published.

82.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data.  The studies must be publicly available and

---

20 World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

Case ID: 210602213

have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

83.     In March 2015, IARC reassessed glyphosate.  The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

84.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112.  For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate.  The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence.  According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

85.     The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

86.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

87.     Exposure pathways are identified as air (especially during spraying), water, and food.  Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

Case ID: 210602213

88.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden.  These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

89.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

90.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells.  One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

91.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma.  A second study reported a positive trend for hemangiosarcoma in male mice.  Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.  A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

92.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption.  Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA).  Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

93.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

94.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[21]  Essentially, glyphosate inhibits the biosynthesis of aromatic

---

21 Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra* at 77.

Case ID: 210602213

amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

95.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[22] While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

96.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate.  This technical fact sheet predates IARC's March 20, 2015 evaluation.   The fact sheet describes the release patterns for glyphosate as follows:

#### Release Patterns

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure

---

22 Anneclare J. De Roos et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Envt'l Health Perspectives 49–54 (2005), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

Case ID: 210602213

may also occur during glyphosate's manufacture, transport storage, and disposal.[23]

97.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[24]

### The Toxicity of Other Ingredients in Roundup

98.     In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendants' Roundup products is more dangerous and toxic than glyphosate alone.  Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[25]

99.     In 2002, a study by Julie Marc, entitled "Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[26]

100.    A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.  The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer.  Failure in the cell-cycle checkpoints leads genomic instability and

---

23 U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate, supra.*

24 Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

25 Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup® herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43–46 (1991).

26 Julie Marc, et al., *Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326–331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.

Case ID: 210602213

subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[27]

101.   In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup's effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone.  The Peixoto study further suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup formulation.[28]

102.   In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.  The study tested dilution levels of Roundup and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food.  The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone.  The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide.  The study confirmed that the adjuvants present in

---

27 Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

28 Francisco Peixoto, *Comparative effects of the Roundup® and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *available at* https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mitochondrial_oxidative_phosphorylation.

Case ID: 210602213

Roundup are not, in fact, inert and that Roundup is potentially far more toxic than its active ingredient glyphosate alone.[29]

103.   The results of these studies were at all times available to Defendants.

104.   Monsanto's chief toxicologist Donna Farmer has admitted that she cannot say that Roundup does not cause cancer because Monsanto has not performed carcinogenicity studies with the formulated product Roundup, the very product that caused Ernest Caranci's NHL.[30]  Indeed, she further admitted that in the 35 years that Monsanto has marketed Roundup to the public, Monsanto has conducted no chronic carcinogenicity studies on the formulated Roundup product merely because EPA did not require that such a study be performed for registration of glyphosate.[31]

105.   Defendants thus knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies of Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Ernest Caranci from Roundup.

106.   Despite its knowledge that Roundup is considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe.

***Monsanto's Industry Ties***

107.   Monsanto has been able to leverage its contacts within the EPA to protect glyphosate and Roundup from scrutiny and review.

108.   Internal Monsanto documents, including email communications, demonstrate that Jess Rowland, former Deputy Division Director, Health Effects Division of the EPA's OPP, and

---

29 Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008), *available at* http://big.assets.huffingtonpost.com/france.pdf.

30 *See* Plaintiffs' Submission in Response to Pretrial Order No. 8, Ex. 7, *In re: Roundup® Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 187-7.

31 *See id.*

Case ID: 210602213

formerly the chair of the CARC (the same committee that inadvertently leaked the EPA's glyphosate report in April 2016), repeatedly and directly intervened on Monsanto's behalf. These same documents reveal that Monsanto was secure in the knowledge that it had allies within the EPA.

109.    To begin, in the months following IARC's initial March 2015 announcement that it had classified glyphosate as a probable carcinogen, Monsanto turned its attention to the EPA's review of glyphosate. In one April 27, 2015 email, Monsanto official Bill Heydens wrote to colleagues to suggest "approaching EPA and…. ask if there is anything that would help them defend the situation?" His colleague Dan Jenkins responded: "I think you and I could get on the phone w Jess Rowland and discuss this pretty openly. He'll give us straight talk."[32]

110.    The following day, Mr. Jenkins spoke to Mr. Rowland by telephone and then relayed the substance of the conversation for his colleagues in an April 28, 2015 email. Specifically, he reported back that with respect to the CARC investigation, Mr. Rowland had stated: "We have enough to sustain our conclusions. Don't need gene tox or epi . . . . I am the chair of the CARC and my folks are running this process for glyphosate in reg review. I have called a CARC meeting in June."[33] Thus, even though the ostensible purpose of the CARC review was to evaluate the exhaustive IARC assessment on glyphosate, and even though the full IARC monograph on glyphosate would not be completed until July 2015, Mr. Rowland had already formed his conclusion months earlier—in April 2015.

111.    Mr. Rowland also intervened to halt another agency's review of glyphosate. When the Agency for Toxic Substances and Disease Registry (ATSDR), a federal public health agency

---

32 *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. D, In re: Roundup® Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-4.
33 *Id.*

Case ID: 210602213

of the U.S. Department of Health and Human Services, announced in February 2015 that it planned to publish a toxicological review of glyphosate, it was Mr. Rowland who helped Monsanto stop the ATSDR's investigation.  In the same April 28, 2015, email discussed above, Mr. Jenkins explained that Mr. Rowland wanted to help Monsanto stop an investigation concerning the carcinogenicity of glyphosate being conducted by ATSDR.[34]  Since ATSDR is not controlled by the EPA, according to Mr. Jenkins, Mr. Rowland had bragged: "If I can kill this I should get a medal."[35]  Jenkins cautioned, however, that Monsanto should not "get your hopes up, I doubt EPA and Jess can kill this; but it's good to know they are going to actually make the effort now to coordinate due to our pressing and their shared concern that ATSDR is consistent in its conclusions with the EPA."[36]  The ATSDR never published its toxicological profile of glyphosate.

112.    Further, the released documents reveal Monsanto's confidence that its allies within the EPA would continue to support glyphosate.  In an internal memo on glyphosate, Monsanto executives wrote: "We know, *but cannot say*, that EPA's Office of Pesticide Program scientists strongly feel that glyphosate does not cause cancer and have defended their written determination internally for months."[37]  Notably, when Mr. Rowland attended the IARC glyphosate meetings as an observed for the EPA, internal communications indicate Monsanto was not displeased with his attendance since, "we all know Jess."[38]

---

34 See id.

35 Id.

36 *Id.*

37 See Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. E, In re: Roundup® Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-5 (emphasis original).

38 *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. G, *In re: Roundup® Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-7.

Case ID: 210602213

### *Recent Worldwide Bans on Roundup/Glyphosate*

113.    Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup become more widely known.   The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which will take effect by the end of 2015.   In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons.   In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are.   Especially children are sensitive to toxic substances and should therefore not be exposed to it."[39]

114.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[40]

115.    France banned the private sale of Roundup and glyphosate following the IARC assessment for Glyphosate.[41]

116.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup.   The Bermuda government explained its ban as follows: "Following a recent scientific

---

[39] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, *available at* http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[40] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, GLOBAL RESEARCH, May 14, 2015, *available at* http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; *see* Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do mercado nacional*, April, 14, 2015, *available at* http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

[41] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup® in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen'*, NEWSWEEK, June 15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

Case ID: 210602213

study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[42]

117.    The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[43]

118.    The government of Colombia announced its ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[44]

### Statement of Concern Regarding Glyphosate-Based Herbicides

119.    On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs).[45]   The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[46]   The researchers drew seven factual conclusions about GBHs:

1.    GBHs are the most heavily applied herbicide in the world
        and usage continues to rise;

---

42 *Health Minister: Importation of Roundup® Weed Spray Suspended*, Today in Bermuda, May, 11 2015, *available at* http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weed-spray-suspended.

43 *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, *available at* http://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/#.VeduYk3bKAw.

44 *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, *available at* http://www.bbc.com/news/world-latin-america-32677411.

45 John P. Myers, et al, *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), *available at* http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

46 *Id.*

Case ID: 210602213

2.      Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

3.      The half-life of glyphosate in water and soil is longer than previously recognized;

4.      Glyphosate and its metabolites are widely present in the global soybean supply;

5.      Human exposures to GBHs are rising;

6.      Glyphosate is now authoritatively classified as a probable human carcinogen; and

7.      Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[47]

120.    The researchers noted that GBH use has increased approximately 100-fold since the 1970s.  Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[48]

121.    The paper attributed uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes

---

[47] *Id.*
[48] *Id.*

33

Case ID: 210602213

between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[49]

122.    Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish."  Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk."   The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[50]

123.    The researchers also critiqued the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[51]

124.    The researchers also called for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be
> undertaken, and . . . this re-examination be accompanied by
> systematic efforts by relevant agencies to monitor GBH levels in
> people and in the food supply, none of which are occurring today.
> The U.S. National Toxicology Program should prioritize a thorough
> toxicological assessment of the multiple pathways now identified as
> potentially vulnerable to GBHs.[52]

---

49 *Id.*

50 *Id.*

51 *Id.*

52 *Id.*

Case ID: 210602213

125.    The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> "[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects."[53]

126.    Despite these stated concerns, Monsanto, to date, has failed to test its formulated Roundup products.

## TOLLING OF THE STATUTE OF LIMITATIONS

127.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

### *Discovery Rule Tolling*

128.    Plaintiff Ernest Caranci suffers from, has suffered from, and acquired an illness and disease, NHL, that has a latency period and does not arise until years after exposure.

129.    Plaintiff Ernest Caranci had no way of knowing about the risks of serious illness associated with the use of and/or exposure to Roundup and glyphosate and/or reasonably discovering his causes of action and/or that his causes of action were attributable to conduct of

---

[53] *Id.*

Case ID: 210602213

another – Defendants – until he was made aware that his NHL could be caused by his use of and/or exposure to Roundup.

130.    Consequently, the discovery rule applies to this case, and the statute of limitations has been tolled and thus does not being to run until the day that Plaintiff and/or Ernest Caranci knew or had reason to know through the exercise of reasonable diligence that Ernest Caranci's NHL was linked to his use of and/or exposure to Roundup.

131.    Within two years of being diagnosed with NHL, Plaintiff Ernest Caranci could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup and glyphosate is injurious to human health.

132.    Plaintiff Ernest Caranci did not know or have reason to know that he suffered his NHL due to the fault of another or due to his use of and/or exposure to Roundup until 2021.

133.    The very first time plaintiff Ernest Caranci knew or had reason to believe that he developed NHL due to the fault of another or due to his use of and/or exposure to Roundup occurred within 2021.

134.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

### *Fraudulent Concealment*

135.    The running of the statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and conduct, as alleged above.  Through their affirmative misrepresentations and omissions upon which Ernest Caranci justifiably relied, Defendants actively concealed from Ernest Caranci the true risks associated with use of or exposure to Roundup.

Case ID: 210602213

136.   As a result of Defendants' actions, Ernest Caranci was unaware, and could not reasonably have known or have learned through reasonable diligence, that Ernest Caranci had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

137.   Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of Roundup.  Defendants were under a duty to disclose the true character, quality and nature of Roundup because this was non-public information over which they continue to have exclusive control.  Defendants knew that this information was not available to others, including Ernest Caranci, Ernest Caranci's medical providers and/or their health facilities, yet they failed to disclose the information to the public.

138.   Defendants had the ability to and did spend enormous amounts of money in furtherance of their purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks.  Plaintiff Ernest Caranci and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and they were forced to rely on Defendants' representations.

### *Estoppel*

139.   Defendants were under a continuous duty to disclose to consumers, users and other persons coming into contact with their products, including Plaintiff Ernest Caranci, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup and glyphosate.

140.   Instead, Defendants' knowingly, affirmatively, and actively concealed safety information concerning Roundup and glyphosate and the serious risks associated with the use of and/or exposure to its products.

Case ID: 210602213

141.    Based on the foregoing, Defendants' estopped from relying on any statutes of limitations in defense of this action.

142.    The defendants' negligence, recklessness, fraudulent concealment, strict liability, and all other wrongful conduct as alleged throughout the entirety of this Complaint were factual causes of and/or placed plaintiff Ernest Caranci at an increased risk of harm for and/or were substantial factors in causing and did in fact directly and proximately cause the severe, permanent and grievous personal injuries and damages to Ernest Caranci previously described herein which include:

a)    Cancer;

b)    NHL;

c)    Multiple medical tests and procedures for treatment of NHL;

d)    Increased risk of developing NHL;

e)    Development of NHL;

f)    Multiple hospitalizations;

g)    Past and future conscious physical pain and suffering;

h)    Past and future conscious mental and psychological pain and suffering;

i)    Past and future mental anguish, severe emotional distress, disfigurement, embarrassment, humiliation, depression, anxiety, and fear;

j)    Past and future loss of life's pleasures;

k)    Past and future medical expenses;

l)    Past and future loss of income and wages;

m)    Past and future loss of earning capacity;

n)    Past and future pecuniary losses and damages;

o)    Loss of consortium;

38

Case ID: 210602213

p)     Increased risk of harm; and

q)     All injuries and damages set forth in Ernest Caranci's medical records and otherwise permissible under Pennsylvania law.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

<u>**COUNT ONE: STRICT LIABILITY**</u>
**(Plaintiffs v. All Defendants)**

143.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

144.    All Defendants are in the business of selling Roundup products.

145.    All Defendants had a nondelegable duty to place into the stream of commerce only those products that were free of defects and dangers and, further, to refrain from placing into the stream of commerce products that were in a defective condition, were unreasonably dangerous, that fail to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, and/or for which, on balance, the risks of their design outweigh the benefits of the same.

146.    Defendants Monsanto and/or Bayer AG expected their Roundup products to reach consumers, users, and other persons coming into contact with them, including Ernest Caranci, without substantial change in their condition from when those products were designed and manufactured.

147.    Defendants Monsanto and Bayer AG did, in fact, sell their Roundup products to S&H Hardware & Supply Co., Penn Hardware, Inc., and Penn Hardware Two, Inc. knowing that those Roundup products would reach consumers, users, and other persons coming into contact with

Case ID: 210602213

them, including Plaintiff Ernest Caranci, without substantial change in their condition from when those products were designed and manufactured.

148.    S&H Hardware & Supply Co., Penn Hardware, Inc., and Penn Hardware Two, Inc., in turn, sold those Roundup products to consumers, users, and other persons who came into contact with them, including Ernest Caranci, without substantial change in their condition from when those products were designed and manufactured.

149.    At all relevant times, those Roundup products were in a defective condition, were unreasonably dangerous, failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, and/or on balance, the risks of their design outweighed the benefits of the same, once those products reached consumers, users, and other persons who came into contact with them, including Ernest Caranci.

150.    At all times relevant to this litigation, Ernest Caranci used and/or was exposed to Roundup products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

151.    Plaintiff Ernest Caranci could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure.

152.    The harm caused by Roundup products far outweighed their benefit, rendering the products dangerous to an extent beyond that which an ordinary consumer would contemplate. The Roundup products were and are more dangerous than alternative products and Defendants could have avoided selling the Roundup products in such a dangerous form. Indeed, at the time that Defendants placed these Roundup products into the stream of commerce, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

Case ID: 210602213

153.   Placing these Roundup products into the stream of commerce amounts to willful, wanton, and/or reckless conduct by Defendants.

154.   As a direct and proximate result of the defective design and manufacture of Roundup products, Ernest Caranci developed NHL and was injured catastrophically, including severe pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, death, economic damages, and all the damages alleged throughout the entirety of this complaint.

155.   Therefore, as a result of the unreasonably dangerous condition of the Roundup products, Defendants are strictly liable to Plaintiffs.

156.   The defects in the Roundup products were substantial and contributing factors in causing Ernest Caranci's grave injuries, and, but for Defendants' misconduct and omissions, Plaintiff Ernest Caranci would not have sustained their injuries.

157.   As a direct and proximate result of the defective design and manufacture of Roundup products, Ernest Caranci developed NHL and was injured catastrophically and caused to suffer severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, death, and economic damages, giving rise to Plaintiffs' damages herein.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

### COUNT TWO:  STRICT LIABILITY FOR DEFECTIVE MANUFACTURE AND DESIGN
**(Plaintiffs v. Defendants Monsanto and Bayer AG)**

158.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

Case ID: 210602213

159. Plaintiffs bring this strict liability claim against Defendants Monsanto and Bayer AG for defective manufacture and design.

160. At all relevant times, Defendants Monsanto and Bayer AG engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, users, and other persons coming into contact with them, including Plaintiff Ernest Caranci, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants Monsanto and Bayer AG.

161. At all times relevant to this litigation, Defendants Monsanto and Bayer AG designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by Ernest Caranci, and/or to which Ernest Caranci was exposed, as described above.

162. At all times relevant to this litigation, Defendants Monsanto and Bayer AG's Roundup products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Ernest Caranci.

163. At all times relevant to this litigation, Defendants Monsanto and Bayer AG's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Pennsylvania and throughout the United States, including Ernest Caranci, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants Monsanto and Bayer AG.

164. Defendants Monsanto and Bayer AG's Roundup products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and

42

Case ID: 210602213

marketed by Defendants Monsanto and Bayer AG, were defectively manufactured and designed by Defendants Monsanto and Bayer AG in that when they left the hands of the Defendants Monsanto and Bayer AG's manufacturers and/or suppliers, they were unreasonably dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

165.    Defendants Monsanto and Bayer AG Roundup products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants Monsanto and Bayer AG, were defective in manufacture, design, and formulation in that when they left the hands of Defendants Monsanto and Bayer AG's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

166.    At all relevant times, Defendants Monsanto and Bayer AG's Roundup products created significant risks to the health and safety of consumers and others who were exposed to the products that far outweigh the risks posed by other products on the market used for the same or similar purpose.

167.    Therefore, at all relevant times to this litigation, Defendants Monsanto and Bayer AG's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants, were defective in design and formulation, in one or more of the following ways:

a)    When placed in the stream of commerce, the Roundup products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect.

b)    When placed in the stream of commerce, the Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

43

Case ID: 210602213

c)   When placed in the stream of commerce, the Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d)   Defendants Monsanto and Bayer AG did not sufficiently test, investigate, or study its Roundup products and, specifically, the active ingredient glyphosate.

e)   Defendants Monsanto and Bayer AG failed to test, investigate, or study its formulated Roundup products.

f)   Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

g)   Defendants Monsanto and Bayer AG knew or should have known at the time of marketing its Roundup products that exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

h)   Defendants Monsanto and Bayer AG did not conduct adequate post-marketing surveillance of its Roundup products.

i)   Defendants could have employed safer alternative designs and formulations.

168.   At all times relevant to this litigation, Ernest Caranci used and/or was exposed to Defendants Monsanto and Bayer AG's Roundup products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

169.   Ernest Caranci could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure.

170.   The harm caused by Defendants Monsanto and Bayer AG's Roundup products far outweighed their benefit, rendering Defendants Monsanto and Bayer AG's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants Monsanto and Bayer AG's Roundup products were and are more dangerous than alternative products and Defendants Monsanto and Bayer AG could have designed its Roundup products to make them less dangerous. Indeed, at the time that Defendants Monsanto and Bayer AG designed their Roundup

44

Case ID: 210602213

products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

171.    Defendants Monsanto and Bayer AG's defective design of Roundup amounts to willful, wanton, and/or reckless conduct by Defendants.

172.    As a direct and proximate result of the defective design and manufacture of Roundup products, Ernest Caranci developed NHL and was injured catastrophically and caused to suffer severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, death, and economic damages, giving rise to Plaintiffs' damages herein.

173.    Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Defendants Monsanto and Bayer AG are strictly liable to Plaintiff.

174.    The defects in Defendants Monsanto and Bayer AG's Roundup products were substantial and contributing factors in causing Plaintiffs' damages, and, but for Defendants Monsanto and Bayer AG's misconduct and omissions, Plaintiffs would not have sustained these damages.

175.    As a direct and proximate result of Defendants Monsanto and Bayer AG placing their defective Roundup products into the stream of commerce, Plaintiff suffered the damages set forth herein.

**WHEREFORE,** Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

## COUNT THREE:  STRICT LIABILITY FOR FAILURE TO WARN
### (Plaintiffs v. All Defendants)

176.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

Case ID: 210602213

177.   Plaintiffs bring this strict liability claim against Defendants for failure to warn.

178.   At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and/or promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Ernest Caranci, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and specifically, the active ingredient glyphosate.  These actions were under the ultimate control and supervision of Defendants.

179.   Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and/or otherwise released into the stream of commerce its Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Ernest Caranci and persons responsible for consumers like him, and Defendants therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

180.   At all times relevant to this litigation, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn users, like Ernest Caranci, of the dangers associated with Roundup use and exposure, and a continuing duty to instruct on the proper, safe use of these products.  Defendants, as manufacturers, sellers, and/or distributors of chemical herbicides, are held to the knowledge of experts in the field.

Case ID: 210602213

181.     At the time of manufacture and sale, Defendants could have provided warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

182.     At all times relevant to this litigation, Defendants failed to investigate, study, test, or promote the safety of their Roundup products. Defendants also failed to minimize the dangers to users and consumers of their Roundup products and to those who would foreseeably use or be harmed by Defendants' herbicides, including Plaintiff Ernest Caranci.

183.     Despite the fact that Defendants knew or should have known that Roundup products posed a grave risk of harm, they failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of their products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied, and/or sold the product, and not known to end users and consumers, such as Ernest Caranci.

184.     Defendants knew or should have known that their Roundup and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendants have wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

185.     At all times relevant to this litigation, Defendants' Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products

Case ID: 210602213

throughout Pennsylvania and the United States, including Ernest Caranci, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

186.   At all times relevant to this litigation, Ernest Caranci used and/or was exposed to the use of Defendants' Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

187.   Ernest Caranci could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of his exposure. Ernest Caranci relied upon the skill, superior knowledge, and judgment of Defendants.

188.   Defendants knew or should have known that the minimal warnings disseminated with their Roundup products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

189.   The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Ernest Caranci to utilize the products safely and with adequate protection.  Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to aggressively promote the efficacy of their products, even after they knew or should have known of the unreasonable risks from use or exposure; and/or

48

Case ID: 210602213

concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

190.   To this day, Defendants have failed to adequately and accurately warn of the true risks injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate, a carcinogen.

191.   To this day, Defendants have failed to test, investigate, or study their formulated Roundup products.

192.   As a result of their inadequate warnings, Defendants' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed and sold by Defendants, and used by consumers including Ernest Caranci.

193.   Defendants are liable to Plaintiffs for injuries caused by their failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their Roundup products and the risks associated with the use of or exposure to Roundup and glyphosate.

194.   The defects in Defendants' Roundup products were substantial and contributing factors in causing Plaintiffs' damages, and, but for Defendants' misconduct and omissions, Plaintiffs would not have sustained these damages.

195.   Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup products, Ernest Caranci could have avoided the risk of developing injuries as alleged herein and he could have obtained alternative herbicides.

196.   As a direct and proximate result of Defendants placing their defective Roundup products into the stream of commerce and failing to warn Ernest Caranci of the increased risk of

Case ID: 210602213

cancer associated with the use of and/or exposure to Roundup products as described herein, Ernest Caranci has developed NHL and was injured catastrophically, including having been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, death, and economic damages, including for medical care and treatment.  Plaintiffs will continue to incur damages associated with these Defendants' failures in the future.

WHEREFORE, Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

## COUNT FOUR:  VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES ACT AND CONSUMER PROTECTION LAW, 73 P.S. §§201-1 et seq.
### (Plaintiffs v. All Defendants)

197.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

198.    At all relevant times, Defendants knew or should have known of the unreasonably dangerous and carcinogenic nature of the use of and/or exposure to Roundup.

199.    At all relevant times, Defendants, through labeling, advertisements, public representations and marketing of Roundup, intentionally used deception, fraud, false pretenses, false promises, misrepresentations, misleading statements, and unfair trade practices in order to mislead consumers that Roundup products are safe for use.

200.    At all relevant times, Defendants also engaged in the concealment, suppression and/or omission of material facts in connection with the sale and/or advertisement of Roundup products in trade or commerce.  In particular, Defendants failed to disclose to the public that Roundup is unsafe and poses serious health hazards, particularly NHL and similarly cancers like B-Cell, which Ernest Caranci had.  Defendants were aware of the hazardous risks posed by

Case ID: 210602213

Roundup and yet failed to inform the public of these risks through their advertisements, labeling, or other means available to them. Defendants' failure to state material facts about Roundup constitutes a violation of 73 P.S. §§ 201-1 *et seq.*

201.    At all relevant times, Plaintiff Ernest Caranci was deceived by Defendants' intentional misrepresentations and omissions, including by the orchestrated claims made on or in television commercials, advertising materials, websites, and on product labels and packaging regarding the usage and safety of Roundup.

202.    At all relevant times, Plaintiff Ernest Caranci acted in reasonable reliance upon Defendants' unlawful trade practices, and had the Defendants not engaged in the deceptive conduct described herein, Ernest Caranci would not have purchased Roundup® and/or would have protected himself from exposure to Roundup.

203.    As a direct and proximate result of Defendants' unlawful trade practices, Ernest Caranci developed NHL and was injured catastrophically, having been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, death and economic damages.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

## COUNT FIVE: NEGLIGENCE
### (Plaintiffs v. All Defendants)

204.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

Case ID: 210602213

205.    At all relevant times, Defendants breached their duty to Plaintiff Ernest Caranci and were otherwise negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing Roundup products.

206.    Defendants, directly or indirectly, caused Roundup products to be purchased and/or used by Ernest Caranci.

207.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

208.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of Roundup products.  Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup and, in particular, its active ingredient glyphosate.

209.    At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

210.    Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundupproducts could cause Plaintiff Ernest Caranci's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff Ernest Caranci.

Case ID: 210602213

211.    Defendants knew or, in the exercise of reasonable care, should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff Ernest Caranci from Roundup.

212.    Defendants knew or, in the exercise of reasonable care, should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

213.    Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup and glyphosate-containing products.

214.    As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Roundup products, in that Defendants manufactured, produced, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

215.    Defendants failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect consumers like Ernest Caranci from Roundup.

216.    Despite their ability and means to investigate, study, and test Roundup products and to provide adequate warnings, Defendants have failed to do so.   Indeed, Defendants have

Case ID: 210602213

wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

217.   Defendants' negligence included:

a)   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup products without thorough and adequate pre- and post-market testing;

b)   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c)   Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d)   Failing to test, investigate, or study formulated Roundup products;

e)   Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f)   Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

g)   Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

h)   Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use and/or be exposed to Roundup products;

i)   Failing to disclose to Plaintiff Ernest Caranci, users, consumers, and the general public that the use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

j)   Failing to warn Plaintiff Ernest Caranci, and other users, consumers, and the general public that the product's risk of harm was unreasonable and that

Case ID: 210602213

there were safer and effective alternative herbicides available to Plaintiff, Ernest Caranci, and other users or consumers;

k) Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-containing products;

l) Representing that Roundup products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended use;

m) Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup and glyphosate;

n) Advertising, marketing, and recommending the use of Roundup products, while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of or exposure to Roundup and glyphosate;

o) Continuing to disseminate information to its consumers, which indicate or imply that Roundup products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

p) Continuing the manufacture and sale of Roundup products with the knowledge that the products were unreasonably unsafe and dangerous.

218.    Defendants knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiff Ernest Caranci, would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup.

219.    Plaintiff Ernest Caranci did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

220.    Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff Ernest Caranci suffered, and will continue to suffer, as described herein.

Case ID: 210602213

221.   Defendants' conduct, as described above, was reckless.  Defendants regularly risk the lives of consumers and users of Roundup products, including Plaintiff Ernest Caranci, with full knowledge of the dangers of these products.  Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff Ernest Caranci, with respect to the dangers of Roundup about which Defendants knew but the public, including Plaintiff Ernest Caranci, did not. Defendants' reckless conduct therefore warrants an award of punitive damages.

222.   As a proximate result of Defendants' wrongful acts and omissions in placing defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Ernest Caranci developed NHL and was injured catastrophically, having been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, death, and economic damages, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

## COUNT SIX:  BREACH OF IMPLIED WARRANTIES
### (Plaintiffs v. All Defendants)

223.   Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

224.   At all relevant times, Defendants engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to users, consumers and those

Case ID: 210602213

in proximity to users, including Plaintiff Ernest Caranci, thereby placing Roundup products into the stream of commerce.   These actions were under the ultimate control and supervision of Defendants.

225.   Before the time that Ernest Caranci was exposed to the use of the aforementioned Roundup products, Defendants impliedly warranted to its consumers and users—including Plaintiff Ernest Caranci —that its Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

226.   Defendants, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' damages.

227.   Defendants further failed to test, investigate, or study its formulated Roundup products.

228.   Upon information and belief, Plaintiff Ernest Caranci reasonably relied upon the skill, superior knowledge and judgment of Defendants and upon their implied warranties that the Roundup products were of merchantable quality and fit for their intended purpose or use.

229.   Upon information and belief, Plaintiff Ernest Caranci reasonably relied upon the skill, superior knowledge and judgment of Defendants and upon their implied warranties that the Roundup products were of merchantable quality and fit for their intended purpose or use.

230.   The Roundup products were expected to reach and did in fact reach consumers, users and those in proximity to users, including Plaintiff Ernest Caranci, without substantial change in the condition in which they were manufactured and sold by Defendants.

231.   At all relevant times, Defendants were aware that consumers, users, and those in proximity of users of its products, including Plaintiff Ernest Caranci, would use Roundup products

Case ID: 210602213

as marketed by Defendants, which is to say that Plaintiff Ernest Caranci was a foreseeable user of Roundup.

232.   Defendants intended that their Roundup products be used in the manner in which Ernest Caranci in fact used or was exposed to them and Defendants impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

233.   In reliance upon Defendants' implied warranty, Ernest Caranci used or was in proximity to the use of Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendants.

234.   Plaintiff Ernest Caranci could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

235.   Defendants breached their implied warranties to Plaintiff Ernest Caranci in that their Roundup products were not of merchantable quality, safe, or fit for their intended use, or adequately tested.  Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

236.   The harm caused by Defendants' Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

237.   As a direct and proximate result of Defendants' wrongful acts and omissions Ernest Caranci suffered severe and permanent physical and emotional injuries, including but not limited to and untimely death.  Plaintiffs will continue to incur these expenses in the future.

Case ID: 210602213

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

## COUNT SEVEN: FRAUDULENT CONCEALMENT
### (Plaintiffs v. All Defendants)

238.   Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

239.   Defendants are estopped from asserting a statute of limitations defense because they fraudulently concealed their wrongful conduct from Plaintiff Ernest Caranci with the intent that Plaintiff Ernest Caranci, as well as other consumers and users of Roundup, would justifiability rely on such material representations, on which Plaintiff, Ernest Caranci, and others similarly situated did justifiability rely.

240.   Defendants had actual knowledge that exposure to Roundup and, specifically, its active ingredient, glyphosate, could result in cancer and other severe illnesses and injuries. Defendants knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies of Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff Ernest Caranci from Roundup.

241.   Defendants failed to conduct adequate testing of glyphosate and the Roundup formulation.

242.   Defendants had actual knowledge of its misrepresentations, negligence, breach of warranties, and false, misleading, deceptive, and unconscionable conduct.  Even so, Defendants perpetuated its wrongful conduct with the intent and fixed purpose of concealing its wrongs from Plaintiff, Ernest Caranci, and the public at large. Despite their knowledge that Roundup is

Case ID: 210602213

considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe.

243.   Plaintiff Ernest Caranci was unaware of the falsity of these representations, acted in actual and justifiable reliance on such material misrepresentations, and were injured as a direct and proximate result.

244.   Additionally, Defendants knowingly omitted material information and remained silent regarding said misrepresentations despite the fact that they had a duty to inform Plaintiff Ernest Caranci, and the general public, of the inaccuracy of said misrepresentations, which omission constitutes a positive misrepresentation of material fact, with the intent that Plaintiff, Ernest Caranci, and the general public would rely on Defendants' misrepresentations.

245.   Plaintiff, Ernest Caranci, and the general public did, in fact, act in actual and justifiable reliance on Defendants' representations, and Plaintiff Ernest Caranci suffered damages as a result.

246.   Defendants, as the manufacturers and sellers of Roundup, were in a position of superior knowledge and judgment regarding any potential risks associated with its products.

247.   Defendants committed constructive fraud by breaching one or more legal or equitable duties owed to Plaintiff, Ernest Caranci, and the general public relating to Roundup, said breach or breaches constituting fraud because of their propensity to deceive others or constitute an injury to public interests or public policy.

248.   In breaching its duties to Plaintiff Ernest Caranci, Defendants used their position of trust as the manufacturer and/or distributor of Roundup to increase sales of its products at the expense of informing Plaintiff, Ernest Caranci, and the general public, that use of or exposure to Roundup® carries the risk of serious illness, such as NHL and other similar cancers.

Case ID: 210602213

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

## COUNT EIGHT: LOSS OF CONSORTIUM
### (Plaintiff Carmela Caranci v. All Defendants)

249.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

250.    At all material times hereto, Plaintiff, Carmela Caranci, was and is married to Ernest Caranci.

251.    As a direct and proximate result of the Defendants' negligence, recklessness, fraudulent concealment, strict liability, and all other wrongful conduct as alleged throughout the entirety of this Complaint and as described and incorporated by reference as though fully set forth herein, Carmela Caranci suffered the loss of services, society, comfort and companionship of her husband, Ernest Caranci, in the past and will continue to do so indefinitely into the future.

252.    As a direct and proximate result of the Defendants' negligence, recklessness, fraudulent concealment, strict liability, and all other wrongful conduct as alleged throughout the entirety of this Complaint and as described and incorporated by reference as though fully set forth herein, Carmela Caranci claims the full measure of damages allowable under Pennsylvania law for the loss of consortium of her husband.

253.    Carmela Caranci suffered a loss of consortium for the loss of their spouse's service, society, companionship, aid, affection, and sexual relations as a direct and proximate result of their spouse's injuries due to the acts and/or omissions of the Defendants as outlined throughout the entirety of this Complaint, to which they are entitled compensation.

Case ID: 210602213

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

Respectfully submitted,
**KLINE & SPECTER, P.C.**

By: _____

THOMAS R. KLINE, ESQUIRE
KILA B. BALDWIN, ESQUIRE
THOMAS E. BOSWORTH, ESQUIRE
PHILIP M. PASQUARELLO, ESQUIRE
*Attorneys for Plaintiffs*

Date: 6/29/21

Case ID: 210602213

## VERIFICATION

I, Ernest Caranci, hereby verify that I am the plaintiff in the foregoing action; that the attached Complaint is based upon information which I have furnished to my counsel and information which has been gathered by my counsel in the preparation of the lawsuit. The language of the Complaint is that of counsel and not of affiant. I have read the Complaint and to the extent that the allegations therein are based upon information I have given counsel, they are true and correct to the best of my knowledge, information, and belief. To the extent that the contents of the Complaint are that of counsel, I have relied upon counsel in making this Verification. I understand that false statements made herein are made subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsifications to authorities.

ERNEST CARANCI

**KLINE & SPECTER, P.C.**
By:    THOMAS R. KLINE, ESQUIRE
Attorney Identification No. 28895
1525 Locust Street
Philadelphia, PA   19102
(215) 772-1000



*Filed and Attested by the
Office of Judicial Records
30 JUN 2021 04:13 pm
G. IMPERATO*

*Attorney for Plaintiffs*

| | |
|---|---|
| ERNEST CARANCI and CARMELA CARANCI,<br><br>                            *Plaintiffs*,<br><br>v.<br><br>MONSANTO COMPANY, et al.<br><br>                         *Defendants.* | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br><br><br>JUNE TERM, 2021<br><br><br>NO. 002213 |

## ENTRY OF APPEARANCE

To the Office of Judicial Records:

    Kindly enter my appearance as co-counsel for Plaintiffs in the above captioned matter.

                                  **KLINE & SPECTER, P.C.**

                        By:        _____
                                  THOMAS R. KLINE, ESQUIRE
                                  *Attorney for Plaintiffs*

Date:   6/30/2021

COURT OF COMMON PLEASE OF PHILADELPHIA COUNTY
TRIAL DIVISON

Filed and Attested by the
Office of Judicial Records
01 JUL 2021 01:56 pm
M. RUSSO

ERNEST CARANCI, ET AL,.

Plaintiff(s) – Petitione (s)

V.

E-FILING NUMBER: 2106055896

MONSANTO COMPANY., ET AL.,

Defendant(s) – Respondent(s)

STATE OF NEW JERSEY
COUNTY OF BURLINGTON          ss.:

**Roxanne Elzie**, the undersigned, being duly sworn, deposes and says that I was at the time of service over the age of 18 years and not a party to this action.

On **6/30/2021** at **3:35 PM**, I served a true copy of a **CIVIL COVER SHEET, NOTICE TO PLEAD AND COMPLAINT**, upon **BAYER AG C/O CORPORATION SERVICE COMPANY** at **100 CHARLES EWING BLVD, EWING, NJ 08628** in the manner indicated below:

**Suitable age Person [ X ]**     By delivering a true copy of each and leaving with **DOREEN HASELIN** who is known to be the **SERVICE FACILLITATOR** and a competent member over 14 years of age residing therein.  Said premises is recipients
[  ] usual place of abode within the state      [ x ] actual place of business

**SERVICE NOTE:**     No description available because this is the information provided at the desk where process servers leave documents.

Sworn to before me this
____ day of July, 20 21

Notary Public

Roxanne Elzie
PO Box 25066
Newark, NJ 07102
800-637-1805

Alexander Vays, Esq.
Notary Public
State of New Jersey
New Jersey Attorney ID 068072014

WE SERVE NJ LLC, PO BOX 25066, NEWARK, NJ 07102



**B&R**
Services for Professionals Inc.

235 SOUTH 13TH STREET
PHILADELPHIA, PA 19107
PHONE: (215) 546-7400
FAX: (215) 985-0169

NAPPS
National Association of
Professional Process Servers

Ernest Carnaci. et al

-VS-

Monsanto Company, et al

**COURT** Court of Common Pleas of Pennsylvania
Philadelphia County, Civil

*Filed and Attested by the
Office of Judicial Records
21 JUL 2021 07:39 am
G. IMPERATO*

**CASE NUMBER** 210602213

## AFFIDAVIT

State of  Pennsylvania
County of   Philadelphia

**B&R Control #**  CS180315.01
**Reference Number**

Frederic A. Blum, being duly sworn according to law, deposes and says that he/she is the process server/sheriff herein named, and that the facts set forth below are true and correct to the best of their knowledge, information and belief.

On 6/29/2021 we received the  **Civil Action Complaint** and that service was effected upon **S&H Hardware & Supply Co.** at **6700 Castor Avenue, Philadelphia, PA 19149**  on **6/29/2021** at **4:05 PM**, in the manner described below:

**By service upon:** Andy Schwartz, Person in Charge as an agent or person authorized to accept service at usual place of business.

**Description:**
Gender: **Male**      Race/Skin: **Caucasian**  Age: **60 - 70 Yrs.**         Weight: **Medium Build**  Height: **5ft9in - 6ft0in**     Hair:
**Balding**             Other:

Service Notes:

> Commonwealth of Pennsylvania - Notary Seal
> BRENDA M RAVENELL, Notary Public
> Philadelphia County
> My Commission Expires December 16, 2023
> Commission Number 1266310

**Sworn to and subscribed before me this**
1st **day of** July 2021

**Process Server/Sheriff** _____

_Brenda Ravenell_
**Notary Public**

ATTEMPTS:

Client      Phone (215) 772-1000                    :                **Filed Date:** 6/29/2021 **BR Serve By:** 06/29/2021

Thomas E. Bosworth, Esquire
Kline and Specter, P.C
1525 Locust Street
19th Floor
Philadelphia, PA  19102



ORIGINAL

Case ID: 210602213



235 SOUTH 13TH STREET
PHILADELPHIA, PA 19107
PHONE: (215) 546-7400
FAX: (215) 985-0169



National Association of
Professional Process Servers

Ernest Carnaci, et al

-VS-

Monsanto Company, et al

**COURT** Court of Common Pleas of Pennsylvania
Philadelphia County, Civil

*Filed and Attested by the
Office of Judicial Records
01 JUL 2021 07:43 am
G. IMPERATO*

**CASE NUMBER** 210602213

# AFFIDAVIT

State of  Pennsylvania
County of   Philadelphia

**B&R Control #**  CS180315.02
**Reference Number**

Frederic A. Blum, being duly sworn according to law, deposes and says that he/she is the process server/sheriff herein named, and that the facts set forth below are true and correct to the best of their knowledge, information and belief.

On 6/29/2021 we received the  **Civil Action Complaint** and that service was effected upon **Penn Hardware, Inc.** at **7404 Frankford Avenue, Philadelphia, PA 19136**  on **6/29/2021** at **4:25 PM**, in the manner described below:

**By service upon:** Kim Heo, Owner as an agent or person authorized to accept service at usual place of business.

**Description:**
Gender: **Female**      Race/Skin: **Asian**      Age: **30 - 40 Yrs.**      Weight: **Small Build**      Height: **5ft0in - 5ft3in**
Hair: **Black**      Glasses: **Yes**      Other:

Service Notes:

Commonwealth of Pennsylvania - Notary Seal
BRENDA M  RAVENELL, Notary Public
Philadelphia County
My Commission Expires December 16, 2023
Commission Number 1266310

**Sworn to and subscribed before me this**

1st day of July 2021

**Process Server/Sheriff** _____

**Notary Public**

ATTEMPTS:

Client      Phone (215) 772-1000                    :                    | **Filed Date:** | 6/29/2021 | **BR Serve By:** | 06/29/2021 |

Thomas E. Bosworth, Esquire
Kline and Specter, P.C.
1525 Locust Street
19th Floor
Philadelphia, PA  19102



ORIGINAL

Case ID: 210602213



235 SOUTH 12TH STREET
PHILADELPHIA, PA 19107
PHONE: (215) 546-7400
FAX: (215) 985-0169



National Association of
Professional Process Servers

Ernest Carnaci, et al

   -VS-

Monsanto Company, et al

**COURT** Court of Common Pleas of Pennsylvania
Philadelphia County Civil

*Filed and Attested by the Office of Judicial Records
22 JUL 2021 07:47 am
G. IMPERATO*

**CASE NUMBER** 210602213

# AFFIDAVIT

State of  Pennsylvania
County of   Philadelphia

**B&R Control #**  CS180315.03
**Reference Number**

   Frederic A. Blum, being duly sworn according to law, deposes and says that he/she is the process server/sheriff herein named, and that the facts set forth below are true and correct to the best of their knowledge, information and belief.

   On 6/29/2021 we received the  **Civil Action Complaint** and that service was effected upon **Penn Hardware Two, Inc.** at **7404 Frankford Avenue, Philadelphia, PA 19136**  on **6/29/2021** at **4:25 PM**, in the manner described below:

   **By service upon:** Kim Heo, Owner as an agent or person authorized to accept service at usual place of business.

**Description:**
Gender: **Female**    Race/Skin: **Asian**    Age: **30 - 40 Yrs.**    Weight: **Small Build**    Height: **5ft0in - 5ft3in**
Hair: **Black**    Glasses: **Yes**    Other:

Service Notes:

Commonwealth of Pennsylvania - Notary Seal
BRENDA M RAVENELL, Notary Public
Philadelphia County
My Commission Expires December 16, 2023
Commission Number 1266310

Sworn to and subscribed before me this

1st day of July 2021

**Process Server/Sheriff**

**Notary Public**

ATTEMPTS:

Client   Phone (215) 772-1000    :    | **Filed Date:** 6/29/2021 | **BR Serve By:** |

Thomas E. Bosworth, Esquire
Kline and Specter, P.C.
1525 Locust Street
19th Floor
Philadelphia, PA  19102



ORIGINAL

**IN THE COURT OF COMMON PLEAS OF PENNSYLVANIA**
**COUNTY OF PHILADELPHIA**

*Filed and Attested by the*
*Office of Judicial Records*
*02 JUL 2021 04:42 pm*
*G. IMPERATO*

**ERNEST CARANCI AND CARMELA CARANCI,**          Plaintiff(s) – Petitioner(s)

**V.**                                                                    **CASE ID.:  210602213**

**MONSANTO COMPANY, ET AL.,**                              Defendant(s) – Respondent(s)

---

STATE OF MISSOURI
COUNTY OF ST. LOUIS                     ss.:

**Richard A. Raymond**, the undersigned, being duly sworn, deposes and says that I was at the time of service over the age of 18 years and not a party to this action.

On **6/29/2021** at **3:22 PM**, I served a true copy of a **CIVIL COVER SHEET, NOTICE TO PLEAD AND COMPLAINT** upon **MONSANTO COMPANY C/O CSC** at **9666 OLIVE BLVD SUITE 690, ST. LOUIS, MO 63167**

**Corporation**          By delivering a true copy of each to **GREGORY BROUGH** personally.
**[ X ]**          Deponent knew said corporation served to be the corporation described as the named
          recipient and knew said individual to be the **AUTHORIZED LEGAL AGENT** thereof, and an
          authorized person to accept service of process.

| Approximate Description of Receipt | **Male** | **White** | **Balding** | | **5'9"** | **150 lbs** | |
|---|---|---|---|---|---|---|---|
| | Sex | Skin | Hair Color | Age | Height | Weight | Other |

Richard A. Raymond
1528 S Big Bend
St Louis, MO 63117
800-637-1805

Sworn to before me this
_____ day of _____, 20__

_____
Notary Public

SAMANTHA LYNNE CLARK
Notary Public   Notary Seal
STATE OF MISSOURI
Jefferson County
My Commission Expires:  July 27, 2024
Commission # 20234881

**NOTICE TO PLAINTIFFS:**
You are hereby directed to respond to the
enclosed New Matter within twenty (20) days,
or a default may be entered against you.

Filed and Attested by the
Office of Judicial Records
19 JUL 2021 03:11 pm
E. HAURIN

*/s/ Joseph H. Blum*
**Joseph H. Blum**
*Attorney for Defendant, Monsanto Company*

**SHOOK, HARDY & BACON L.L.P.**
BY:   Joseph H. Blum (Attorney I.D. No. 36874)
      Erin L. Leffler (Attorney I.D. No. 204507)
      KaSandra N. Rogiers (Attorney I.D. No. 306770)
Two Commerce Square
2001 Market Street, Suite 3000
Philadelphia, PA  19103
(215) 278-2555
Jblum@shb.com
Eleffler@shb.com
Krogiers@shb.com

## IN THE COURT OF COMMON PLEAS
## OF PHILADELPHIA COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| ERNEST CARANCI and CARMELA CARANCI, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Division |
| v. | ) ) | Case No. 210602213 |
| MONSANTO COMPANY, *et al.*, | ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) ) | |

## MONSANTO COMPANY'S ANSWER TO PLAINTIFF'S COMPLAINT

Defendant Monsanto Company ("Monsanto"), by and through its counsel, answers

plaintiffs' Complaint ("the Complaint") by generally denying all allegations contained in the

Complaint, except as set forth below.  As defined in the Complaint and as used in this Answer,

Monsanto refers to Monsanto Company, a United States-based company incorporated in

Delaware, and not to other Monsanto-affiliated companies.  Monsanto denies – and objects to –

allegations by plaintiffs that purport to lump Monsanto together with other defendants.

Monsanto responds to the allegations in the Complaint only on behalf of Monsanto and not on

behalf of any other defendant.  Silence as to any allegations shall constitute a denial.  Monsanto

answers the specific, numbered allegations of the Complaint as follows:

In response to the allegations in the unnumbered paragraph under the section titled

"INTRODUCTION," Monsanto admits that plaintiffs purport to assert the specified claims but

denies any liability as to those claims.  Monsanto denies the remaining allegations in the section

titled "INTRODUCTION."

1.      After reasonable investigation, Monsanto lacks information or knowledge

sufficient to form a belief as to the truth of the allegations in paragraph 1 and therefore denies

those allegations.

2.      After reasonable investigation, Monsanto lacks information or knowledge

sufficient to form a belief as to the truth of the allegations in paragraph 2 and therefore denies

those allegations.

3.      In response to the allegations in the first sentence of paragraph 3, Monsanto

admits that plaintiffs purport to seek damages based on exposure to Roundup®-branded products

but denies any liability as to those claims.  Monsanto denies the allegations in the second

sentence of paragraph 3.

4.      After reasonable investigation, Monsanto lacks information or knowledge

sufficient to form a belief as to the truth of the allegations in paragraph 4 and therefore denies

those allegations.

Case ID: 210602213

5.      After reasonable investigation, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 5 and therefore denies those allegations.

6.      After reasonable investigation, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 6 and therefore denies those allegations.

7.      After reasonable investigation, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 7 and therefore denies those allegations.

8.      After reasonable investigation, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 8 and therefore denies those allegations.

9.      Monsanto denies the allegations in paragraph 9.

10.     After reasonable investigation, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 10 and therefore denies those allegations.  Monsanto denies the allegations in the second sentence of paragraph 10.

11.     Monsanto denies the allegations in paragraph 11.

12.     After reasonable investigation, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 12 and therefore denies those allegations.

13.     Monsanto denies that any exposure to Roundup®-branded products can cause NHL and other serious illnesses and therefore denies those allegations in paragraph 13. Monsanto states, however, that the scientific studies upon which the International Agency for

Case ID: 210602213

Research on Cancer ("IARC") purported to base its evaluation of glyphosate were all publicly available before March, 2015. After reasonable investigation, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 13 and therefore denies those allegations.

14.    Monsanto admits the allegations in the first sentence of paragraph 14. The allegations in the second sentence of paragraph 14 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

15.    In response to the allegations in paragraph 15, Monsanto admits that it was the entity that discovered the herbicidal properties of glyphosate and that Monsanto has manufactured Roundup®-branded products that have glyphosate as the active ingredient, but notes that Monsanto was and is not the only manufacturer of glyphosate-based herbicides. Monsanto also admits that certain of these herbicides contain POEA and adjuvants and that the United States Environmental Protection Agency ("EPA") has classified surfactants and adjuvants as inert.

16.    The allegations in paragraph 16 do not require a response from Monsanto because these allegations relate to a defendant other than Monsanto.

17.    Monsanto denies the allegations in paragraph 17.

18.    Monsanto denies the allegations in paragraph 18.

19.    The allegations in paragraph 19 do not require a response from Monsanto because these allegations relate to a defendant other than Monsanto.

20.    The allegations in paragraph 20 do not require a response from Monsanto because these allegations relate to a defendant other than Monsanto.

21.    The allegations in paragraph 21 do not require a response from Monsanto because these allegations relate to a defendant other than Monsanto.

Case ID: 210602213

22.     The allegations in paragraph 22 do not require a response from Monsanto because these allegations relate to a defendant other than Monsanto.

23.     The allegations in paragraph 23 do not require a response from Monsanto because these allegations relate to a defendant other than Monsanto.

24.     The allegations in paragraph 24 do not require a response from Monsanto because these allegations relate to a defendant other than Monsanto.

25.     The allegations in paragraph 25 do not require a response from Monsanto because these allegations relate to a defendant other than Monsanto.

26.     The allegations in paragraph 26 do not require a response from Monsanto because these allegations relate to a defendant other than Monsanto.

27.     The allegations in paragraph 27 do not require a response from Monsanto because these allegations relate to a defendant other than Monsanto.

28.     The allegations in paragraph 28 set forth conclusions of law for which no response is required.

29.     The allegations in paragraph 29 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

30.     The allegations in paragraph 30 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

31.     The allegations in paragraph 31 do not require a response from Monsanto because these allegations relate to a defendant other than Monsanto.

32.     The allegations in paragraph 32 do not require a response from Monsanto because these allegations relate to a defendant other than Monsanto.

33.     The allegations in paragraph 33 do not require a response from Monsanto because these allegations relate to a defendant other than Monsanto.

Case ID: 210602213

34.     The allegations in paragraph 34 do not require a response from Monsanto because these allegations relate to a defendant other than Monsanto.

35.     The allegations in paragraph 35 do not require a response from Monsanto because these allegations relate to a defendant other than Monsanto.

36.     The allegations in paragraph 36 do not require a response from Monsanto because these allegations relate to a defendant other than Monsanto.

37.     The allegations in paragraph 37 do not require a response from Monsanto because these allegations relate to a defendant other than Monsanto.

38.     The allegations in paragraph 38 do not require a response from Monsanto because these allegations relate to a defendant other than Monsanto.

39.     The allegations in paragraph 39 do not require a response from Monsanto because these allegations relate to a defendant other than Monsanto.

40.     The allegations in paragraph 40 do not require a response from Monsanto because these allegations relate to a defendant other than Monsanto.

41.     The allegations in paragraph 41 do not require a response from Monsanto because these allegations relate to a defendant other than Monsanto.

42.     The allegations in paragraph 42 do not require a response from Monsanto because these allegations relate to a defendant other than Monsanto.

43.     The allegations in paragraph 43 set forth conclusions of law for which no response is required.

44.     The allegations in paragraph 44 set forth conclusions of law for which no response is required.

45.     Monsanto admits the allegations in the first two sentences of paragraph 45. In response to the third sentence of paragraph 45, Monsanto admits that certain Roundup®-branded

Case ID: 210602213

herbicides contain POEA and adjuvants and that EPA has classified surfactants and adjuvants as inert. In response to the last sentence of paragraph 45, Monsanto admits that glyphosate was one of the world's most widely used herbicides in 2013, but notes that Monsanto was and is not the only manufacturer of glyphosate-based herbicides. Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the specific numbers and statistics cited in the remaining sentences of paragraph 45 and therefore denies those allegations.

46.     In response to the allegations in paragraph 46, Monsanto admits that its headquarters are in St. Louis County, Missouri, and that it is incorporated in Delaware. Monsanto admits that it and its affiliated companies have operations and offices in countries around the world. Monsanto admits that it is a producer of glyphosate-based herbicides but lacks sufficient information regarding the business of other glyphosate producers to admit or deny the allegation as written in the second sentence of paragraph 46. Monsanto admits that it is the leading producer of seeds that contain the Roundup Ready® trait and that use of crops with the Roundup Ready® trait substantially improve a farmer's ability to control weeds. Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the specific numbers and statistics provided in the remaining sentences of paragraph 46 and therefore denies those allegations.

47.     In response to the allegations in paragraph 47, Monsanto admits that its glyphosate products are registered in at least 130 countries and approved for use on over 100 different crops. Monsanto admits that certain studies have reported that glyphosate is found at *de minimis* levels significantly below regulatory safety limits in various locations and media. Monsanto otherwise denies the remaining allegations in paragraph 47.

48.     Monsanto admits the allegations in the first sentence of paragraph 48. Monsanto denies the allegations in the second sentence of paragraph 48 to the extent they suggest that

Case ID: 210602213

IARC based its evaluation on a complete or accurate assessment of the scientific research regarding glyphosate.

49.     Monsanto admits the allegations in the first sentence of paragraph 49. Monsanto denies the allegations in the second sentence of paragraph 49.

50.     In response to the allegations in paragraph 50, Monsanto admits that the IARC working group classified glyphosate under Group 2A. Monsanto denies the remaining allegations in paragraph 50.

51.     Monsanto denies the allegations in paragraph 51.

52.     In response to paragraph 52, Monsanto admits that glyphosate repeatedly has been found to be safe to humans and the environment by regulators in the United States and around the world and further admits that it has labeled glyphosate products as approved by regulatory bodies consistent with those findings. Monsanto also admits that the EPA repeatedly has concluded pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") that glyphosate-based herbicides create no unreasonable risk to human health or to the environment when used in accordance with the label. To the extent that paragraph 52 alleges that Monsanto has labeled glyphosate-based or Roundup®-branded herbicides in any manner different or in addition to such regulatory approval, Monsanto denies such allegations.

53.     In response to the allegations in paragraph 53 Monsanto admits that glyphosate is an herbicide that is used to kill invasive plants and weeds. The remaining allegations in paragraph 53 are vague and ambiguous and Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 53 and therefore denies those allegations.

54.     Monsanto admits the allegations in the first sentence of paragraph 54. Monsanto denies the allegations in the second sentence of paragraph 54 because the impact of glyphosate

Case ID: 210602213

on treated plants varies depending upon the amount of glyphosate applied and the type of plant. Monsanto denies the allegations of the third sentence of paragraph 54 to the extent that it suggests that glyphosate is present in any plants at anything other than de minimis amounts well within regulatory safety levels, as determined by EPA.

55.     In response to the allegations in paragraph 55, Monsanto admits that farmers have safely used Roundup®-branded products since the 1970s. Monsanto denies the remaining allegations in paragraph 55.

56.     Monsanto admits the allegations in the first two sentences of paragraph 56 and admits that it has marketed Roundup®-branded products in accord with EPA's regulatory determinations under FIFRA. Monsanto otherwise denies the remaining allegations in paragraph 56.

57.     In response to the allegations in paragraph 57, Monsanto admits that certain Roundup®-branded herbicides contain POEA and adjuvants, that EPA has classified surfactants and adjuvants as inert, and that the specific surfactants and adjuvants used in Roundup®-branded herbicides — like those in other manufacturers' herbicide products — are protected by EPA as "trade secrets." Monsanto notes that EPA has determined that the surfactants used in Roundup®-branded herbicides do not pose an unreasonable risk to human health. Monsanto denies the remaining allegations in paragraph 57.

58.     Monsanto admits the allegations in paragraph 58.

59.     In response to the allegations in paragraph 59, Monsanto admits that EPA requires registrants of herbicides to submit extensive data in support of the human health and environmental safety of their products and further admits that EPA will not register or approve the labeling of herbicides that do not satisfy the requirements set forth in FIFRA. The remaining allegations in paragraph 59 set forth conclusions of law for which no response is required.

Case ID: 210602213

60.     The allegations in paragraph 60 set forth conclusions of law for which no response is required.

61.     In response to the allegations in paragraph 61, Monsanto admits that Roundup®-branded products are registered by EPA for manufacture, sale, and distribution in the United States and are registered by the State of California for sale and distribution.

62.     In response to the allegations in paragraph 62, Monsanto admits that EPA requires registrants of herbicides to submit extensive data in support of the human health and environmental safety of their products and further admits that EPA will not register or approve the labeling of herbicides that do not satisfy the requirements set forth in FIFRA. Monsanto states that the term "the product tests" in the last sentence of paragraph 62 is vague and ambiguous, and Monsanto therefore denies the same. The remaining allegations in paragraph 62 set forth conclusions of law for which no response is required.

63.     Monsanto denies the allegations in paragraph 63 to the extent they suggest that EPA only evaluates the safety of pesticide products on the date of their initial registration. Monsanto admits that EPA is in the process of conducting regulatory review of various pesticide products, but Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 63 regarding such pesticide products generally. The remaining allegations in paragraph 63 set forth conclusions of law for which no response is required.

64.     In response to the allegations in paragraph 64, Monsanto admits that EPA has undertaken a regulatory review of glyphosate and further admits that EPA has not released its findings. Monsanto states, however, that: (a) in September 2016, EPA's Office of Pesticide Programs ("OPP") issued a 227-page evaluation of glyphosate's carcinogenic potential, concluding that "[t]he strongest support is for [the descriptor] `not likely to be carcinogenic to

Case ID: 210602213

humans' at doses relevant to human health risk assessment"[1]; and (b) at the same time, EPA

posted an October 2015 final report by its standing Cancer Assessment Review Committee

("CARC"), in which CARC endorsed EPA's existing classification of glyphosate as "Not Likely

to be Carcinogenic to Humans."[2] Monsanto further states that, in December 2017, EPA's OPP

issued a detailed, lengthy revised evaluation of glyphosate's carcinogenic potential that reiterated

the conclusion that "[t]he strongest support is for [the descriptor] `not likely to be carcinogenic to

humans'."[3] Monsanto lacks information or knowledge sufficient to form a belief as to the truth of

the remaining allegations in paragraph 64 and therefore denies these allegations.

65.     In response to the allegations in paragraph 65, Monsanto admits that an EPA

review committee classified glyphosate as Class C in 1985 based on limited data and that EPA

changed its classification of glyphosate to Group E based upon a full evaluation of the scientific

evidence, including but not limited to three animal carcinogenicity studies. Monsanto admits that

plaintiffs have accurately quoted from one passage in an EPA document in 1991 with respect to

the designation of an agent as Group E, but states that EPA repeatedly has concluded that

glyphosate does not pose any cancer risk to humans. In addition to the conclusions in the two

EPA OPP reports and the EPA CARC Final Report discussed above, other specific findings of

safety include:

- "In June 1991, EPA classified glyphosate as a Group E [carcinogen]—one that shows evidence of non-carcinogenicity for humans—based on the lack of convincing evidence of carcinogenicity in adequate studies." EPA, *Glyphosate:*

---

[1] EPA's Office of Pesticide Programs, *Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* at 141 (Sept. 12, 2016) ("EPA OPP Report"), https://www.regulations.gov/ document?D=EPA-HQ-OPP-2016-0385-0094. The EPA OPP Report was prepared in anticipation of an EPA Scientific Advisory Panel meeting on glyphosate's carcinogenic potential.

[2] Cancer Assessment Review Committee, Health Effects Division, Office of Pesticide Programs, U.S. Environmental Protection Agency, *Cancer Assessment Document — Evaluation of the Carcinogenic Potential of Glyphosate* at 10, 77 (Final Report, Oct. 1, 2015) ("EPA CARC Final Report"), https://www.regulations.gov/document?D=EPA-HQ-OPP-2016-0385-0014.

[3] EPA's Office of Pesticide Programs, *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* at 143, 144 (Dec. 12, 2017), https://www.regulations.gov/document?D=EPA-HQ-OPP-2016-0385-0528.

Case ID: 210602213

*Reregistration Eligibility Decision (RED) Facts,* 2 (Sept. 1993), http://archive.epa.gov/pesticides/reregistration/web/pdf/0178fact.pdf.

- "No evidence of carcinogenicity." Glyphosate; Pesticide Tolerances, 67 Fed. Reg. 60,934, 60,943 (Sept. 27, 2002) (to be codified at 40 C.F.R. pt. 180).

- "Glyphosate has no carcinogenic potential." Glyphosate; Pesticide Tolerance, 69 Fed. Reg. 65,081, 65,086 (Nov. 10, 2004) (to be codified at 40 C.F.R. pt. 180).

- "There is [an] extensive database available on glyphosate, which indicate[s] that glyphosate is not mutagenic, not a carcinogen, and not a developmental or reproductive toxicant." Glyphosate; Pesticide Tolerances, 73 Fed. Reg. 73,586, 73,589 (Dec. 3, 2008) (to be codified at 40 C.F.R. pt. 180).

- "EPA has concluded that glyphosate does not pose a cancer risk to humans." 78 Fed. Reg. 25,396, 25,398 (May 1, 2013) (to be codified at 40 C.F.R. pt. 180).

- "In 2014, EPA reviewed over 55 epidemiological studies conducted on the possible cancer and non-cancer effects of [g]lyphosate. Our review concluded that this body of research does not provide evidence to show that [g]lyphosate causes cancer and does not warrant any change in the EPA's cancer classification for [g]lyphosate." *Agriculture Biotechnology: A Look at Federal Regulation and Stakeholder Perspectives: Hearing Before the S. Comm. on Agr., Nutrition, & Forestry,* 114th Cong. (2015) (statement of Dr. William Jordan, Deputy Director of EPA's Office of Pesticide Programs), http://www.ag.senate.gov/templates/watch.cfm?id=74793e67-5056-a055-64af-0e55900753b4, at time stamp 55:05 — 56:20.

Monsanto denies the remaining allegations in paragraph 65.

66.    In response to the allegations in paragraph 66, Monsanto admits that it — along with a large number of other companies and governmental agencies — was defrauded by two chemical testing laboratories, and that Monsanto had hired both of these laboratories to conduct testing on glyphosate. Monsanto states that only one of these laboratories was hired to conduct toxicity tests of glyphosate. Monsanto denies that EPA's registration of glyphosate or any glyphosate-based herbicides is based upon any invalid Industrial Bio-Test ("IBT") studies. To the extent that the allegations in paragraph 66 are intended to suggest that Monsanto was anything other than a victim of this fraud, such allegations are denied.

Case ID: 210602213

67.     In response to the allegations in paragraph 67, Monsanto admits that IBT Laboratories was hired to conduct toxicity studies in connection with the registration of a Roundup®-branded product. Monsanto denies that EPA's regulatory approval of such product is based upon any fraudulent or false IBT studies.

68.     Monsanto denies the allegations in paragraph 68 to the extent they suggest that EPA performed an inspection of IBT Laboratories solely or specifically in connection with studies conducted on glyphosate. Monsanto admits that EPA performed an audit of IBT Laboratories to investigate that laboratory's fraudulent and/or improper testing procedures in connection with services provided to a broad number of private and governmental entities and that this inspection included a review of studies IBT conducted on glyphosate. Monsanto was one of several pesticide manufacturers who had used IBT test results. The audit found some toxicology studies conducted with the original Roundup® herbicide to be invalid. As a result, Monsanto repeated all required studies in accordance with applicable EPA testing guidelines. Monsanto denies that EPA's registration of glyphosate or any glyphosate-based herbicides is based upon any invalid IBT studies. To the extent that the allegations in paragraph 68 are intended to suggest that Monsanto was anything other than a victim of this fraud, such allegations also are denied.

69.     In response to the allegations in paragraph 69, Monsanto admits that three IBT employees were convicted of the charge of fraud, but Monsanto denies that any of the individuals were convicted based upon studies conducted on glyphosate or glyphosate-based herbicides.

70.     In response to the allegations in paragraph 70, Monsanto admits that it — along with numerous other private companies — hired Craven Laboratories as an independent laboratory to conduct residue studies for Monsanto agricultural products. Monsanto further

Case ID: 210602213

admits that it was defrauded by Craven Laboratories and that, as a result, Monsanto repeated the studies conducted at Craven Laboratories at a substantial cost. To the extent that the allegations in paragraph 70 are intended to suggest that Monsanto was anything other than a victim of this fraud, Monsanto denies those allegations.

71.     Monsanto denies the allegations in paragraph 71.

72.     In response to the allegations in paragraph 72, Monsanto admits that Roundup®-branded products are highly valued by its customers because of their efficacy and safety. Monsanto also admits that the patent for glyphosate expired in the United States in 2000. The remaining allegations in paragraph 72 are vague and conclusory, comprise attorney characterizations, and are accordingly denied.

73.     In response to the allegations in paragraph 73, Monsanto admits that following the development of Roundup® Ready seeds, it began to sell them in the 1990s and that such seeds are now widely used by farmers in the United States and worldwide. Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the specific numbers cited in paragraph 73 and accordingly denies those allegations. The remaining allegations in paragraph 73 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

74.     In response to the allegations in paragraph 74, Monsanto admits that glyphosate is one of the world's largest herbicides by sales volume, but Monsanto denies any suggestion that it is the only company that sells glyphosate or glyphosate-based herbicides. Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the specific numbers cited in paragraph 74 and accordingly denies the same. The remaining allegations in paragraph 74 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

Case ID: 210602213

75.     In response to the allegations in paragraph 75, Monsanto admits that the New York Attorney General filed a lawsuit against Monsanto in 1996 alleging false and misleading advertising of Roundup®-branded products. This lawsuit was subsequently resolved without any admission of wrongdoing by Monsanto. Monsanto states that none of the New York Attorney General's allegations related in any way to a purported or alleged risk of cancer. To the extent the subparts of paragraph 75 purport to quote a document, the document speaks for itself and thus does not require any further response. The remaining allegations in paragraph 75 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

76.     In response to the allegations in paragraph 76, Monsanto admits it entered into an assurance of discontinuance with the New York Attorney General. The assurance speaks for itself and thus does not require any further response. The remaining allegations in paragraph 76 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

77.     Monsanto denies the allegations in paragraph 77.

78.     In response the allegations in paragraph 78, Monsanto admits that the French court ruled that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean," but denies the allegations to the extent they suggest that this ruling was in any way related to plaintiffs' claims here that glyphosate can cause cancer. Monsanto denies the remaining allegations in paragraph 78.

79.     In response to the allegations in paragraph 79, Monsanto denies that IARC follows stringent procedures for the evaluation of a chemical agent. Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the specific numbers cited in paragraph 79, which are not limited as of any specified date, and accordingly denies the same.

Case ID: 210602213

80.     In response to the allegations in paragraph 80, Monsanto admits that IARC sets forth in its Preamble the procedures that it claims to follow in its carcinogenicity evaluations. Monsanto denies the remaining allegations in paragraph 80.

81.     Monsanto denies any suggestion that IARC reviewed the full body of scientific research in conducting its evaluation of glyphosate or that IARC reliably reviewed the studies that it cited in its glyphosate monograph. Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 81 and therefore denies those allegations.

82.     Monsanto denies any suggestion that IARC reviewed the full body of scientific research in conducting its evaluation of glyphosate or that IARC reliably reviewed the studies that it cited in its glyphosate monograph. Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 82 and therefore denies those allegations.

83.     Monsanto denies the allegations in paragraph 83 to the extent that they suggest that IARC had previously assessed glyphosate. Monsanto admits that IARC classified glyphosate as a Group 2A agent in March 2015.

84.     In response to the allegations in paragraph 84, Monsanto admits that IARC issued its monograph for glyphosate, Monograph 112, on July 29, 2015, and that a draft of the monograph was prepared by a "working group" of individuals selected by IARC who met over a one week period in March 2015 to consider glyphosate along with a number of other substances. Monsanto denies the allegation that all members of the working groups are "experts." Monsanto denies that the working group or anyone at IARC conducted a one-year review of the scientific evidence related to glyphosate or that the working group's findings reflected a comprehensive review of the latest available scientific evidence. Monsanto also denies that the working group

Case ID: 210602213

considered all information available in the scientific literature and all data from government reports that are publicly available. Monsanto denies the remaining allegations in paragraph 84.

85.     In response to the allegations in paragraph 85, Monsanto denies that the IARC working group considered all of the data in the numerous studies that have been conducted looking at the safety of glyphosate and glyphosate-containing herbicides in human populations or that it reliably considered the studies that it purports to have reviewed, which frequently reach conclusions directly contrary to those espoused by the IARC working group. To the extent the allegations purport to characterize statements made in the IARC monograph for glyphosate, the statements in that document speak for themselves, but Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the source of said information and accordingly denies the allegations.

86.     The allegations in paragraph 86 are vague and conclusory. To the extent they purport to characterize statements made in the IARC monograph for glyphosate, the statements in that document speak for themselves, but Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the source of said information and accordingly denies the allegations.

87.     In response to the allegations in paragraph 87, to the extent the allegations purport to characterize statements made in the IARC monograph for glyphosate, the statements in that document speak for themselves, but to the extent that this paragraph means that more than de minimis amounts of exposure are present, the allegations in paragraph 87 are denied.

88.     In response to the allegations in paragraph 88, Monsanto admits that the IARC working group identified a number of case control studies of populations with exposures to glyphosate, but Monsanto denies that any of these studies provide any evidence of a human health concern from such exposures.

Case ID: 210602213

89.     Monsanto denies the allegations in paragraph 89. The IARC working group concluded that there was only limited evidence of carcinogenicity in epidemiologic studies, which, per IARC's guidelines, means that the working group could not rule out chance, bias or confounding so as to reach any conclusion of an increased risk.

90.     In response to the allegations in paragraph 90, Monsanto admits that the working group cited to a study that it concluded provided evidence of chromosomal damage in community residents reported to be exposed to glyphosate, but Monsanto denies that the study supports such a conclusion or that the authors of the study reached such a conclusion.

91.     In response to the allegations in paragraph 91, Monsanto admits that the IARC working group purported to make these findings, but denies that the animal carcinogenicity studies of glyphosate in the aggregate provide evidence of a positive trend for or increase in any of the identified tumors. Monsanto further states that regulatory agencies around the world have reviewed the same animal studies and concluded that they do not provide evidence that glyphosate can cause cancer. Monsanto denies the remaining allegations in paragraph 91.

92.     In response to the allegations in paragraph 92, Monsanto admits that the IARC working group purported to make these findings, but denies that the cited studies provide any reliable basis for a finding that any meaningful levels of glyphosate or AMPA is present or persists in human blood or urine. Monsanto denies the remaining allegations in paragraph 92.

93.     In response to the allegations in paragraph 93, Monsanto admits that the IARC working group interpreted a selected number of experimental studies as evidence that glyphosate can cause genotoxicity, but Monsanto denies that the working group reliably considered the full body of scientific data on such alleged genotoxic endpoints and denies that the working group reliably interpreted the studies that it selected for consideration. Regulators around the world

Case ID: 210602213

repeatedly have concluded that glyphosate is not genotoxic. Monsanto denies the remaining allegations in paragraph 93.

94.     In response to the allegations in paragraph 94, Monsanto admits that the IARC working group purported to find such effects, but denies that there is any reliable scientific basis for such conclusion. Monsanto denies the remaining allegations in paragraph 94.

95.     In response to the allegations in paragraph 95, Monsanto admits that the working group reviewed the findings of an Agricultural Health Study ("AHS") published in 2005, but denies that the working group characterized that study as supporting an association between glyphosate and the specified cancers. The AHS cohort study did not find a positive association between glyphosate and any type of cancer. Monsanto denies all other allegations in paragraph 95.

96.     In response to the allegations in paragraph 96, Monsanto admits that EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations, relating to glyphosate that predates the IARC March 20, 2015 evaluation, and that the Complaint accurately quotes from the identified document, which should be read in context of EPA's precautionary regulatory mandate and the EPA's consistent finding that glyphosate does not pose any cancer risk to humans.

97.     In response to the allegations in paragraph 97, Monsanto admits that the Northwest Coalition for Alternatives to Pesticides made the identified claims, but denies that the Coalition provides any reliable basis for any conclusions regarding potential health risks from glyphosate. Monsanto notes that a federal district court has characterized this same publication as an "advocacy piece[] published in [a] non-peer-reviewed journal." *See Arias v. DynCorp*, 928 F. Supp. 2d 10, 24 (D.D.C. 2013).

Case ID: 210602213

98.     Monsanto states that the term "toxic" as used in paragraph 98 is vague and ambiguous to the extent it is intended to suggest any evidence of carcinogenicity. Monsanto denies the allegations in paragraph 98.

99.     In response to the allegations in paragraph 99, Monsanto admits that Julie Marc published the cited study in 2002 and states that the document speaks for itself and does not require a response. To the extent that a response is deemed required, Monsanto denies the allegations in paragraph 99.

100.    In response to the allegations in the first sentence of paragraph 100, Monsanto admits that Julie Marc published a study titled "Glyphosate-based pesticides affect cell cycle regulation" in 2004. To the extent that the first sentence of paragraph 100 characterizes the meaning of the cited study, Monsanto denies the allegations in the first sentence of paragraph 100. In response to the remaining allegations in paragraph 100, Monsanto states that the document speaks for itself and does not require a response. To the extent that a response is deemed required, Monsanto denies the remaining allegations in paragraph 100.

101.    In response to the allegations in paragraph 101, Monsanto states that the cited document speaks for itself and does not require a response. To the extent that paragraph 101 characterizes the meaning of the cited study, Monsanto denies the remaining allegations in paragraph 101.

102.    In response to the allegations in paragraph 102, Monsanto states that the cited document speaks for itself and does not require a response. To the extent that paragraph 102 characterizes the meaning of the cited study, Monsanto denies the allegation that the cited studies support the allegation that glyphosate or Roundup®-branded products pose any risk to human health and denies the remaining allegations in paragraph 102.

Case ID: 210602213

103.     In response to the allegations in paragraph 103, Monsanto states that the terms "at all times" and these studies are vague and ambiguous, and therefore Monsanto denies the allegations in paragraph 103.

104.     In response to the allegations in paragraph 104, Monsanto denies that glyphosate or Roundup®-branded products cause cancer. The allegations in paragraph 104 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations — and are accordingly denied.

105.     Monsanto denies the allegations in paragraph 105.

106.     Monsanto admits that it has in the past promoted, and continues to promote Roundup®-branded herbicides as safe when used in accordance with the products' labeling. Monsanto denies the remaining allegations in paragraph 106.

107.     Monsanto denies the allegations in paragraph 107.

108.     Monsanto denies the allegations in paragraph 108.

109.     The allegations in paragraph 109 take statements in the cited documents out of context, are vague, incomplete, and conclusory, and/or comprise attorney characterizations — and are accordingly denied.

110.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 110 regarding Jess Rowland and therefore denies those allegations. The allegations in paragraph 110 take statements in the cited document out of context, are vague, incomplete, and conclusory, and/or comprise attorney characterizations — and are accordingly denied.

111.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 111 regarding Jess Rowland and the Agency for Toxic Substances and Diseases and therefore denies those allegations. The allegations in paragraph 111

Case ID: 210602213

take statements in the cited document out of context, are vague, incomplete, and conclusory, and/or comprise attorney characterizations — and are accordingly denied.

112.     The allegations in paragraph 112 take statements in the cited documents out of context, are vague, incomplete, and conclusory, and/or comprise attorney characterizations — and are accordingly denied.

113.     In response to the allegations in paragraph 113, Monsanto admits that the IARC working group's classification of glyphosate as a Class 2A carcinogen has resulted in ongoing discussions and/or restrictions in certain countries regarding the sale and/or use of glyphosate-based herbicides, including the Netherlands, but denies that there is any scientific basis for the concerns raised by the improper IARC classification. Monsanto denies the remaining allegations in paragraph 113.

114.     In response to the allegations in paragraph 114, Monsanto admits that the IARC working group classification led an individual government attorney in Brazil to write a letter to the Brazilian regulatory authorities requesting a reevaluation of glyphosate. Monsanto denies the remaining allegations in paragraph 114.

115.     Monsanto admits that, in France, the sale to and use by amateurs (i.e., non-professionals) of all pesticides (with certain exceptions for biocontrol pesticides) are prohibited as of January 1, 2019, with certain exceptions. Monsanto denies the remaining allegations in paragraph 115.

116.     In response to the allegations in paragraph 116, Monsanto admits that some employees of Bermuda's government announced an intention to suspend the importation of glyphosate-based herbicides, but Monsanto lacks information sufficient to form a belief as to the truth of the allegations about whether this suspension took effect and accordingly denies the same. Monsanto denies the remaining allegations in paragraph 116.

Case ID: 210602213

117.    In response to the allegations in paragraph 117, Monsanto admits that the IARC monograph appears to be the alleged basis for the Sri Lankan government's actions, including the allegation that glyphosate can cause kidney disease. Monsanto further states that the allegations regarding kidney disease found in Sri Lanka are unrelated to plaintiffs' allegations regarding claimed carcinogenicity. Monsanto denies the remaining allegations in paragraph 117.

118.    In response to the allegations in paragraph 118, Monsanto denies the alleged basis for Colombia's suspension of aerial spraying of glyphosate. Colombia's attorney general has explained that the ban on aerial spraying of illicit coca plantations was a concession to the FARC ("Fuerzas Armadas Revolucionarias de Colombia"), and had nothing to do with alleged safety concerns. As of April 2016, the government of Colombia has resumed manual application of glyphosate on illicit coca crops. A federal district court in the United States excluded plaintiffs' expert testimony purporting to link these same aerial eradication operations with cancer as scientifically unreliable. *See Arias v. DynCorp*, 928 F. Supp. 2d 10 (D.D.C. 2013). Monsanto denies the remaining allegations in paragraph 118.

119.    In response to the allegations in paragraph 119, Monsanto states that the cited document speaks for itself and does not require a response. Monsanto denies that the self-labeled "consensus statement" represents the view of any consensus of scientific opinion. To the extent that paragraph 119 characterizes the scientific evidence regarding the safety of glyphosate-based herbicides, Monsanto denies the remaining allegations in paragraph 119.

120.    In response to the allegations in paragraph 120, Monsanto states that the cited document speaks for itself and does not require a response. Monsanto denies that the self-labeled "consensus statement" represents the view of any consensus of scientific opinion. To the extent that paragraph 120 characterizes the scientific evidence regarding the safety of glyphosate-based herbicides, Monsanto denies the remaining allegations in paragraph 120.

Case ID: 210602213

121.   In response to the allegations in paragraph 121, Monsanto states that the cited document speaks for itself and does not require a response. Monsanto denies that the self-labeled "consensus statement" represents the view of any consensus of scientific opinion. To the extent that paragraph 121 characterizes the scientific evidence regarding the safety of glyphosate-based herbicides, Monsanto denies the remaining allegations in paragraph 121.

122.   In response to the allegations in paragraph 122, Monsanto states that the cited document speaks for itself and does not require a response. Monsanto denies that the self-labeled "consensus statement" represents the view of any consensus of scientific opinion. To the extent that paragraph 122 characterizes the scientific evidence regarding the safety of glyphosate-based herbicides, Monsanto denies the remaining allegations in paragraph 122.

123.   In response to the allegations in paragraph 123, Monsanto states that the cited document speaks for itself and does not require a response. Monsanto denies that the self-labeled "consensus statement" represents the view of any consensus of scientific opinion. To the extent that paragraph 123 characterizes the scientific evidence regarding the safety of glyphosate-based herbicides, Monsanto denies the remaining allegations in paragraph 123.

124.   In response to the allegations in paragraph 124, Monsanto states that the cited document speaks for itself and does not require a response. Monsanto denies that the self-labeled "consensus statement" represents the view of any consensus of scientific opinion. To the extent that paragraph 124 characterizes the scientific evidence regarding the safety of glyphosate-based herbicides, Monsanto denies the remaining allegations in paragraph 124.

125.   In response to the allegations in paragraph 125, Monsanto states that the cited document speaks for itself and does not require a response. Monsanto denies that the self-labeled "consensus statement" represents the view of any consensus of scientific opinion. To the extent

Case ID: 210602213

that paragraph 125 characterizes the scientific evidence regarding the safety of glyphosate-based herbicides, Monsanto denies the remaining allegations in paragraph 125.

126.    Monsanto denies the allegations in paragraph 126.

127.    Monsanto incorporates by reference its responses to paragraphs 1 through 126 in response to paragraph 127 of the Complaint.

128.    After reasonable investigation, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 128 and therefore denies those allegations.

129.    In response to the allegations in paragraph 129, Monsanto denies that there is any risk of NHL or other serious illness associated with or linked to the use of and/or exposure to Roundup®-branded products and glyphosate. Monsanto states, however, that the scientific studies upon which IARC purported to base its cancer classification for glyphosate were all publicly available before March 2015.

130.    In response to the allegations in paragraph 130, Monsanto denies that there is any risk of NHL or other serious illness associated with or linked to the use of and/or exposure to Roundup®-branded products and glyphosate. Monsanto states, however, that the scientific studies upon which IARC purported to base its cancer classification for glyphosate were all publicly available before March 2015. The remaining allegations in paragraph 130 set forth conclusions of law for which no response is required.

131.    In response to the allegations in paragraph 131, Monsanto denies that there is any risk of NHL or other serious illness associated with or linked to the use of and/or exposure to Roundup®-branded products and glyphosate. Monsanto states, however, that the scientific studies upon which IARC purported to base its cancer classification for glyphosate were all

Case ID: 210602213

publicly available before March 2015. The remaining allegations in paragraph 131 set forth conclusions of law for which no response is required.

132.    In response to the allegations in paragraph 132, Monsanto denies that there is any risk of NHL or other serious illness associated with or linked to the use of and/or exposure to Roundup®-branded products and glyphosate. Monsanto states, however, that the scientific studies upon which IARC purported to base its cancer classification for glyphosate were all publicly available before March 2015.

133.    In response to the allegations in paragraph 133, Monsanto denies that there is any risk of NHL or other serious illness associated with or linked to the use of and/or exposure to Roundup®-branded products and glyphosate. Monsanto states, however, that the scientific studies upon which IARC purported to base its cancer classification for glyphosate were all publicly available before March 2015.

134.    The allegations in paragraph 134 set forth conclusions of law for which no response is required. To the extent that a response is deemed required, Monsanto denies the allegations in paragraph 134. Monsanto states that the scientific studies upon which IARC purported to base its cancer classification for glyphosate were all publicly available before March 2015.

135.    Monsanto denies the allegations in paragraph 135.

136.    Monsanto denies that exposure to Roundup®-branded products and glyphosate exposed plaintiff to a risk of cancer and denies the remaining allegations in paragraph 136. Monsanto states, however, that the scientific studies upon which IARC purported to base its cancer classification for glyphosate were all publicly available before March 2015.

137.    Monsanto denies the allegations in the first and last sentences of paragraph 137. The remaining allegations in paragraph 137 set forth conclusions of law for which no response is

Case ID: 210602213

required. Monsanto states, however, that the scientific studies upon which IARC purported to base its classification were all publicly available before March 2015.

138.    Monsanto denies that there is any risk of NHL or other serious illness associated with the use of and/or exposure to Roundup®-branded products and glyphosate. The remaining allegations in paragraph 138 set forth conclusions of law for which no response is required, consist of attorney characterizations and are accordingly denied, or comprise allegations for which, after a reasonable investigation, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of therefore denies. Monsanto states that the scientific studies upon which IARC purported to base its cancer classification for glyphosate were all publicly available before March 2015.

139.    The allegations in paragraph 139 set forth conclusions of law for which no response is required.

140.    Monsanto denies the allegations in paragraph 140.

141.    The allegations in paragraph 141 set forth conclusions of law for which no response is required. To the extent that a response is deemed required, Monsanto denies the allegations in paragraph 141. Monsanto states that the scientific studies upon which IARC purported to base its cancer classification for glyphosate were all publicly available before March 2015.

142.    Monsanto denies the allegations in paragraph 142.

WHEREFORE, Monsanto demands that judgment be entered in its favor and against plaintiffs; that plaintiffs' Complaint be dismissed, with prejudice; and that Monsanto be awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

Case ID: 210602213

## COUNT ONE: STRICT LIABILITY
### (Plaintiffs v. All Defendants)

143.    Monsanto incorporates by reference its responses to paragraphs 1 through 142 in response to paragraph 143 of the Complaint.

144.    In response to the allegations in paragraph 144, Monsanto admits that it has sold Roundup®-branded products.

145.    The allegations in paragraph 145 set forth conclusions of law for which no response is required.

146.    Monsanto denies that it had any sort of expectation concerning Ernest Caranci, and therefore denies the allegations in paragraph 146.

147.    Monsanto states that it is incapable of possessing knowledge regarding future events beyond its control and, therefore, denies the allegations in paragraph 147.

148.    The allegations in paragraph 148 do not require a response from Monsanto because these allegations relate to defendants other than Monsanto.  To the extent that a response is deemed required, Monsanto states that, after reasonable investigation, it lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 148 and therefore denies those allegations.

149.    Monsanto denies the allegations in paragraph 149.

150.    After reasonable investigation, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 150 regarding plaintiff's claimed use of and/or exposure to Roundup®-branded products and therefore denies those allegations.  Monsanto denies the remaining allegations in paragraph 150, including that Roundup®-branded products have "dangerous characteristics."

Case ID: 210602213

151.     Monsanto denies that exposure to Roundup®-branded products and glyphosate exposed plaintiff to a risk of cancer and denies the remaining allegations in paragraph 151. Monsanto states, however, that the scientific studies upon which IARC purported to base its cancer classification for glyphosate were all publicly available before March 2015.

152.     Monsanto denies the allegations in paragraph 152.

153.     Monsanto denies the allegations in paragraph 153.

154.     Monsanto denies the allegations in paragraph 154.

155.     Monsanto denies the allegations in paragraph 155.

156.     Monsanto denies the allegations in paragraph 156.

157.     Monsanto denies the allegations in paragraph 157.

WHEREFORE, Monsanto demands that judgment be entered in its favor and against plaintiffs; that plaintiffs' Complaint be dismissed, with prejudice; and that Monsanto be awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

## COUNT TWO: STRICT LIABILITY FOR DEFECTIVE MANUFACTURE AND DESIGN
### (Plaintiffs v. Defendants Monsanto and Bayer AG)

158.     Monsanto incorporates by reference its responses to paragraphs 1 through 157 in response to paragraph 158 of the Complaint.

159.     In response to the allegations in paragraph 159, Monsanto admits that plaintiffs purport to bring claims for strict liability but denies any liability to plaintiffs.

160.     Monsanto denies the allegations in paragraph 160.

161.     Monsanto denies the allegations in paragraph 161.

162.     Monsanto denies the allegations in paragraph 162.

Case ID: 210602213

163.    After reasonable investigation, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 163 and therefore denies those allegations.

164.    Monsanto denies the allegations in paragraph 164.

165.    Monsanto denies the allegations in paragraph 165.

166.    Monsanto denies the allegations in paragraph 166.

167.    Monsanto denies the allegations in paragraph 167, including each of its subparts.

168.    After reasonable investigation, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 168 regarding plaintiff's claimed use of and/or exposure to Roundup®-branded products and therefore denies those allegations.  Monsanto denies the remaining allegations in paragraph 168, including that Roundup®-branded products have "dangerous characteristics."

169.    Monsanto denies that exposure to Roundup®-branded products and glyphosate exposed plaintiff to a risk of cancer and denies the remaining allegations in paragraph 169.  Monsanto states, however, that the scientific studies upon which IARC purported to base its cancer classification for glyphosate were all publicly available before March 2015.

170.    Monsanto denies the allegations in paragraph 170.

171.    Monsanto denies the allegations in paragraph 171.

172.    Monsanto denies the allegations in paragraph 172.

173.    Monsanto denies the allegations in paragraph 173.

174.    Monsanto denies the allegations in paragraph 174.

175.    Monsanto denies the allegations in paragraph 175.

WHEREFORE, Monsanto demands that judgment be entered in its favor and against plaintiffs; that plaintiffs' Complaint be dismissed, with prejudice; and that Monsanto be

Case ID: 210602213

awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

## COUNT THREE: STRICT LIABILITY FOR FAILURE TO WARN
### (Plaintiffs v. All Defendants)

176.    Monsanto incorporates by reference its responses to paragraphs 1 through 175 in response to paragraph 176 of the Complaint.

177.    In response to the allegations in paragraph 177, Monsanto admits that plaintiffs purport to bring claims for strict liability but denies any liability to plaintiffs.

178.    Monsanto denies the allegations in paragraph 178. All labeling of Roundup®-branded products has been and remains EPA-approved and in compliance with all federal requirements under FIFRA.

179.    In response to the allegations in paragraph 179, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations that plaintiffs or other persons or entities purchased Roundup®-branded products and therefore denies those allegations. The allegations in paragraph 179 also set forth conclusions of law for which no response is required. Monsanto denies the remaining allegations in paragraph 179.

180.    In response to the allegations in paragraph 180, Monsanto denies that there is any risk of NHL or other serious illness associated with the use of and/or exposure to Roundup®-branded products and glyphosate. The remaining allegations in paragraph 180 set forth conclusions of law for which no response is required.

181.    Monsanto denies the allegations in paragraph 181. All labeling of Roundup®-branded products has been and remains EPA-approved and in compliance with all federal requirements under FIFRA.

182.    Monsanto denies the allegations in paragraph 182.

Case ID: 210602213

183.     Monsanto denies the allegations in paragraph 183.

184.     Monsanto denies the allegations in paragraph 184.

185.     After reasonable investigation, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 185 and therefore denies those allegations.

186.     After reasonable investigation, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 186 regarding plaintiff's claimed use of and exposure to Roundup®-branded products and therefore denies those allegations. Monsanto denies the remaining allegations in paragraph 186, including that Roundup®-branded products have "dangerous characteristics."

187.     In response to the allegations in paragraph 187, Monsanto denies that Roundup®-branded products are associated with risks of NHL or other serious illness or that Roundup®-branded products have "defects." Monsanto states, however, that the scientific studies upon which IARC purported to base its cancer classification for glyphosate were all publicly available before March 2015. Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 187 and therefore denies those allegations. Monsanto denies the remaining allegations in paragraph 187.

188.     Monsanto denies the allegations in paragraph 188.

189.     Monsanto denies the allegations in paragraph 189.

190.     Monsanto denies the allegations in paragraph 190.

191.     Monsanto denies the allegations in paragraph 191.

192.     Monsanto denies the allegations in paragraph 192.

193.     Monsanto denies the allegations in paragraph 193.

194.     Monsanto denies the allegations in paragraph 194.

Case ID: 210602213

195.     Monsanto denies the allegations in paragraph 195.

196.     Monsanto denies the allegations in paragraph 196.

WHEREFORE, Monsanto demands that judgment be entered in its favor and against plaintiffs; that plaintiffs' Complaint be dismissed, with prejudice; and that Monsanto be awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

## COUNT FOUR: VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES ACT AND CONSUMER PROTECTION LAW, 73 P.S. §§201-1 et seq.
### (Plaintiffs v. All Defendants)

197.     Monsanto incorporates by reference its responses to paragraphs 1 through 196 in response to paragraph 197 of the Complaint.

198.     Monsanto denies the allegations in paragraph 198.

199.     Monsanto denies the allegations in paragraph 199.

200.     Monsanto denies the allegations in paragraph 200

201.     Monsanto denies the allegations in paragraph 201.

202.     Monsanto denies the allegations in paragraph 202.

203.     Monsanto denies the allegations in paragraph 203.

WHEREFORE, Monsanto demands that judgment be entered in its favor and against plaintiffs; that plaintiffs' Complaint be dismissed, with prejudice; and that Monsanto be awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

## COUNT FIVE: NEGLIGENCE
### (Plaintiffs v. All Defendants)

204.     Monsanto incorporates by reference its responses to paragraphs 1 through 203 in response to paragraph 204 of the Complaint.

Case ID: 210602213

205.    Monsanto denies the allegations in paragraph 205.

206.    After reasonable investigation, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 206 and therefore denies those allegations.

207.    The allegations in paragraph 207 set forth conclusions of law for which no response is required.

208.    The allegations in paragraph 208 set forth conclusions of law for which no response is required.

209.    Monsanto denies the allegations in paragraph 209.

210.    Monsanto denies the allegations in paragraph 210.

211.    Monsanto denies the allegations in paragraph 211.

212.    Monsanto denies the allegations in paragraph 212.

213.    Monsanto denies the allegations in paragraph 213. All labeling of Roundup®-branded products has been and remains EPA-approved and in compliance with all federal requirements under FIFRA.

214.    Monsanto denies the allegations in paragraph 214

215.    Monsanto denies the allegations in paragraph 215.

216.    Monsanto denies the allegations in paragraph 216.

217.    Monsanto denies the allegations in paragraph 217, including each of its subparts.

218.    Monsanto denies the allegations in paragraph 218.

219.    After reasonable investigation, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 219 regarding plaintiff's knowledge and therefore denies those allegations. Monsanto denies the remaining allegations in

Case ID: 210602213

paragraph 219, including that intended use of and/or exposure to Roundup®-branded products causes any injuries.

220.    Monsanto denies the allegations in paragraph 220.

221.    Monsanto denies the allegations in paragraph 221.

222.    Monsanto denies the allegations in paragraph 222. All labeling of Roundup®-branded products has been and remains EPA-approved and in compliance with all federal requirements under FIFRA.

WHEREFORE, Monsanto demands that judgment be entered in its favor and against Plaintiff; that Plaintiff's Complaint be dismissed, with prejudice; and that Monsanto be awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

## COUNT SIX:  BREACH OF IMPLIED WARRANTIES
### (Plaintiffs v. All Defendants)

223.    Monsanto incorporates by reference its responses to paragraphs 1 through 222 in response to paragraph 223 of the Complaint.

224.    Monsanto denies the allegations in paragraph 224.

225.    The allegations in paragraph 225 set forth conclusions of law for which no response is required.

226.    Monsanto denies the allegations in paragraph 226.

227.    Monsanto denies the allegations in paragraph 227.

228.    After reasonable investigation, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 228 regarding plaintiff's claimed use of Roundup®-branded products or plaintiff's claimed reliance and therefore denies

Case ID: 210602213

those allegations.  The allegation in paragraph 228 regarding Monsanto's implied warranty sets forth conclusions of law for which no response is required.

229.    After reasonable investigation, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 229 regarding plaintiff's claimed use of Roundup®-branded products or plaintiff's claimed reliance and therefore denies those allegations.  The allegation in paragraph 229 regarding Monsanto's implied warranty sets forth conclusions of law for which no response is required.

230.    After reasonable investigation, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 230 and therefore denies those allegations.

231.    After reasonable investigation, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 231 regarding the claimed use of Roundup®-branded products by plaintiff and others and therefore denies those allegations. The remaining allegations in paragraph 231 set forth conclusions of law for which no response is required.

232.    After reasonable investigation, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 232 regarding plaintiff's claimed use of or exposure to Roundup®-branded products and therefore denies those allegations. The allegation in paragraph 232 regarding Monsanto's implied warranty sets forth conclusions of law for which no response is required. Monsanto denies the remaining allegations in paragraph 232.

233.    After reasonable investigation, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 233 regarding plaintiff's claimed use of Roundup®-branded products or plaintiff's claimed reliance and therefore denies

Case ID: 210602213

those allegations. The allegation in paragraph 233 regarding Monsanto's implied warranty sets forth conclusions of law for which no response is required.

234.    Monsanto denies that there is any risk of serious injury associated with the as-directed use of and/or exposure to Roundup®-branded products and/or glyphosate. Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 234 regarding plaintiff's knowledge about Roundup®-branded products and therefore denies the remaining allegations in paragraph 234.

235.    Monsanto denies the allegations in paragraph 235.

236.    Monsanto denies the allegations in paragraph 236.

237.    Monsanto denies the allegations in paragraph 237.

WHEREFORE, Monsanto demands that judgment be entered in its favor and against Plaintiff; that Plaintiff's Complaint be dismissed, with prejudice; and that Monsanto be awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

## COUNT SEVEN:  FRAUDULENT CONCEALMENT
### (Plaintiffs v. All Defendants)

238.    Monsanto incorporates by reference its responses to paragraphs 1 through 237 in response to paragraph 238 of the Complaint.

239.    Monsanto denies the allegations in paragraph 239.

240.    Monsanto denies the allegations in paragraph 240.

241.    Monsanto denies the allegations in paragraph 241.

242.    Monsanto denies the allegations in paragraph 242.

243.    Monsanto denies the allegations in paragraph 243.

244.    Monsanto denies the allegations in paragraph 244.

Case ID: 210602213

245.     After reasonable investigation, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 245 regarding plaintiff's reliance and therefore denies those allegations. Monsanto denies the remaining allegations in paragraph 245.

246.     The allegations in paragraph 246 set forth conclusions of law for which no response is required.

247.     Monsanto denies the allegations in paragraph 247.

248.     Monsanto denies the allegations in paragraph 248.

WHEREFORE, Monsanto demands that judgment be entered in its favor and against Plaintiff; that Plaintiff's Complaint be dismissed, with prejudice; and that Monsanto be awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

## COUNT EIGHT:  LOSS OF CONSORTIUM
### (Plaintiff Carmela Caranci v. All Defendants)

249.     Monsanto incorporates by reference its responses to paragraphs 1 through 248 in response to paragraph 249 of the Complaint.

250.     After reasonable investigation, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 250 and therefore denies those allegations.

251.     Monsanto denies the allegations in paragraph 251.

252.     Monsanto denies the allegations in paragraph 252.

253.     Monsanto denies the allegations in paragraph 253.

WHEREFORE, Monsanto demands that judgment be entered in its favor and against Plaintiff; that Plaintiff's Complaint be dismissed, with prejudice; and that Monsanto be awarded

Case ID: 210602213

costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

Every allegation in the Complaint that is not specifically and expressly admitted in this Answer is hereby specifically and expressly denied.

## NEW MATTER

1.     Monsanto incorporates by reference the preceding paragraphs of its Answer as if set forth fully herein.

2.     The Complaint, in whole or part, fails to state a claim or cause of action against Monsanto upon which relief can be granted.

3.     Plaintiffs' claims against Monsanto are barred because plaintiffs cannot proffer any scientifically reliable evidence that the products at issue were defective or unreasonably dangerous.

4.     Any alleged negligent or culpable conduct of Monsanto, none being admitted, was so insubstantial as to be insufficient to be a proximate or substantial contributing cause of plaintiffs' alleged injuries.

5.     Plaintiffs' claims against Monsanto are barred, in whole or in part, because the products at issue were designed, manufactured, marketed and labeled with proper warnings, information, cautions and instructions, in accordance with the state of the art and the state of scientific and technological knowledge.

6.     Plaintiffs' claims against Monsanto are barred, in whole or in part, because the products at issue were not defective or unreasonably dangerous in that they complied with, at all relevant times, all applicable government safety standards.

7.     Any claims based on allegations that Monsanto misled, defrauded, made misrepresentations to, or withheld information from U.S. EPA are preempted by federal law.

Case ID: 210602213

*See, e.g.*, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001); *Nathan Kimmel, Inc. v. Dowelanco*, 275 F.3d 1199 (9th Cir. 2002).

8.     Plaintiffs' claims against Monsanto are preempted, in whole or in part, by applicable federal law relating to the design, testing, producing, manufacturing, labeling, distributing, modeling, processing, and supply of Roundup®-branded products and/or glyphosate-containing products.

9.     Plaintiffs' claims against Monsanto are preempted, in whole or in part, because of U.S. EPA findings that glyphosate does not cause cancer in humans and/or because of U.S. EPA-approved product labeling.

10.     Plaintiffs' claims against Monsanto are barred, in whole or in part, by the doctrine of primary jurisdiction, including by the authority delegated by Congress to the U.S. EPA.

11.     Plaintiffs' claims against Monsanto are barred, in whole or in part, because plaintiff's injuries, if any, were the result of conduct of plaintiff, independent third parties, and/or events that were extraordinary under the circumstances, not foreseeable in the normal course of events, and/or independent, intervening and superseding causes of the alleged injuries, including but not limited to plaintiff's pre-existing medical conditions.

12.     The doctrines contained in Restatement (Second) of Torts § 402A, comments j and k, bar plaintiff's claims against Monsanto in whole or in part.

13.     Applicable statutes of limitations and/or repose bar plaintiffs' claims against Monsanto in whole or in part.

14.     Plaintiffs' misuse or abnormal use of the product or failure to follow instructions bar plaintiff's claims against Monsanto in whole or in part.

15.     If plaintiffs suffered injuries or damages as alleged, which is denied, such injuries or damages resulted from: (a) acts or omissions of persons or entities for which Monsanto is

Case ID: 210602213

neither liable nor responsible or, in the alternative, Monsanto is entitled to an assessment of the relative degree of fault of all such persons and entities; or (b) resulted from diseases and/or causes that are not related or connected with any product sold, distributed, or manufactured by Monsanto.  Such acts or omissions on the part of others or diseases or causes constitute an independent, intervening and sole proximate cause of plaintiffs' alleged injuries or damages.

16.     Monsanto had no legal relationship or privity with plaintiffs and owed no duty to them by which liability could be attributed to it.

17.     Plaintiffs' claims against Monsanto are preempted or otherwise barred in whole or in part by the Freedom of Speech Clause of the First Amendment of the U.S. Constitution.

18.     Plaintiffs' claims against Monsanto for punitive, exemplary, and/or treble damages are barred because such an award would violate Monsanto's due process, equal protection and other rights under the United States Constitution, the Pennsylvania Constitution, and/or other applicable state constitutions.

19.     Plaintiffs' claims against Monsanto for punitive, exemplary, and/or treble damages are barred because plaintiffs have failed to allege conduct warranting imposition of such damages under Pennsylvania law and/or other applicable state laws.

20.     Plaintiffs' claims for punitive, exemplary, and/or treble damages are barred and/or limited by operation of state and/or federal law.

21.     Plaintiff's medical condition was caused directly, solely, and proximately by medical conditions, sensitivities, and idiosyncrasies peculiar to him, which were unknown, unknowable, or not reasonably foreseeable to Monsanto.

22.     Plaintiffs' claims against Monsanto are barred in whole or in part by plaintiffs' own contributory/comparative negligence.

Case ID: 210602213

23.     Plaintiffs' claims against Monsanto are barred in whole or in part by plaintiffs' own failure to mitigate damages.

24.     Plaintiffs' claims against Monsanto are barred in whole or in part by the sophisticated user doctrine.

25.     To the extent that plaintiffs recovered payments for plaintiffs' alleged injuries from any collateral source(s) or other source(s), plaintiffs' recovery in this lawsuit, if any, shall be reduced to the extent allowed by applicable law.

26.     If plaintiffs have been injured or damaged, no injury or damages being admitted, such injuries were not caused by a Monsanto product.

27.     Plaintiffs' claims against Monsanto are barred or limited to the extent that plaintiffs assert claims that are governed by the laws of a state that does not recognize, or limits, such claims.

28.     Plaintiffs' claims against Monsanto are barred to the extent that plaintiffs seek relief under the laws of states that do not govern plaintiffs' claims.

29.     Monsanto hereby preserves any and all defenses under *Tincher v. Omega Flex, Inc.*, 104 A.3d 328 (Pa. 2014).

30.     Monsanto made no warranties of any kind or any representations of any nature whatsoever to plaintiffs.  If any such warranties were made, which Monsanto specifically denies, then plaintiffs failed to give notice of any breach thereof.

31.     Monsanto incorporates by reference all affirmative defenses stated in Pa. R.C.P. No. 1030(a) as if set forth fully herein.

32.     Monsanto hereby gives notice that it intends to rely upon such other defenses as may become available or apparent during the course of discovery and thus reserves its right to amend this Answer to assert such defenses.

Case ID: 210602213

WHEREFORE, Defendant Monsanto demands judgment in its favor and against plaintiffs, dismissing plaintiffs' Complaint with prejudice, together with the costs of suit and such other relief as the Court deems equitable and just.

## **JURY TRIAL DEMAND**

Monsanto demands a jury trial on all issues so triable.

SHOOK, HARDY & BACON L.L.P.

DATED:  July 19, 2021

By: ___*/s/ Joseph H. Blum*_____
Joseph H. Blum, Esq. (PA ID 36874)
Erin L. Leffler, Esq. (PA ID 204507)
KaSandra N. Rogiers, Esq. (PA ID 306770)
Two Commerce Square
2000 Market Street, Suite 3000
Philadelphia, PA 19103
Phone:  215-278-2555
jblum@shb.com
eleffler@shb.com
krogiers@shb.com

*Attorneys for Defendant*
*MONSANTO COMPANY*

Case ID: 210602213

## **VERIFICATION**

I, Keith R. Abrams, state that I am an Assistant Secretary for Monsanto Company; that for or on behalf of Monsanto Company, I verify the facts in the foregoing Answer to Plaintiffs' Complaint in the *Ernest Caranci et al. v. Monsanto Company et al.* lawsuit; that I am duly authorized by Monsanto Company to do so; and that certain matters stated therein are not within my personal knowledge, but that the facts stated therein have been assembled by authorized representatives of Monsanto Company and that I am informed and believe that the facts stated therein are true.  This Verification is made subject to the penalties contained in 18 Pa.C.S.A. § 4904, relating to unsworn verification to authorities.

By: _____
    Keith R. Abrams

Dated:  July 16, 2021

## CERTIFICATE OF SERVICE

I, Joseph H. Blum, hereby certify that on July 19, 2021, I served a true and correct copy

of the foregoing Answer to Complaint via the Court's e-filing system on the following counsel of

record:

> Thomas R. Kline, Esquire
> Kila B. Baldwin, Esquire
> Thomas E. Bosworth, Esquire
> Philip M. Pasquarello, Esquire
> Kline & Specter, PC
> 1525 Locust Street
> 19th Floor
> Philadelphia, PA  19102
> ***Attorneys for Plaintiffs***

By: */s/ Joseph H. Blum*
    Joseph H. Blum

***Attorneys for Defendant Monsanto Company***

**SHOOK, HARDY & BACON L.L.P.**
BY:    Joseph H. Blum (Attorney I.D. No. 36874)
          Erin L. Leffler (Attorney I.D. No. 204507)
          KaSandra N. Rogiers (Attorney I.D. No. 306770)
Two Commerce Square
2001 Market Street, Suite 3000
Philadelphia, PA  19103
(215) 278-2555
Jblum@shb.com
Eleffler@shb.com
Krogiers@shb.com



*Filed and Attested by the
Office of Judicial Records
19 JUL 2021 05:32 pm
G.  IMPERATO*

## IN THE COURT OF COMMON PLEAS
### OF PHILADELPHIA COUNTY, PENNSYLVANIA

| | |
|---|---|
| ERNEST CARANCI and CARMELA CARANCI,     ) ) ) | |
|        Plaintiffs,     ) | Civil Division |
|     ) | |
|       v.     ) | Case No. 210602213 |
|     ) | |
| MONSANTO COMPANY, *et al.*,     ) | JURY TRIAL DEMANDED |
|     ) | |
|       Defendants.     ) | |
| ————————————————— ) | |

## ENTRY OF APPEARANCE

**TO THE PROTHONOTARY:**

Kindly enter the appearance of Erin L. Leffler (PA Bar No. 204507) on behalf of Defendant

Monsanto Company, in the above-captioned action.

SHOOK, HARDY & BACON L.L.P.

Dated:  July19, 2021          By: _/s/ Erin L. Leffler_____
                                            Erin L. Leffler

***Attorneys for Defendant Monsanto Company***

## CERTIFICATE OF SERVICE

I, Erin L. Leffler, hereby certify that on July 19, 2021, I served a true and correct copy of

the foregoing Entry of Appearance via the Court's e-filing system on the following counsel of

record:

> Thomas R. Kline, Esquire
> Kila B. Baldwin, Esquire
> Thomas E. Bosworth, Esquire
> Philip M. Pasquarello, Esquire
> Kline & Specter, PC
> 1525 Locust Street
> 19th Floor
> Philadelphia, PA  19102
> ***Attorneys for Plaintiffs***

By: */s/ Erin L. Leffler*
Erin L. Leffler

***Attorneys for Defendant Monsanto Company***

**SHOOK, HARDY & BACON L.L.P.**
BY:     Joseph H. Blum (Attorney I.D. No. 36874)
        Erin L. Leffler (Attorney I.D. No. 204507)
        KaSandra N. Rogiers (Attorney I.D. No. 306770)
Two Commerce Square
2001 Market Street, Suite 3000
Philadelphia, PA  19103
(215) 278-2555
Jblum@shb.com
Eleffler@shb.com
Krogiers@shb.com



*Filed and Attested by the
Office of Judicial Records
19 JUL 2021 05:34 pm
G.  IMPERATO*

**IN THE COURT OF COMMON PLEAS
OF PHILADELPHIA COUNTY, PENNSYLVANIA**

|  |  |  |
|---|---|---|
| ERNEST CARANCI and CARMELA CARANCI, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Division |
| v. | ) ) | Case No. 210602213 |
| MONSANTO COMPANY, *et al.*, | ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) ) | |

**ENTRY OF APPEARANCE**

**TO THE PROTHONOTARY:**

Kindly enter the appearance of KaSandra N. Rogiers (PA Bar No. 306770) on behalf of

Defendant Monsanto Company, in the above-captioned action.

SHOOK, HARDY & BACON L.L.P.


Dated:  July19, 2021              By: */s/ KaSandra N. Rogiers*
                                       KaSandra N. Rogiers

                                  ***Attorneys for Defendant Monsanto Company***

## <u>CERTIFICATE OF SERVICE</u>

I, KaSandra N. Rogiers, hereby certify that on July 19, 2021, I served a true and correct

copy of the foregoing Entry of Appearance via the Court's e-filing system on the following

counsel of record:

>Thomas R. Kline, Esquire
>Kila B. Baldwin, Esquire
>Thomas E. Bosworth, Esquire
>Philip M. Pasquarello, Esquire
>Kline & Specter, PC
>1525 Locust Street
>19th Floor
>Philadelphia, PA  19102
>***Attorneys for Plaintiffs***

By: */s/ KaSandra N. Rogiers*
KaSandra N. Rogiers

***Attorneys for Defendant Monsanto Company***

**KLINE & SPECTER, P.C.**
By:    THOMAS R. KLINE, ESQUIRE
        KILA B. BALDWIN, ESQUIRE
        THOMAS E. BOSWORTH, ESQUIRE
        PHILIP M. PASQUARELLO, ESQUIRE
Attorney I.D. Nos. 28895/94430/323350/326263
1525 Locust Street
Philadelphia, PA   19102
(215) 772-1000

*Filed and Attested by the
Office of Judicial Records
28 JUL 2021 02:14 pm
G. IMPERATO*

*Attorney for Plaintiffs*

|  |  |
|---|---|
| ERNEST CARANCI and CARMELA CARANCI, | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| *Plaintiffs,* | |
| v. | JUNE TERM, 2021 |
| MONSANTO COMPANY, et al. | NO. 002213 |
| *Defendants.* | |

## ENTRY OF APPEARANCE

TO THE PROTHONOTARY:

Kindly enter my appearance as co-counsel for Plaintiffs in the above captioned matter.

**KLINE & SPECTER, P.C.**

By:    */s/ Kila B. Baldwin*
        KILA B. BALDWIN, ESQUIRE
        *Attorney for Plaintiffs*

Date:   7/28/21

**RAWLE & HENDERSON** LLP
By:     John C. McMeekin II, Esquire
        Anisha S. Abraham, Esquire
Identification Nos.: 81250 / 205538
The Widener Building
One South Penn Square
Philadelphia, Pennsylvania  19107                    Attorneys for Defendant,
Telephone:    (215) 575-4200                          Penn Hardware Two, Inc.
Facsimile:    (215) 563-2583

*Filed and Attested by the Office of Judicial Records 29 JUL 2021 01:06 pm I. LOWELL*

|  |  |  |
|---|---|---|
| ERNEST CARANCI and | : | COURT OF COMMON PLEAS |
| CARMELA CARANCI | : | PHILADELPHIA COUNTY |
|  | : |  |
| Plaintiffs, | : |  |
| v. | : | JUNE TERM, 2021 |
|  | : |  |
| MONSANTO COMPANY, BAYER AG, | : | NO. 02213 |
| S&H HARDWARE & SUPPLY CO., PENN | : |  |
| HARDWARE, INC. and PENN HARDWARE | : |  |
| TWO, INC. | : |  |
|  | : |  |
| Defendants. | : |  |

## ENTRY OF APPEARANCE

**TO THE PROTHONOTARY:**

Kindly enter our appearances on behalf of defendant, Penn Hardware Two, Inc.,

in the above captioned matter.

                              **RAWLE & HENDERSON** LLP

                    By: _____
                              John C. McMeekin II, Esquire
                              Anisha S. Abraham, Esquire

Dated:  July 29, 2021

15035992-1

## CERTIFICATE OF SERVICE

I, John C. McMeekin II, Esquire, hereby certify that the foregoing Entry of Appearance will be served as follows:

a.      Electronically by the Court in accordance with Pa. R.C.P. 205.4(g); or

b.      In accordance with Pa. R.C.P. 440 via United States First Class Mail upon all parties not served electronically.

By: _____

John C. McMeekin II, Esq.

Dated: July 29, 2021

Case ID: 210602213

**KLINE & SPECTER, P.C.**
By:     THOMAS R. KLINE, ESQUIRE
          KILA B. BALDWIN, ESQUIRE
          THOMAS E. BOSWORTH, ESQUIRE
          PHILIP M. PASQUARELLO, ESQUIRE
Attorney I.D. Nos. 28895/94430/323350/326263
1525 Locust Street
Philadelphia, PA   19102
(215) 772-1000



*Filed and Attested by the
Office of Judicial Records
30 JUL 2021 10:08 am
G. IMPERATO*

*Attorney for Plaintiffs*

| | |
|---|---|
| ERNEST CARANCI and CARMELA CARANCI, | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| *Plaintiffs*, | |
| v. | JUNE TERM, 2021 |
| MONSANTO COMPANY, et al. | NO. 002213 |
| *Defendants*. | |

## PRAECIPE TO REINSTATE COMPLAINT

TO THE PROTHONOTARY;

  Kindly reinstate the Complaint in the above-captioned matter upon payment of your costs only, a copy of which is attached hereto.

         **KLINE & SPECTER, P.C.**

      By:  */s/ Kila B. Baldwin*
          KILA B. BALDWIN, ESQUIRE
          *Attorney for Plaintiffs*

Date: __7/30/21__

Case ID: 210602213

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

| | For Prothonotary Use Only (Docket Number) |
|---|---|
| | **JUNE 2021**     **002213** |
| | E-Filing Number: 2106055896 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| ERNEST CARANCI | MONSANTO COMPANY |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 1235 SEROTA PLACE<br>PHILADELPHIA PA 19115 | 800 N. LINDBERGH BOULEVARD<br>ST. LOUIS MO 63167 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| CARMELA CARANCI | BAYER AG |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 1235 SEROTA PLACE<br>PHILADELPHIA PA 19115 | 100 BAYER BOULEVARD<br>WHIPPANY NJ 07981 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | S&H HARDWARE & SUPPLY CO. |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | 6700 CASTOR AVENUE<br>PHILADELPHIA PA 19149 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION | |
|---|---|---|---|
| 2 | 5 | [X] Complaint   [ ] Petition Action   [ ] Notice of Appeal<br>[ ] Writ of Summons   [ ] Transfer From Other Jurisdictions | |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | |
|---|---|---|---|
| [ ] $50,000.00 or less<br>[X] More than $50,000.00 | [ ] Arbitration<br>[X] Jury<br>[ ] Non-Jury<br>[ ] Other: | [ ] Mass Tort<br>[ ] Savings Action<br>[ ] Petition | [ ] Commerce    [ ] Settlement<br>[ ] Minor Court Appeal    [ ] Minors<br>[ ] Statutory Appeals    [ ] W/D/Survival |

**CASE TYPE AND CODE**

2P – PRODUCT LIABILITY

**STATUTORY BASIS FOR CAUSE OF ACTION**

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | **FILED PRO PROTHY** <br> JUN **29** 2021 <br> **M. RUSSO** | IS CASE SUBJECT TO COORDINATION ORDER? <br> YES     NO |
|---|---|---|

**TO THE PROTHONOTARY:**

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: ERNEST CARANCI , CARMELA CARANCI

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| THOMAS E. BOSWORTH | KLINE & SPECTER, PC<br>1525 LOCUST STREET |
| **PHONE NUMBER** (215)772-1000    **FAX NUMBER** (215)735-5827 | 19TH FL<br>PHILADELPHIA PA 19102 |
| **SUPREME COURT IDENTIFICATION NO.** 323350 | **E-MAIL ADDRESS** thomas.bosworth@klinespecter.com |
| **SIGNATURE OF FILING ATTORNEY OR PARTY** THOMAS BOSWORTH | **DATE SUBMITTED** Tuesday, June 29, 2021, 02:01 pm |

Case ID: 210602213

FINAL COPY (Approved by the Prothonotary Clerk)

**COMPLETE LIST OF DEFENDANTS:**

1. MONSANTO COMPANY
   800 N. LINDBERGH BOULEVARD
   ST. LOUIS MO 63167
2. BAYER AG
   100 BAYER BOULEVARD
   WHIPPANY NJ 07981
3. S&H HARDWARE & SUPPLY CO.
   6700 CASTOR AVENUE
   PHILADELPHIA PA 19149
4. PENN HARDWARE, INC.
   7404 FRANKFORD AVENUE
   PHILADELPHIA PA 19136
5. PENN HARDWARE TWO, INC.
   7404 FRANKFORD AVENUE
   PHILADELPHIA PA 19136

Case ID: 210602213

**KLINE & SPECTER, P.C.**
By:   THOMAS R. KLINE, ESQUIRE
      KILA B. BALDWIN, ESQUIRE
      THOMAS E. BOSWORTH, ESQUIRE
      PHILIP M. PASQUARELLO, ESQUIRE
Attorney I.D. Nos. 28895/94430/323350/326263
1525 Locust Street
Philadelphia, PA 19102
(215) 772-1000
Attorneys for Plaintiffs



**Filed and Attested by the
Office of Judicial Records
30 JUN 2021 10:08 am
G. IMPERATO**

| | |
|---|---|
| **ERNEST CARANCI** and **CARMELA CARANCI**, 1235 Serota Place Philadelphia, PA 19115 | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY, PENNSYLVANIA** |
| *Plaintiffs* | **JUNE TERM, 2021** |
| v. | **CIVIL ACTION NO.** |
| **MONSANTO COMPANY** 800 N. Lindbergh Blvd. St. Louis, MO 63167 | **JURY TRIAL DEMANDED** |
| *And* | **CIVIL ACTION – PRODUCT LIABILITY** |
| **BAYER AG** 100 Bayer Blvd. Whippany, NJ 07981 | **NOTICE TO PLEAD AND COMPLAINT** |
| *And* | |
| **S&H HARDWARE & SUPPLY CO.** 6700 Castor Ave. Philadelphia, PA 19149 | |
| *And* | **(continued on next page)** |
| **PENN HARDWARE, INC.** 7404 Frankford Ave. Philadelphia, PA 19136 | |
| *And* | |

1

Case ID: 210602213

**PENN HARDWARE TWO, INC.**
7404 Frankford Ave.
Philadelphia, PA 19136

*Defendants.*

## NOTICE TO PLEAD

| NOTICE | ADVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you. | Le han demandado a used en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte pueda decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted. |
| YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP. | LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL. |
| **Lawyer Referral Service**<br>**Philadelphia Bar Association**<br>**1101 Market Street, 11th Floor**<br>**Philadelphia, PA 19107**<br>**(215) 238-6338** | **Lawyer Referral Service**<br>**Philadelphia Bar Association**<br>**1101 Market Street, 11th Floor**<br>**Philadelphia, PA 19107**<br>**(215) 238-6338** |

2

Case ID: 210602213

## COMPLAINT

## INTRODUCTION

Plaintiffs bring this cause of action against Defendants.  Plaintiff, Ernest Caranci, suffered significant injuries, including, but not limited to, Non Hodgkin's Lymphoma ("NHL"), as a direct and proximate result of Defendants' negligent, reckless, willful, and otherwise wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or sale of the product known as Roundup®("Roundup").  Plaintiffs in this action seek recovery for damages as a result of Ernest Caranci's developing NHL and his resulting injuries, damages, and pain and suffering, all of which was directly and proximately caused by such wrongful conduct by Defendants, the unreasonably dangerous and defective nature of Roundup, and its active ingredient, glyphosate, and the attendant effects of developing NHL.

## THE PARTIES

### PLAINTIFFS

1.      Plaintiff, Ernest Caranci, is an adult citizen and resident of the Commonwealth of Pennsylvania, residing at 1235 Serota Place, Philadelphia, Pennsylvania 19115.

2.      Plaintiff, Carmela Caranci, wife of Ernest Caranci, is an adult citizen and resident of the Commonwealth of Pennsylvania, residing at 1235 Serota Place, Philadelphia, Pennsylvania 19115.

3.      Plaintiffs bring this action for personal injuries and damages sustained due to exposure to Roundup containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"). As a direct and proximate result of being exposed to Roundup, Ernest Caranci developed NHL.

4.      Ernest Caranci was exposed to Roundupthroughout the 1990s and 2000s,.

Case ID: 210602213

5.      During that time period, Mr. Caranci would spray Roundup, while wearing gloves, two to three times per week for four to six months of each year.

6.      Ernest Caranci purchased the Roundup he used from S&H Hardware & Supply Co.'s, Penn Hardware, Inc.'s, and Penn Hardware Two, Inc.'s stores, all of which were at all times located in Philadelphia County, Pennsylvania.

7.      All of Plaintiff Ernest Caranci's purchases of Roundup were made in and occurred in Philadelphia County, Pennsylvania.

8.      All of Plaintiff Ernest Caranci's usage of Roundup occurred in Philadelphia County, Pennsylvania.

9.      Plaintiff, Ernest Caranci, developed NHL due to his use of Roundup in Philadelphia County.

10.      Following years of routine and repeated usage of Roundup, Ernest Caranci was diagnosed with NHL. Following his diagnosis, Ernest Caranci suffered numerous effects attendant to NHL, including chemotherapy, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup and Defendants' wrongful conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup.

11.      As a direct and proximate result of being exposed to Roundup, plaintiff Ernest Caranci developed NHL.

12.      As a direct and proximate result of these injuries, Ernest Caranci incurred medical expenses, endured pain and suffering and loss of enjoyment of life, lost wages, lost earning capacity, and has otherwise been damaged in a personal and pecuniary nature.

13.      During the entire time that Ernest Caranci was exposed to Roundup, he did not know that exposure to Roundup was injurious to his health or the health of others.

4

Case ID: 210602213

## DEFENDANTS

### MONSANTO

14.     Defendant, Monsanto Company ("Monsanto"), is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.   At all relevant times, Monsanto regularly conducted, transacted, and solicited business in Pennsylvania, including in Philadelphia County.

15.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

### BAYER AG

16.     Defendant, Bayer AG, is a German multinational corporation with its global headquarters located in Leverkusen, Germany. At all relevant times, Bayer AG regularly conducted, transacted, and solicited business in Pennsylvania, including in Philadelphia County. Bayer AG's U.S. headquarters is located at 100 Bayer Blvd., Whippany, New Jersey. Bayer AG regularly conducts business in the Commonwealth of Pennsylvania, including in Philadelphia County.

17.     In June of 2018, Bayer AG acquired Defendant Monsanto, including its assets and liabilities, which, in turn, include the Roundup brand, for $66 billion. Through the merger, Bayer AG became the sole shareholder of Monsanto.

18.     Although Monsanto has continued to sell, distribute, and market the Roundup products at issue after the Bayer AG acquisition, on information and belief, Bayer AG undercapitalized Monsanto, exerted substantial control over Monsanto, and/or jointly participated in the commission of tortious and/or fraudulent activity with Monsanto, such that recognizing Bayer AG's distinct corporate form and shielding Bayer AG from liability would defeat public

5

Case ID: 210602213

policy and bring about injustices to plaintiffs, like Ernest Caranci herein, and others similarly situated. Alternatively, following the acquisition, Monsanto has been a mere alter-ego of Bayer. Alternatively, Bayer has been named as a successor to Monsanto.

### S&H HARDWARE & SUPPLY CO.

19.    Defendant, S&H Hardware & Supply Co., is a corporation that was and is incorporated under the laws of and in the Commonwealth of Pennsylvania, with its principal place of business and a registered office located at 6700 Castor Avenue, Philadelphia, Pennsylvania 19149. S&H Hardware & Supply Co. engaged in the marketing, sale, and distribution of a product line of herbicide Roundup, which contains the active ingredient glyphosate.

20.    At all relevant times, S&H Hardware & Supply Co. sold Roundup products to users, including Ernest Caranci, within the Commonwealth of Pennsylvania and City of Philadelphia, including this county, and derived substantial revenue from such sales.

21.    At all relevant times, S&H Hardware & Supply Co. regularly conducted business in Philadelphia County.

### PENN HARDWARE INC. AND PENN HARDWARE TWO, INC.

22.    Defendant, Penn Hardware, Inc., was at all times relevant hereto incorporated under the laws of and in the Commonwealth of Pennsylvania, with its principal place of business and a registered office located at 7404 Frankford Avenue, Philadelphia, Pennsylvania 19136.

23.    At all relevant times, Penn Hardware, Inc., sold Roundup products to users, including Ernest Caranci, within the Commonwealth of Pennsylvania and City of Philadelphia, including this county, and derived substantial revenue from such sales.

24.    At all relevant times, Penn Hardware, Inc. regularly conducted business in Philadelphia County.

Case ID: 210602213

25.     Defendant, Penn Hardware Two, Inc., was at all times relevant hereto incorporated under the laws of and in the Commonwealth of Pennsylvania, with its principal place of business and a registered office located at 7404 Frankford Avenue, Philadelphia, Pennsylvania 19136.

26.     At all relevant times, Penn Hardware Two, Inc., sold Roundup products to users, including Ernest Caranci, within the Commonwealth of Pennsylvania and City of Philadelphia, including this county, and derived substantial revenue from such sales.

27.     At all relevant times, Penn Hardware Two, Inc. regularly conducted business in Philadelphia County.

## JURISDICTION AND VENUE

28.     At all relevant times, Monsanto had, and continues to have, regular and systematic contact with and conducts business in and from the Commonwealth of Pennsylvania, such that it has purposefully availed itself of the laws of the Commonwealth and expects to both sue and be sued in Pennsylvania.  Additionally, Monsanto's presence in the Commonwealth of Pennsylvania satisfies the due process requirements for Pennsylvania courts to exercise jurisdiction over it. Additionally, Monsanto has consented to the exercise of jurisdiction over it by Pennsylvania courts by registering to and conducting business from the Commonwealth of Pennsylvania.

29.     At all relevant times, Monsanto has transacted business in the Commonwealth of Pennsylvania including by: (1) selling and distributing products and merchandise, including Roundup products, in the Commonwealth of Pennsylvania for the purpose of realizing pecuniary benefit from those sales and distributions; (2) shipping products and merchandise, including Roundup products, directly into and through the Commonwealth of Pennsylvania; (3) engaging in business in the Commonwealth of Pennsylvania; and/or (4) owning, using, and/or possessing real property situated in the Commonwealth of Pennsylvania.

7

Case ID: 210602213

30.     At all relevant times, Monsanto has contracted to supply services or things, including Roundup products, in the Commonwealth of Pennsylvania.

31.     At all relevant times, Bayer AG had, and continues to have, regular and systematic contact with and conducts business in and from the Commonwealth of Pennsylvania, such that it has purposefully availed itself of the laws of the Commonwealth and expects to both sue and be sued in Pennsylvania.  Additionally, Bayer AG's presence in the Commonwealth of Pennsylvania satisfies the due process requirements for Pennsylvania courts to exercise jurisdiction over it. Additionally, Bayer AG has consented to the exercise of jurisdiction over it by Pennsylvania courts by registering to and conducting business from the Commonwealth of Pennsylvania.

32.     At all relevant times, Bayer AG has transacted business in the Commonwealth of Pennsylvania including by: (1) selling and distributing products and merchandise, including Roundup products, in the Commonwealth of Pennsylvania for the purpose of realizing pecuniary benefit from those sales and distributions; (2) shipping products and merchandise, including Roundup products, directly into and through the Commonwealth of Pennsylvania; (3) engaging in business in the Commonwealth of Pennsylvania; and/or (4) owning, using, and/or possessing real property situated in the Commonwealth of Pennsylvania.

33.     At all relevant times, Bayer AG has contracted to supply services or things, including Roundup products, in the Commonwealth of Pennsylvania.

34.     At all relevant times, S&H Hardware & Supply Co. had, and continues to have, regular and systematic contact with and conducts business in and from the Commonwealth of Pennsylvania, such that it has purposefully availed itself of the laws of the Commonwealth and expects to both sue and be sued in Pennsylvania.  Additionally, S&H Hardware & Supply Co.'s presence in the Commonwealth of Pennsylvania satisfies the due process requirements for

8

Pennsylvania courts to exercise jurisdiction over it. Additionally, S&H Hardware & Supply Co. has consented to the exercise of jurisdiction over it by Pennsylvania courts by registering to and conducting business from the Commonwealth of Pennsylvania.

35.     At all relevant times, S&H Hardware & Supply Co. has transacted business in the Commonwealth of Pennsylvania including by: (1) selling and distributing products and merchandise, including Roundup products, in the Commonwealth of Pennsylvania for the purpose of realizing pecuniary benefit from those sales and distributions; (2) shipping products and merchandise, including Roundup products, directly into and through the Commonwealth of Pennsylvania; (3) engaging in business in the Commonwealth of Pennsylvania; and/or (4) owning, using, and/or possessing real property situated in the Commonwealth of Pennsylvania.

36.     At all relevant times, S&H Hardware & Supply Co. has contracted to supply services or things, including Roundup products, in the Commonwealth of Pennsylvania.

37.     At all relevant times, Penn Hardware, Inc., had, and continues to have, regular and systematic contact with and conducts business in and from the Commonwealth of Pennsylvania, such that it has purposefully availed itself of the laws of the Commonwealth and expects to both sue and be sued in Pennsylvania. Additionally, Penn Hardware, Inc.'s presence in the Commonwealth of Pennsylvania satisfies the due process requirements for Pennsylvania courts to exercise jurisdiction over it. Additionally, Penn Hardware, Inc. has consented to the exercise of jurisdiction over it by Pennsylvania courts by registering to and conducting business from the Commonwealth of Pennsylvania.

38.     At all relevant times, Penn Hardware, Inc. has transacted business in the Commonwealth of Pennsylvania including by: (1) selling and distributing products and merchandise, including Roundup products, in the Commonwealth of Pennsylvania for the purpose

Case ID: 210602213

of realizing pecuniary benefit from those sales and distributions; (2) shipping products and merchandise, including Roundup products, directly into and through the Commonwealth of Pennsylvania; (3) engaging in business in the Commonwealth of Pennsylvania; and/or (4) owning, using, and/or possessing real property situated in the Commonwealth of Pennsylvania.

39.     At all relevant times, Penn Hardware, Inc. has contracted to supply services or things, including Roundup products, in the Commonwealth of Pennsylvania.

40.     At all relevant times, Penn Hardware Two, Inc., had, and continues to have, regular and systematic contact with and conducts business in and from the Commonwealth of Pennsylvania, such that it has purposefully availed itself of the laws of the Commonwealth and expects to both sue and be sued in Pennsylvania.  Additionally, Penn Hardware Two, Inc.'s presence in the Commonwealth of Pennsylvania satisfies the due process requirements for Pennsylvania courts to exercise jurisdiction over it. Additionally, Penn Hardware Two, Inc. has consented to the exercise of jurisdiction over it by Pennsylvania courts by registering to and conducting business from the Commonwealth of Pennsylvania.

41.     At all relevant times, Penn Hardware Two, Inc. has transacted business in the Commonwealth of Pennsylvania including by: (1) selling and distributing products and merchandise, including Roundup products, in the Commonwealth of Pennsylvania for the purpose of realizing pecuniary benefit from those sales and distributions; (2) shipping products and merchandise, including Roundup products, directly into and through the Commonwealth of Pennsylvania; (3) engaging in business in the Commonwealth of Pennsylvania; and/or (4) owning, using, and/or possessing real property situated in the Commonwealth of Pennsylvania.

42.     At all relevant times, Penn Hardware Two, Inc. has contracted to supply services or things, including Roundup products, in the Commonwealth of Pennsylvania.

Case ID: 210602213

43.     Venue is proper in Philadelphia County under Pennsylvania Rule of Civil Procedure 2179 because: (1) one or more defendants has a registered office and/or principal place of business located in Philadelphia County; (2) one or more defendants regularly conducts business in Philadelphia County; (3) the cause of action in this case arose in Philadelphia County; and/or (4) one or more transactions or occurrences took place in Philadelphia County out of which the cause of action arose.

<strong><u>LACK OF FEDERAL SUBJECT MATTER JURISDICTION</u></strong>

44.     This case is not removable because Plaintiffs do not make or allege any claims that implicate a federal question. Additionally, the parties are not completely diverse, as is required to make a case removable on the basis of 28 U.S.C. § 1332 and § 1446. And finally, multiple defendants are residents and citizens of the Commonwealth of Pennsylvania. Any attempts to remove this case to federal court would be frivolous and without legal basis.

<strong><u>ALLEGATIONS COMMON TO ALL COUNTS</u></strong>

45.     In 1970, Defendant Monsanto Company, Inc. ("Monsanto") discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup. Roundup is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. In addition to the active ingredient glyphosate, Roundup contains the surfactant Polyethoxylated tallow amine (POEA) and/or adjuvants and other so-called "inert" ingredients. In 2001, glyphosate was the most-used pesticide active ingredient in American agriculture with 85–90 million pounds used annually. That number grew to 185 million pounds in 2007.[1] As of 2013, glyphosate was the world's most widely used herbicide.

---

[1] Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006–2007 Market Estimates* 14 (2011), *available at* http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.

Case ID: 210602213

46.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware.  It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2]  The majority of these seeds are of the Roundup Ready® brand.  The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, because glyphosate can be sprayed in the fields during the growing season without harming the crops.  In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States were Roundup Ready®.[3]

47.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[4]  They are ubiquitous in the environment.  Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup is used.[5]  It has been found in food,[6] in the urine of agricultural workers,[7] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[8]

---

[2] ETC Group, *Who Will Control the Green Economy?* 22 (2011), *available at* http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.

[3] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.

[4] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

[5] *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), *available at* http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also* U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *available at* http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

[6] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup®Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), *available at* http://www.sciencedirect.com/science/article/pii/S0308814613019201.

[7] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), *available at* http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

[8] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), *available at* http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

Case ID: 210602213

48.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate.  That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

49.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate.  In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

50.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*.  The IARC Working Group concluded that the cancers most associated with glyphosate exposure are Non-Hodgkin's Lymphoma ("NHL") and other hematopoietic cancers, including lymphocytic lymphoma / chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[9]

51.     The IARC evaluation is significant.  It confirms what has been believed for years: that glyphosate is toxic to humans.

52.     Nevertheless, Monsanto, since it began selling Roundup, has represented it as safe to humans and the environment.  Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment.

---

9 *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra.*

Case ID: 210602213

## FACTS

53.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

54.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.  Treated plants generally die within two to three days.  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

55.     For nearly 40 years, farms across the world have used Roundup without knowing of the dangers its use poses.  That is because when Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment.  Of course, history has shown that not to be true.  According to the WHO, the main chemical ingredient of Roundup—glyphosate—is a probable cause of cancer.  Those most at risk are farm workers and other individuals with workplace exposure to Roundup, such as garden center workers, nursery workers, and landscapers.  Agricultural workers are, once again, victims of corporate greed.  Monsanto assured the public that Roundup was harmless.  In order to prove this, Monsanto has championed falsified data and has attacked legitimate studies that revealed Roundup's dangers.  Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup is safe.

### The Discovery of Glyphosate and Development of Roundup

56.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the

14

Case ID: 210602213

mid-1970s under the brand name Roundup.[10]  From the outset, Monsanto marketed Roundup as a "safe" general-purpose herbicide for widespread commercial and consumer use.  It still markets Roundup as safe today.[11]

57.     In addition to the active ingredient glyphosate, Roundup formulations also contain adjuvants and other chemicals, such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing.  Growing evidence suggests that these adjuvants and additional components of Roundup formulations are not, in fact, inert and are toxic in their own right.

### Registration of Herbicides under Federal Law

58.     The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq.  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act.  7 U.S.C. § 136a(a).

59.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.  Registration by the EPA, however, is not an assurance or finding of safety.  The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the

---

10 Monsanto, *Backgrounder, History of Monsanto's Glyphosate Herbicide* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

11 Monsanto, *What is Glyphosate?* (Sep. 2, 2015), http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

Case ID: 210602213

product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment."  7 U.S.C. § 136a(c)(5)(D).

60.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide."  7 U.S.C. § 136(bb).  FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted, or a pesticide allowed to continue to be sold in commerce.

61.     The EPA and the State of California registered Roundup for distribution, sale, and manufacture in the United States and the State of California.

62.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup, conducts the health and safety testing of pesticide products.  The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation.  The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

63.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time.  The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1.  In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's recent review and evaluation.

64.     In the case of glyphosate, and therefore Roundup, the EPA had planned on releasing its preliminary risk assessment—in relation to the reregistration process—no later than

Case ID: 210602213

July 2015.  The EPA completed its review of glyphosate in early 2015, but it delayed releasing

the risk assessment pending further review in light of the WHO's health-related findings.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

65.     Based on early studies showing that glyphosate could cause cancer in laboratory

animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C)

in 1985.  After pressure from Monsanto, including contrary studies it provided to the EPA, the

EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991.

In so classifying glyphosate, however, the EPA made clear that the designation did not mean the

chemical does not cause cancer:  "It should be emphasized, however, that designation of an agent

in Group E is based on the available evidence at the time of evaluation and should not be

interpreted as a definitive conclusion that the agent will not be a carcinogen under any

circumstances."[12]

66.     On two occasions, the EPA found that the laboratories hired by Monsanto to test

the toxicity of its Roundup products for registration purposes committed fraud.

67.     In the first instance, Monsanto, in seeking initial registration of Roundup by the

EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide

toxicology studies relating to Roundup.[13]  IBT performed about 30 tests on glyphosate and

glyphosate-containing products, including nine of the 15 residue studies needed to register

Roundup.

68.     In 1976, the United States Food and Drug Administration ("FDA") performed an

inspection of IBT that revealed discrepancies between the raw data and the final report relating

---

12 U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available at*
http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.

13 Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015),
http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

Case ID: 210602213

to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup herbicide to be invalid.[14] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[15]

69.     Three top executives of IBT were convicted of fraud in 1983.

70.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[16]

71.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup in 115 countries.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

72.     The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year

---

14 U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru +1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QF ieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles %5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=an onymous&SortMethod=h%7C- &MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=p%7Cf&De fSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyE ntry=1&SeekPage=x&ZyPURL.

15 Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978)).

16 Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories*, *supra*.

18

Case ID: 210602213

2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

73.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996.  Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds.  It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup herbicide.

74.     Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready® seeds, Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[17]  Today, glyphosate remains one of the world's largest herbicides by sales volume.

*Monsanto has known for decades that it falsely advertises the safety of Roundup*

75.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products.  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds, and fish.  Among the representations the NYAG found deceptive and

---

17 David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

Case ID: 210602213

misleading about the human and environmental safety of glyphosate and/or Roundup are the following:

a) "Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences ..."

b) "And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem."

c) "Roundup® biodegrades into naturally occurring elements."

d) "Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e) "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f) "You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

g) "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h) "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i) "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j) "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[18]

---

[18] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

Case ID: 210602213

76.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)      its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b)      its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

c)      its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d)      its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e)      glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f)      its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

77.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so today.

78.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup.  The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[19]

---

19 *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

Case ID: 210602213

## *Classifications and Assessments of Glyphosate*

79.     The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent.  Over time, the IARC Monograph program has reviewed 980 agents.  Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

80.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[20]  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

81.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts.  Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members.  One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment.  Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation.  Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in *The Lancet Oncology*, and within a year after the meeting, the finalized Monograph is published.

82.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data.  The studies must be publicly available and

---

20 World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

Case ID: 210602213

have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

83.     In March 2015, IARC reassessed glyphosate.  The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

84.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate.  The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

85.     The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

86.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

87.     Exposure pathways are identified as air (especially during spraying), water, and food.  Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

Case ID: 210602213

88.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden.  These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

89.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

90.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells.  One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

91.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma.   A second study reported a positive trend for hemangiosarcoma in male mice.  Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.  A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

92.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption.   Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA).  Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

93.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

94.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[21] Essentially, glyphosate inhibits the biosynthesis of aromatic

---

21 Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra* at 77.

Case ID: 210602213

amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

95.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[22] While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

96.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate.  This technical fact sheet predates IARC's March 20, 2015 evaluation.   The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure

---

22 Anneclare J. De Roos et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Envt'l Health Perspectives 49–54 (2005), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

Case ID: 210602213

may also occur during glyphosate's manufacture, transport storage, and disposal.[23]

97.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[24]

### The Toxicity of Other Ingredients in Roundup

98.     In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendants' Roundup products is more dangerous and toxic than glyphosate alone.  Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[25]

99.     In 2002, a study by Julie Marc, entitled "Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[26]

100.    A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.  The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer.  Failure in the cell-cycle checkpoints leads genomic instability and

---

23 U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *supra.*

24 Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

25 Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup® herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

26 Julie Marc, et al., *Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326–331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.

Case ID: 210602213

subsequent development of cancers from the initial affected cell."  Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[27]

101.   In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup's effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone.  The Peixoto study further suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup formulation.[28]

102.   In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.  The study tested dilution levels of Roundup and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food.  The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone.  The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide.  The study confirmed that the adjuvants present in

---

27 Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

28 Francisco Peixoto, *Comparative effects of the Roundup® and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *available at* https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mit ochondrial_oxidative_phosphorylation.

Case ID: 210602213

Roundup are not, in fact, inert and that Roundup is potentially far more toxic than its active ingredient glyphosate alone.[29]

103.   The results of these studies were at all times available to Defendants.

104.   Monsanto's chief toxicologist Donna Farmer has admitted that she cannot say that Roundup does not cause cancer because Monsanto has not performed carcinogenicity studies with the formulated product Roundup, the very product that caused Ernest Caranci's NHL.[30]   Indeed, she further admitted that in the 35 years that Monsanto has marketed Roundup to the public, Monsanto has conducted no chronic carcinogenicity studies on the formulated Roundup product merely because EPA did not require that such a study be performed for registration of glyphosate.[31]

105.   Defendants thus knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies of Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Ernest Caranci from Roundup.

106.   Despite its knowledge that Roundup is considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe.

***Monsanto's Industry Ties***

107.   Monsanto has been able to leverage its contacts within the EPA to protect glyphosate and Roundup from scrutiny and review.

108.   Internal Monsanto documents, including email communications, demonstrate that Jess Rowland, former Deputy Division Director, Health Effects Division of the EPA's OPP, and

---

29 Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008), *available at* http://big.assets.huffingtonpost.com/france.pdf.

30 *See* Plaintiffs' Submission in Response to Pretrial Order No. 8, Ex. 7, *In re: Roundup® Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 187-7.

31 *See id.*

Case ID: 210602213

formerly the chair of the CARC (the same committee that inadvertently leaked the EPA's glyphosate report in April 2016), repeatedly and directly intervened on Monsanto's behalf. These same documents reveal that Monsanto was secure in the knowledge that it had allies within the EPA.

109.    To begin, in the months following IARC's initial March 2015 announcement that it had classified glyphosate as a probable carcinogen, Monsanto turned its attention to the EPA's review of glyphosate. In one April 27, 2015 email, Monsanto official Bill Heydens wrote to colleagues to suggest "approaching EPA and…. ask if there is anything that would help them defend the situation?" His colleague Dan Jenkins responded: "I think you and I could get on the phone w Jess Rowland and discuss this pretty openly. He'll give us straight talk."[32]

110.    The following day, Mr. Jenkins spoke to Mr. Rowland by telephone and then relayed the substance of the conversation for his colleagues in an April 28, 2015 email. Specifically, he reported back that with respect to the CARC investigation, Mr. Rowland had stated: "We have enough to sustain our conclusions. Don't need gene tox or epi . . . . I am the chair of the CARC and my folks are running this process for glyphosate in reg review. I have called a CARC meeting in June."[33] Thus, even though the ostensible purpose of the CARC review was to evaluate the exhaustive IARC assessment on glyphosate, and even though the full IARC monograph on glyphosate would not be completed until July 2015, Mr. Rowland had already formed his conclusion months earlier—in April 2015.

111.    Mr. Rowland also intervened to halt another agency's review of glyphosate. When the Agency for Toxic Substances and Disease Registry (ATSDR), a federal public health agency

---

32 *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. D, In re: Roundup® Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-4.
33 *Id.*

Case ID: 210602213

of the U.S. Department of Health and Human Services, announced in February 2015 that it planned to publish a toxicological review of glyphosate, it was Mr. Rowland who helped Monsanto stop the ATSDR's investigation.  In the same April 28, 2015, email discussed above, Mr. Jenkins explained that Mr. Rowland wanted to help Monsanto stop an investigation concerning the carcinogenicity of glyphosate being conducted by ATSDR.[34]  Since ATSDR is not controlled by the EPA, according to Mr. Jenkins, Mr. Rowland had bragged: "If I can kill this I should get a medal."[35]  Jenkins cautioned, however, that Monsanto should not "get your hopes up, I doubt EPA and Jess can kill this; but it's good to know they are going to actually make the effort now to coordinate due to our pressing and their shared concern that ATSDR is consistent in its conclusions with the EPA."[36]  The ATSDR never published its toxicological profile of glyphosate.

112.   Further, the released documents reveal Monsanto's confidence that its allies within the EPA would continue to support glyphosate.  In an internal memo on glyphosate, Monsanto executives wrote: "We know, *but cannot say*, that EPA's Office of Pesticide Program scientists strongly feel that glyphosate does not cause cancer and have defended their written determination internally for months."[37]  Notably, when Mr. Rowland attended the IARC glyphosate meetings as an observed for the EPA, internal communications indicate Monsanto was not displeased with his attendance since, "we all know Jess."[38]

---

34 See id.

35 Id.

36 *Id.*

37 See Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. E, In re: Roundup® Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-5 (emphasis original).

38 *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. G, *In re: Roundup® Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-7.

Case ID: 210602213

### *Recent Worldwide Bans on Roundup/Glyphosate*

113.    Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup become more widely known.   The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which will take effect by the end of 2015.   In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons.   In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are.   Especially children are sensitive to toxic substances and should therefore not be exposed to it."[39]

114.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[40]

115.    France banned the private sale of Roundup and glyphosate following the IARC assessment for Glyphosate.[41]

116.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup.   The Bermuda government explained its ban as follows: "Following a recent scientific

---

[39] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, *available at* http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[40] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, GLOBAL RESEARCH, May 14, 2015, *available at* http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; *see* Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do mercado nacional*, April, 14, 2015, *available at* http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

[41] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup® in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen'*, NEWSWEEK, June 15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

31

Case ID: 210602213

study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[42]

117.    The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[43]

118.    The government of Colombia announced its ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[44]

### *Statement of Concern Regarding Glyphosate-Based Herbicides*

119.    On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs).[45]    The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[46]    The researchers drew seven factual conclusions about GBHs:

> 1.    GBHs are the most heavily applied herbicide in the world and usage continues to rise;

---

42 *Health Minister: Importation of Roundup® Weed Spray Suspended,* Today in Bermuda, May, 11 2015, *available at* http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weed-spray-suspended.

43 *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, *available at* http://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/#.VeduYk3bKAw.

44 *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, *available at* http://www.bbc.com/news/world-latin-america-32677411.

45 John P. Myers, et al, *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), *available at* http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

46 *Id.*

Case ID: 210602213

2.     Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

3.     The half-life of glyphosate in water and soil is longer than previously recognized;

4.     Glyphosate and its metabolites are widely present in the global soybean supply;

5.     Human exposures to GBHs are rising;

6.     Glyphosate is now authoritatively classified as a probable human carcinogen; and

7.     Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[47]

120.    The researchers noted that GBH use has increased approximately 100-fold since the 1970s.  Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[48]

121.    The paper attributed uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes

---

[47] *Id.*
[48] *Id.*

33

Case ID: 210602213

between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[49]

122.    Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[50]

123.    The researchers also critiqued the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[51]

124.    The researchers also called for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.[52]

---

49 *Id.*
50 *Id.*
51 *Id.*
52 *Id.*

Case ID: 210602213

125.    The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> "[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects."[53]

126.    Despite these stated concerns, Monsanto, to date, has failed to test its formulated Roundup products.

## TOLLING OF THE STATUTE OF LIMITATIONS

127.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

### *Discovery Rule Tolling*

128.    Plaintiff Ernest Caranci suffers from, has suffered from, and acquired an illness and disease, NHL, that has a latency period and does not arise until years after exposure.

129.    Plaintiff Ernest Caranci had no way of knowing about the risks of serious illness associated with the use of and/or exposure to Roundup and glyphosate and/or reasonably discovering his causes of action and/or that his causes of action were attributable to conduct of

---

[53] *Id.*

Case ID: 210602213

another – Defendants – until he was made aware that his NHL could be caused by his use of and/or exposure to Roundup.

130.    Consequently, the discovery rule applies to this case, and the statute of limitations has been tolled and thus does not being to run until the day that Plaintiff and/or Ernest Caranci knew or had reason to know through the exercise of reasonable diligence that Ernest Caranci's NHL was linked to his use of and/or exposure to Roundup.

131.    Within two years of being diagnosed with NHL, Plaintiff Ernest Caranci could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup and glyphosate is injurious to human health.

132.    Plaintiff Ernest Caranci did not know or have reason to know that he suffered his NHL due to the fault of another or due to his use of and/or exposure to Roundup until 2021.

133.    The very first time plaintiff Ernest Caranci knew or had reason to believe that he developed NHL due to the fault of another or due to his use of and/or exposure to Roundup occurred within 2021.

134.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

*Fraudulent Concealment*

135.    The running of the statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and conduct, as alleged above.  Through their affirmative misrepresentations and omissions upon which Ernest Caranci justifiably relied, Defendants actively concealed from Ernest Caranci the true risks associated with use of or exposure to Roundup.

Case ID: 210602213

136. As a result of Defendants' actions, Ernest Caranci was unaware, and could not reasonably have known or have learned through reasonable diligence, that Ernest Caranci had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

137. Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of Roundup. Defendants were under a duty to disclose the true character, quality and nature of Roundup because this was non-public information over which they continue to have exclusive control. Defendants knew that this information was not available to others, including Ernest Caranci, Ernest Caranci's medical providers and/or their health facilities, yet they failed to disclose the information to the public.

138. Defendants had the ability to and did spend enormous amounts of money in furtherance of their purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiff Ernest Caranci and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and they were forced to rely on Defendants' representations.

### *Estoppel*

139. Defendants were under a continuous duty to disclose to consumers, users and other persons coming into contact with their products, including Plaintiff Ernest Caranci, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup and glyphosate.

140. Instead, Defendants' knowingly, affirmatively, and actively concealed safety information concerning Roundup and glyphosate and the serious risks associated with the use of and/or exposure to its products.

Case ID: 210602213

141.    Based on the foregoing, Defendants' estopped from relying on any statutes of limitations in defense of this action.

142.    The defendants' negligence, recklessness, fraudulent concealment, strict liability, and all other wrongful conduct as alleged throughout the entirety of this Complaint were factual causes of and/or placed plaintiff Ernest Caranci at an increased risk of harm for and/or were substantial factors in causing and did in fact directly and proximately cause the severe, permanent and grievous personal injuries and damages to Ernest Caranci previously described herein which include:

a)    Cancer;

b)    NHL;

c)    Multiple medical tests and procedures for treatment of NHL;

d)    Increased risk of developing NHL;

e)    Development of NHL;

f)    Multiple hospitalizations;

g)    Past and future conscious physical pain and suffering;

h)    Past and future conscious mental and psychological pain and suffering;

i)    Past and future mental anguish, severe emotional distress, disfigurement, embarrassment, humiliation, depression, anxiety, and fear;

j)    Past and future loss of life's pleasures;

k)    Past and future medical expenses;

l)    Past and future loss of income and wages;

m)    Past and future loss of earning capacity;

n)    Past and future pecuniary losses and damages;

o)    Loss of consortium;

Case ID: 210602213

p)   Increased risk of harm; and

q)   All injuries and damages set forth in Ernest Caranci's medical records and otherwise permissible under Pennsylvania law.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

**COUNT ONE: STRICT LIABILITY**
**(Plaintiffs v. All Defendants)**

143.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

144.   All Defendants are in the business of selling Roundup products.

145.   All Defendants had a nondelegable duty to place into the stream of commerce only those products that were free of defects and dangers and, further, to refrain from placing into the stream of commerce products that were in a defective condition, were unreasonably dangerous, that fail to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, and/or for which, on balance, the risks of their design outweigh the benefits of the same.

146.   Defendants Monsanto and/or Bayer AG expected their Roundup products to reach consumers, users, and other persons coming into contact with them, including Ernest Caranci, without substantial change in their condition from when those products were designed and manufactured.

147.   Defendants Monsanto and Bayer AG did, in fact, sell their Roundup products to S&H Hardware & Supply Co., Penn Hardware, Inc., and Penn Hardware Two, Inc. knowing that those Roundup products would reach consumers, users, and other persons coming into contact with

39

Case ID: 210602213

them, including Plaintiff Ernest Caranci, without substantial change in their condition from when those products were designed and manufactured.

148.    S&H Hardware & Supply Co., Penn Hardware, Inc., and Penn Hardware Two, Inc., in turn, sold those Roundup products to consumers, users, and other persons who came into contact with them, including Ernest Caranci, without substantial change in their condition from when those products were designed and manufactured.

149.    At all relevant times, those Roundup products were in a defective condition, were unreasonably dangerous, failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, and/or on balance, the risks of their design outweighed the benefits of the same, once those products reached consumers, users, and other persons who came into contact with them, including Ernest Caranci.

150.    At all times relevant to this litigation, Ernest Caranci used and/or was exposed to Roundup products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

151.    Plaintiff Ernest Caranci could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure.

152.    The harm caused by Roundup products far outweighed their benefit, rendering the products dangerous to an extent beyond that which an ordinary consumer would contemplate.  The Roundup products were and are more dangerous than alternative products and Defendants could have avoided selling the Roundup products in such a dangerous form.  Indeed, at the time that Defendants placed these Roundup products into the stream of commerce, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

Case ID: 210602213

153.    Placing these Roundup products into the stream of commerce amounts to willful, wanton, and/or reckless conduct by Defendants.

154.    As a direct and proximate result of the defective design and manufacture of Roundup products, Ernest Caranci developed NHL and was injured catastrophically, including severe pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, death, economic damages, and all the damages alleged throughout the entirety of this complaint.

155.    Therefore, as a result of the unreasonably dangerous condition of the Roundup products, Defendants are strictly liable to Plaintiffs.

156.    The defects in the Roundup products were substantial and contributing factors in causing Ernest Caranci's grave injuries, and, but for Defendants' misconduct and omissions, Plaintiff Ernest Caranci would not have sustained their injuries.

157.    As a direct and proximate result of the defective design and manufacture of Roundup products, Ernest Caranci developed NHL and was injured catastrophically and caused to suffer severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, death, and economic damages, giving rise to Plaintiffs' damages herein.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

### COUNT TWO:  STRICT LIABILITY FOR DEFECTIVE MANUFACTURE AND DESIGN
**(Plaintiffs v. Defendants Monsanto and Bayer AG)**

158.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

Case ID: 210602213

159.   Plaintiffs bring this strict liability claim against Defendants Monsanto and Bayer AG for defective manufacture and design.

160.   At all relevant times, Defendants Monsanto and Bayer AG engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, users, and other persons coming into contact with them, including Plaintiff Ernest Caranci, thereby placing Roundup products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendants Monsanto and Bayer AG.

161.   At all times relevant to this litigation, Defendants Monsanto and Bayer AG designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by Ernest Caranci, and/or to which Ernest Caranci was exposed, as described above.

162.   At all times relevant to this litigation, Defendants Monsanto and Bayer AG's Roundup products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Ernest Caranci.

163.   At all times relevant to this litigation, Defendants Monsanto and Bayer AG's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Pennsylvania and throughout the United States, including Ernest Caranci, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants Monsanto and Bayer AG.

164.   Defendants Monsanto and Bayer AG's Roundup products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and

Case ID: 210602213

marketed by Defendants Monsanto and Bayer AG, were defectively manufactured and designed by Defendants Monsanto and Bayer AG in that when they left the hands of the Defendants Monsanto and Bayer AG's manufacturers and/or suppliers, they were unreasonably dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

165.    Defendants Monsanto and Bayer AG Roundup products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants Monsanto and Bayer AG, were defective in manufacture, design, and formulation in that when they left the hands of Defendants Monsanto and Bayer AG's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

166.    At all relevant times, Defendants Monsanto and Bayer AG's Roundup products created significant risks to the health and safety of consumers and others who were exposed to the products that far outweigh the risks posed by other products on the market used for the same or similar purpose.

167.    Therefore, at all relevant times to this litigation, Defendants Monsanto and Bayer AG's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants, were defective in design and formulation, in one or more of the following ways:

a)    When placed in the stream of commerce, the Roundup products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect.

b)    When placed in the stream of commerce, the Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

Case ID: 210602213

c)    When placed in the stream of commerce, the Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d)    Defendants Monsanto and Bayer AG did not sufficiently test, investigate, or study its Roundup products and, specifically, the active ingredient glyphosate.

e)    Defendants Monsanto and Bayer AG failed to test, investigate, or study its formulated Roundup products.

f)    Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

g)    Defendants Monsanto and Bayer AG knew or should have known at the time of marketing its Roundup products that exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

h)    Defendants Monsanto and Bayer AG did not conduct adequate post-marketing surveillance of its Roundup products.

i)    Defendants could have employed safer alternative designs and formulations.

168.    At all times relevant to this litigation, Ernest Caranci used and/or was exposed to Defendants Monsanto and Bayer AG's Roundup products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

169.    Ernest Caranci could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure.

170.    The harm caused by Defendants Monsanto and Bayer AG's Roundup products far outweighed their benefit, rendering Defendants Monsanto and Bayer AG's products dangerous to an extent beyond that which an ordinary consumer would contemplate.  Defendants Monsanto and Bayer AG's Roundup products were and are more dangerous than alternative products and Defendants Monsanto and Bayer AG could have designed its Roundup products to make them less dangerous.  Indeed, at the time that Defendants Monsanto and Bayer AG designed their Roundup

44

Case ID: 210602213

products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

171.    Defendants Monsanto and Bayer AG's defective design of Roundup amounts to willful, wanton, and/or reckless conduct by Defendants.

172.    As a direct and proximate result of the defective design and manufacture of Roundup products, Ernest Caranci developed NHL and was injured catastrophically and caused to suffer severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, death, and economic damages, giving rise to Plaintiffs' damages herein.

173.    Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Defendants Monsanto and Bayer AG are strictly liable to Plaintiff.

174.    The defects in Defendants Monsanto and Bayer AG's Roundup products were substantial and contributing factors in causing Plaintiffs' damages, and, but for Defendants Monsanto and Bayer AG's misconduct and omissions, Plaintiffs would not have sustained these damages.

175.    As a direct and proximate result of Defendants Monsanto and Bayer AG placing their defective Roundup products into the stream of commerce, Plaintiff suffered the damages set forth herein.

**WHEREFORE,** Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

## COUNT THREE:  STRICT LIABILITY FOR FAILURE TO WARN
### (Plaintiffs v. All Defendants)

176.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

Case ID: 210602213

177.    Plaintiffs bring this strict liability claim against Defendants for failure to warn.

178.    At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and/or promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Ernest Caranci, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendants.

179.    Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and/or otherwise released into the stream of commerce its Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Ernest Caranci and persons responsible for consumers like him, and Defendants therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

180.    At all times relevant to this litigation, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn users, like Ernest Caranci, of the dangers associated with Roundup use and exposure, and a continuing duty to instruct on the proper, safe use of these products. Defendants, as manufacturers, sellers, and/or distributors of chemical herbicides, are held to the knowledge of experts in the field.

Case ID: 210602213

181.    At the time of manufacture and sale, Defendants could have provided warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

182.    At all times relevant to this litigation, Defendants failed to investigate, study, test, or promote the safety of their Roundup products.  Defendants also failed to minimize the dangers to users and consumers of their Roundup products and to those who would foreseeably use or be harmed by Defendants' herbicides, including Plaintiff Ernest Caranci.

183.    Despite the fact that Defendants knew or should have known that Roundup products posed a grave risk of harm, they failed to warn of the dangerous risks associated with their use and exposure.  The dangerous propensities of their products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied, and/or sold the product, and not known to end users and consumers, such as Ernest Caranci.

184.    Defendants knew or should have known that their Roundup and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products.  Defendants have wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

185.    At all times relevant to this litigation, Defendants' Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products

47

Case ID: 210602213

throughout Pennsylvania and the United States, including Ernest Caranci, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

186.   At all times relevant to this litigation, Ernest Caranci used and/or was exposed to the use of Defendants' Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

187.   Ernest Caranci could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of his exposure. Ernest Caranci relied upon the skill, superior knowledge, and judgment of Defendants.

188.   Defendants knew or should have known that the minimal warnings disseminated with their Roundup products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

189.   The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Ernest Caranci to utilize the products safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to aggressively promote the efficacy of their products, even after they knew or should have known of the unreasonable risks from use or exposure; and/or

Case ID: 210602213

concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

190.    To this day, Defendants have failed to adequately and accurately warn of the true risks injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate, a carcinogen.

191.    To this day, Defendants have failed to test, investigate, or study their formulated Roundup products.

192.    As a result of their inadequate warnings, Defendants' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed and sold by Defendants, and used by consumers including Ernest Caranci.

193.    Defendants are liable to Plaintiffs for injuries caused by their failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their Roundup products and the risks associated with the use of or exposure to Roundup and glyphosate.

194.    The defects in Defendants' Roundup products were substantial and contributing factors in causing Plaintiffs' damages, and, but for Defendants' misconduct and omissions, Plaintiffs would not have sustained these damages.

195.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup products, Ernest Caranci could have avoided the risk of developing injuries as alleged herein and he could have obtained alternative herbicides.

196.    As a direct and proximate result of Defendants placing their defective Roundup products into the stream of commerce and failing to warn Ernest Caranci of the increased risk of

Case ID: 210602213

cancer associated with the use of and/or exposure to Roundup products as described herein, Ernest Caranci has developed NHL and was injured catastrophically, including having been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, death, and economic damages, including for medical care and treatment. Plaintiffs will continue to incur damages associated with these Defendants' failures in the future.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

### COUNT FOUR:  VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES ACT AND CONSUMER PROTECTION LAW, 73 P.S. §§201-1 et seq.
**(Plaintiffs v. All Defendants)**

197.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

198.    At all relevant times, Defendants knew or should have known of the unreasonably dangerous and carcinogenic nature of the use of and/or exposure to Roundup.

199.    At all relevant times, Defendants, through labeling, advertisements, public representations and marketing of Roundup, intentionally used deception, fraud, false pretenses, false promises, misrepresentations, misleading statements, and unfair trade practices in order to mislead consumers that Roundup products are safe for use.

200.    At all relevant times, Defendants also engaged in the concealment, suppression and/or omission of material facts in connection with the sale and/or advertisement of Roundup products in trade or commerce.  In particular, Defendants failed to disclose to the public that Roundup is unsafe and poses serious health hazards, particularly NHL and similarly cancers like B-Cell, which Ernest Caranci had.  Defendants were aware of the hazardous risks posed by

Case ID: 210602213

Roundup and yet failed to inform the public of these risks through their advertisements, labeling, or other means available to them.  Defendants' failure to state material facts about Roundup constitutes a violation of 73 P.S. §§ 201-1 *et seq.*

201.   At all relevant times, Plaintiff Ernest Caranci was deceived by Defendants' intentional misrepresentations and omissions, including by the orchestrated claims made on or in television commercials, advertising materials, websites, and on product labels and packaging regarding the usage and safety of Roundup.

202.   At all relevant times, Plaintiff Ernest Caranci acted in reasonable reliance upon Defendants' unlawful trade practices, and had the Defendants not engaged in the deceptive conduct described herein, Ernest Caranci would not have purchased Roundup® and/or would have protected himself from exposure to Roundup.

203.   As a direct and proximate result of Defendants' unlawful trade practices, Ernest Caranci developed NHL and was injured catastrophically, having been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, death and economic damages.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

### COUNT FIVE:  NEGLIGENCE
### (Plaintiffs v. All Defendants)

204.   Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

Case ID: 210602213

205.    At all relevant times, Defendants breached their duty to Plaintiff Ernest Caranci and were otherwise negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing Roundup products.

206.    Defendants, directly or indirectly, caused Roundup products to be purchased and/or used by Ernest Caranci.

207.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

208.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of Roundup products.  Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup and, in particular, its active ingredient glyphosate.

209.    At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

210.    Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundupproducts could cause Plaintiff Ernest Caranci's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff Ernest Caranci.

Case ID: 210602213

211.    Defendants knew or, in the exercise of reasonable care, should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff Ernest Caranci from Roundup.

212.    Defendants knew or, in the exercise of reasonable care, should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

213.    Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup and glyphosate-containing products.

214.    As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Roundup products, in that Defendants manufactured, produced, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

215.    Defendants failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect consumers like Ernest Caranci from Roundup.

216.    Despite their ability and means to investigate, study, and test Roundup products and to provide adequate warnings, Defendants have failed to do so.  Indeed, Defendants have

Case ID: 210602213

wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

217. Defendants' negligence included:

a) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup products without thorough and adequate pre- and post-market testing;

b) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c) Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d) Failing to test, investigate, or study formulated Roundup products;

e) Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f) Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

g) Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

h) Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use and/or be exposed to Roundup products;

i) Failing to disclose to Plaintiff Ernest Caranci, users, consumers, and the general public that the use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

j) Failing to warn Plaintiff Ernest Caranci, and other users, consumers, and the general public that the product's risk of harm was unreasonable and that

Case ID: 210602213

there were safer and effective alternative herbicides available to Plaintiff, Ernest Caranci, and other users or consumers;

k)     Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-containing products;

l)     Representing that Roundup products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended use;

m)     Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup and glyphosate;

n)     Advertising, marketing, and recommending the use of Roundup products, while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of or exposure to Roundup and glyphosate;

o)     Continuing to disseminate information to its consumers, which indicate or imply that Roundup products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

p)     Continuing the manufacture and sale of Roundup products with the knowledge that the products were unreasonably unsafe and dangerous.

218.    Defendants knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiff Ernest Caranci, would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup.

219.    Plaintiff Ernest Caranci did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

220.    Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff Ernest Caranci suffered, and will continue to suffer, as described herein.

Case ID: 210602213

221.   Defendants' conduct, as described above, was reckless.  Defendants regularly risk the lives of consumers and users of Roundup products, including Plaintiff Ernest Caranci, with full knowledge of the dangers of these products.  Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff Ernest Caranci, with respect to the dangers of Roundup about which Defendants knew but the public, including Plaintiff Ernest Caranci, did not. Defendants' reckless conduct therefore warrants an award of punitive damages.

222.   As a proximate result of Defendants' wrongful acts and omissions in placing defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Ernest Caranci developed NHL and was injured catastrophically, having been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, death, and economic damages, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

### COUNT SIX:  BREACH OF IMPLIED WARRANTIES
### (Plaintiffs v. All Defendants)

223.   Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

224.   At all relevant times, Defendants engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to users, consumers and those

Case ID: 210602213

in proximity to users, including Plaintiff Ernest Caranci, thereby placing Roundup products into the stream of commerce.   These actions were under the ultimate control and supervision of Defendants.

225.   Before the time that Ernest Caranci was exposed to the use of the aforementioned Roundup products, Defendants impliedly warranted to its consumers and users—including Plaintiff Ernest Caranci —that its Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

226.   Defendants, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' damages.

227.   Defendants further failed to test, investigate, or study its formulated Roundup products.

228.   Upon information and belief, Plaintiff Ernest Caranci reasonably relied upon the skill, superior knowledge and judgment of Defendants and upon their implied warranties that the Roundup products were of merchantable quality and fit for their intended purpose or use.

229.   Upon information and belief, Plaintiff Ernest Caranci reasonably relied upon the skill, superior knowledge and judgment of Defendants and upon their implied warranties that the Roundup products were of merchantable quality and fit for their intended purpose or use.

230.   The Roundup products were expected to reach and did in fact reach consumers, users and those in proximity to users, including Plaintiff Ernest Caranci, without substantial change in the condition in which they were manufactured and sold by Defendants.

231.   At all relevant times, Defendants were aware that consumers, users, and those in proximity of users of its products, including Plaintiff Ernest Caranci, would use Roundup products

Case ID: 210602213

as marketed by Defendants, which is to say that Plaintiff Ernest Caranci was a foreseeable user of Roundup.

232.    Defendants intended that their Roundup products be used in the manner in which Ernest Caranci in fact used or was exposed to them and Defendants impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

233.    In reliance upon Defendants' implied warranty, Ernest Caranci used or was in proximity to the use of Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendants.

234.    Plaintiff Ernest Caranci could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

235.    Defendants breached their implied warranties to Plaintiff Ernest Caranci in that their Roundup products were not of merchantable quality, safe, or fit for their intended use, or adequately tested.  Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

236.    The harm caused by Defendants' Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

237.    As a direct and proximate result of Defendants' wrongful acts and omissions Ernest Caranci suffered severe and permanent physical and emotional injuries, including but not limited to and untimely death.  Plaintiffs will continue to incur these expenses in the future.

Case ID: 210602213

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

## COUNT SEVEN: FRAUDULENT CONCEALMENT
### (Plaintiffs v. All Defendants)

238.   Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

239.   Defendants are estopped from asserting a statute of limitations defense because they fraudulently concealed their wrongful conduct from Plaintiff Ernest Caranci with the intent that Plaintiff Ernest Caranci, as well as other consumers and users of Roundup, would justifiability rely on such material representations, on which Plaintiff, Ernest Caranci, and others similarly situated did justifiability rely.

240.   Defendants had actual knowledge that exposure to Roundup and, specifically, its active ingredient, glyphosate, could result in cancer and other severe illnesses and injuries. Defendants knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies of Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff Ernest Caranci from Roundup.

241.   Defendants failed to conduct adequate testing of glyphosate and the Roundup formulation.

242.   Defendants had actual knowledge of its misrepresentations, negligence, breach of warranties, and false, misleading, deceptive, and unconscionable conduct. Even so, Defendants perpetuated its wrongful conduct with the intent and fixed purpose of concealing its wrongs from Plaintiff, Ernest Caranci, and the public at large. Despite their knowledge that Roundup is

Case ID: 210602213

considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe.

243.  Plaintiff Ernest Caranci was unaware of the falsity of these representations, acted in actual and justifiable reliance on such material misrepresentations, and were injured as a direct and proximate result.

244.  Additionally, Defendants knowingly omitted material information and remained silent regarding said misrepresentations despite the fact that they had a duty to inform Plaintiff Ernest Caranci, and the general public, of the inaccuracy of said misrepresentations, which omission constitutes a positive misrepresentation of material fact, with the intent that Plaintiff, Ernest Caranci, and the general public would rely on Defendants' misrepresentations.

245.  Plaintiff, Ernest Caranci, and the general public did, in fact, act in actual and justifiable reliance on Defendants' representations, and Plaintiff Ernest Caranci suffered damages as a result.

246.  Defendants, as the manufacturers and sellers of Roundup, were in a position of superior knowledge and judgment regarding any potential risks associated with its products.

247.  Defendants committed constructive fraud by breaching one or more legal or equitable duties owed to Plaintiff, Ernest Caranci, and the general public relating to Roundup, said breach or breaches constituting fraud because of their propensity to deceive others or constitute an injury to public interests or public policy.

248.  In breaching its duties to Plaintiff Ernest Caranci, Defendants used their position of trust as the manufacturer and/or distributor of Roundup to increase sales of its products at the expense of informing Plaintiff, Ernest Caranci, and the general public, that use of or exposure to Roundup® carries the risk of serious illness, such as NHL and other similar cancers.

Case ID: 210602213

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

## COUNT EIGHT:  LOSS OF CONSORTIUM
### (Plaintiff Carmela Caranci v. All Defendants)

249.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

250.    At all material times hereto, Plaintiff, Carmela Caranci, was and is married to Ernest Caranci.

251.    As a direct and proximate result of the Defendants' negligence, recklessness, fraudulent concealment, strict liability, and all other wrongful conduct as alleged throughout the entirety of this Complaint and as described and incorporated by reference as though fully set forth herein, Carmela Caranci suffered the loss of services, society, comfort and companionship of her husband, Ernest Caranci, in the past and will continue to do so indefinitely into the future.

252.    As a direct and proximate result of the Defendants' negligence, recklessness, fraudulent concealment, strict liability, and all other wrongful conduct as alleged throughout the entirety of this Complaint and as described and incorporated by reference as though fully set forth herein, Carmela Caranci claims the full measure of damages allowable under Pennsylvania law for the loss of consortium of her husband.

253.    Carmela Caranci suffered a loss of consortium for the loss of their spouse's service, society, companionship, aid, affection, and sexual relations as a direct and proximate result of their spouse's injuries due to the acts and/or omissions of the Defendants as outlined throughout the entirety of this Complaint, to which they are entitled compensation.

Case ID: 210602213

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against all

Defendants, individually, jointly, and severally, in an amount in excess of the prevailing

arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

Respectfully submitted,
**KLINE & SPECTER, P.C.**

By: 
THOMAS R. KLINE, ESQUIRE
KILA B. BALDWIN, ESQUIRE
THOMAS E. BOSWORTH, ESQUIRE
PHILIP M. PASQUARELLO, ESQUIRE
*Attorneys for Plaintiffs*

Date: 6/29/21

62

Case ID: 210602213

## VERIFICATION

I, Ernest Caranci, hereby verify that I am the plaintiff in the foregoing action; that the attached Complaint is based upon information which I have furnished to my counsel and information which has been gathered by my counsel in the preparation of the lawsuit. The language of the Complaint is that of counsel and not of affiant. I have read the Complaint and to the extent that the allegations therein are based upon information I have given counsel, they are true and correct to the best of my knowledge, information, and belief. To the extent that the contents of the Complaint are that of counsel, I have relied upon counsel in making this Verification. I understand that false statements made herein are made subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsifications to authorities.

_____
ERNEST CARANCI

**KLINE & SPECTER, P.C.**
By:    THOMAS R. KLINE, ESQUIRE
         KILA B. BALDWIN, ESQUIRE
         THOMAS E. BOSWORTH, ESQUIRE
         PHILIP M. PASQUARELLO, ESQUIRE
Attorney I.D. Nos. 28895/94430/323350/326263
1525 Locust Street
Philadelphia, PA   19102
(215) 772-1000

*Filed and Attested by the
Office of Judicial Records
30 JUL 2021 10:52 am
C. JONES*

*Attorneys for Plaintiffs*

|  |  |
|---|---|
| ERNEST CARANCI and CARMELA CARANCI, | COURT OF COMMON PLEAS |
| | PHILADELPHIA COUNTY |
| *Plaintiffs*, | |
| v. | JUNE TERM, 2021 |
| MONSANTO COMPANY, et al. | NO. 002213 |
| *Defendants.* | |

## ENTRY OF APPEARANCE

TO THE PROTHONOTARY:

      Kindly enter my appearance as co-counsel for Plaintiffs in the above captioned matter.

                        **KLINE & SPECTER, P.C.**

                    By:    */s/ Thomas R. Kline*
                           THOMAS R. KLINE, ESQUIRE
                           *Attorney for Plaintiffs*

Date:   7/30/21

*Filed and Attested by the*
*Office of Judicial Records*
*30 JUL 2021 04:23 pm*

|  |  |
|---|---|
| ERNEST CARANCI and | : COURT OF COMM. PLEAS |
| CARMELA CARANCI | : PHILADELPHIA COUNTY |
|  | : |
| Plaintiffs, | : |
| v. | : JUNE TERM, 2021 |
|  | : |
| MONSANTO COMPANY, BAYER AG, | : NO. 02213 |
| S&H HARDWARE & SUPPLY CO., PENN | : |
| HARDWARE, INC. and PENN HARDWARE | : |
| TWO, INC. | : |
| Defendants. | : |

## ORDER

AND NOW, this _____ day of _____, 2021, upon consideration of the Preliminary Objections of Defendant Penn Hardware Two, Inc. and any response thereto, it is hereby **ORDERED** that the Preliminary Objections are **SUSTAINED** and Counts Four, Five, Six and Seven of Plaintiffs' Complaint are **DISMISSED WITH PREJUDICE,** and that all requests for punitive damages, pre-judgment interest, delay damages and costs are **DENIED**.

BY THE COURT:

_____ **, J.**

15040237-1

**NOTICE TO PLEAD**
**TO: Plaintiff**

**You are hereby notified to plead to the within Preliminary Objections within twenty (20) days from service hereof.**

**RAWLE & HENDERSON LLP**

**By:** /s/ John C. McMeekin II
      *Attorneys for Penn Hardware Two, Inc.*

**RAWLE & HENDERSON LLP**
By:    John C. McMeekin II, Esquire
       Anisha S. Abraham, Esquire
Identification Nos.: 81250 / 205538
The Widener Building
One South Penn Square
Philadelphia, Pennsylvania 19107
Telephone:    (215) 575-4200
Facsimile:    (215) 563-2583
jmcmeekin@rawle.com
aabraham@rawle.com
*Attorneys for Defendant Penn Hardware Two, Inc.*

| | | |
|---|---|---|
| | : | |
| ERNEST CARANCI and | : | COURT OF COMMON PLEAS |
| CARMELA CARANCI | : | PHILADELPHIA COUNTY |
| | : | |
| Plaintiffs, | : | |
| v. | : | JUNE TERM, 2021 |
| | : | |
| MONSANTO COMPANY, BAYER AG, | : | NO. 02213 |
| S&H HARDWARE & SUPPLY CO., PENN | : | |
| HARDWARE, INC. and PENN HARDWARE | : | |
| TWO, INC. | : | |
| | : | |
| Defendants. | : | |

**PRELIMINARY OBJECTIONS OF DEFENDANT**
**PENN HARDWARE TWO, INC. TO PLAINTIFFS' COMPLAINT**

Pursuant to Rule 1028(a)(2)-(4) of the Pennsylvania Rules of Civil Procedure, and Local

Rule 1028(c), Defendant Penn Hardware Two, Inc. ("Penn Hardware Two"), by and through its

Case ID: 210602213
Control No.: 21076807

undersigned counsel of record, files its Preliminary Objections to Count Four (Violation of Pennsylvania Unfair Trade Practices Act and Consumer Protection Law), Count Five (Negligence), Count Six (Breach of Implied Warranties), and Count Seven (Fraudulent Concealment).  In support of its preliminary objections, Penn Hardware Two avers as follows:

<u>**First Preliminary Objection pursuant to Counts Four and Seven --**</u>
<u>**Failure of a Pleading to Conform to Rule of Court**</u>

1.     Pa.R.C.P. 1028(a)(2) provides in relevant part for the filing of preliminary objections when a pleading fails to conform with a rule of court.

2.     Pennsylvania Rule of Civil Procedure 1019(b) requires that averments of fraud be pled with particularity.

3.     Counts Four (Violation of Unfair Trade Practices and Consumer Protection Law) and Seven (Fraudulent Concealment) of Plaintiffs' Complaint allege causes of action based in Fraud.

4.     To plead a claim of fraud, Pennsylvania requires that plaintiffs must specifically allege all facts constituting fraud: they must aver with the requisite particularity, the material misrepresentation of an existing fact, scienter, justifiable reliance on the misrepresentation, and damages. *Booze v. Allstate Ins. Co*., 750 A.2d 877, 880 (Pa. Super. Ct. 1999) (citation omitted).

5.     Additionally, under Pennsylvania law, "a plaintiff alleging violations of the Consumer Protection Law must prove the common law fraud element of justifiable reliance." *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 208 (Pa. 2007). Plaintiff must prove "the traditional common law elements of reliance and causation" because "[t]he UTPCPL's 'underlying foundation is fraud prevention." *Weinberg v. Sun Co., Inc.*, 777 A.2d 442, 446 (Pa. 2001) (quoting *Commw. v. Monumental Props., Inc.*, 329 A.2d 812, 816 (1974)).

Case ID: 210602213
Control No.: 21076807

6.    In Count Four, Plaintiffs allege fraud based claims under Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"). *See* Compl. at Count Four.

7.    Plaintiffs allege that Penn Hardware Two "intentionally used deception, fraud, false pretenses, false promises, misrepresentations, misleading statements, and unfair trade practices in order to mislead consumers..." *Id*. at ¶ 199.

8.    Plaintiffs alleges that Plaintiff Ernest Caranci was deceived by "intentional misrepresentations and omissions, including by the orchestrated claims made on or in television commercials, advertising materials, websites, and on product labels and packaging regarding the usage and safety of Roundup." *Id*. at 201.

9.    Plaintiffs do not allege any facts specifying the alleged statements made, when they were made, or how they were made to Plaintiff.

10.    Plaintiffs' complaint merely tracks the elements of the UTPCPL statute but fails to plead any facts supporting the when, where and how with the requisite particularity. *Id*. at ¶¶ 198-203.

11.    In Count Seven, Plaintiffs allege that defendants "fraudulently concealed their wrongful conduct from Plaintiff." Compl. at ¶¶ 238-248.

12.    However, like Count Four, Count Seven includes only vague and conclusory statements that Penn Hardware Two engaged in fraud but fails to quote any specific statement of fact that which they assert was fraudulently made, and fails to plead specific dates from which Penn Hardware Two can begin to ascertain when the alleged fraudulent misrepresentations were made to Plaintiff. *Id*.

Case ID: 210602213
Control No.: 21076807

13.    For the foregoing reasons, Plaintiffs' claims for violation of the Unfair Trade Practices Act and Fraudulent Concealment should be dismissed for failure to conform to Rule of Court.

WHEREFORE, Defendant respectfully requests that this Court sustain its preliminary objections and strike Counts Four and Seven of Plaintiffs' Complaint with prejudice.

**Second Preliminary Objection pursuant to Pa. R. Civ. P. 1028(a)(3) and (4) – Legal Insufficiency of Count Five – Negligence Claim**

14.    Penn Hardware Two incorporates the averments in paragraphs 1 through 13 inclusive as though fully set forth herein.

15.    Pa.R.C.P. 1028(a)(3) and (4) provide in relevant part for the filing of preliminary objections when a pleading is legally and factually insufficient.

16.    Plaintiffs' allegations are legally insufficient to state a claim that Penn Hardware Two is liable for negligence.

17.    To establish a negligence claim, a plaintiff must plead and prove (1) the existence of a duty or obligation recognized by law, (2) a breach of that duty, (3) a causal connection between the breach and the resulting injury, and (4) actual loss or damage suffered. *Atcovitz v. Gulph Mills Tennis Club, Inc.*, 812 A.2d 1218, 1222 (Pa. 2002).

18.    A negligence claim fails if the law imposes no duty of care on the defendant to the plaintiff.  *See Gerace v. Holmes Protection of Phila.*, 357 Pa. Super 467, 472, 516 A.2d 354, 357 (1986).

19.    Pennsylvania law is clear that retail vendors are not liable to customers for injuries caused by latent defect in the article when resold in its original sealed package with the manufacturer's warnings and direction for use.  *Kratz v. Am. Stores Co.,* 59 A.2d 138, 139 (Pa. 1948). "The rule of the nonliability of vendors in 'original package' cases is firmly established in

Case ID: 210602213
Control No.: 21076807

the law." *Id.* at 139-40 (Pa. 1948) (noting it would be "wholly impractical" to require a "vendor of a manufactured article" to inspect every single item the vendor sells that is made by another).  *See also* Restatement (Second) of Torts § 402 (1965) (Cmt. e) ("When the seller reasonably believes the chattel is safe, his representation in good faith to that effect is neither fraudulent, reckless, nor negligent.").

20.     Without pleading any facts to establish a duty, Plaintiffs baldly allege that Penn Hardware Two breached its duty to Plaintiff and was "negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing Roundup products."  Compl. at ¶ 205.

21.     Plaintiffs do not and cannot allege that Penn Hardware Two, a merchandise retailer, manufactured or designed the fertilizer product at issue, or had any control over its manufacture, design, or development of warnings.   Compl. ¶ 26 (acknowledging Penn Hardware Two as the retailer that sold the Product).

22.     There is no allegation that Penn Hardware Two in any way altered the Product's original packaging before selling it to Plaintiff.

23.     Plaintiffs' negligence claim against Penn Hardware Two must be dismissed because the Complaint fails to identify any duty that Penn Hardware Two owed to Plaintiff concerning the testing, inspection, labeling, or research of the Products.

24.     Plaintiffs' negligence claim should be dismissed for the additional reason of factual insufficiency, as it recites a series of boilerplate allegations but is devoid of factual support.

25.     Pennsylvania Rule of Civil Procedure 1019(a) requires a complaint to contain the "material facts on which a cause of action or defense is based." To survive a demurrer, a complaint must contain more than a "generic, barebones claim*." Donaldson v. Davidson Bros., Inc.*, 144 A.3d

15040237-1

Case ID: 210602213
Control No.: 21076807

93, 103 (Pa. Super. Ct. 2016). *See also Landau v. W. Pennsylvania Nat'l Bank*, 282 A.2d 335, 339

(Pa. 1971) ("The purpose of [Pa. R. C. P. 1019(a)] is to require the pleader to disclose the 'material

facts' sufficient to enable the adverse party to prepare his case.") (citations omitted).

26.     Plaintiffs assert generic, boilerplate allegations that Penn Hardware Two breached

its duty to exercise reasonable care in the design, research, development, manufacture, testing,

marketing, supply, promotion, advertisement, packaging, sale, and distribution of Roundup®

products resulting in Plaintiff's alleged injuries.  Compl.  ¶¶ 214-15.

27.     The allegations parrot the elements of a negligence claim but contain no specific

facts, let alone material facts to explain with specificity the core allegations of his negligence claim.

28.     For the foregoing reasons, Plaintiffs' Negligence claim is legally and factually

insufficient and should be dismissed for failure to state a claim for negligence against Penn

Hardware Two.

WHEREFORE, Defendant requests that the Court sustain its Preliminary Objections and

strike Count Five of Plaintiffs' Complaint with prejudice.

### Third Preliminary Objection pursuant to Pa. R. Civ. P. 1028(a)(3) and (4) --  Legal Insufficiency of Count Six - Implied Warranties

29.     Penn Hardware Two incorporates the averments in paragraphs 1 through 28

inclusive as though fully set forth herein.

30.     Plaintiffs' claim that Penn Hardware Two is liable for breach of an implied

warranty also fails for legal and factual insufficiency under Pa.R.C.P. 1028(a)(3) and (4).

31.     Plaintiffs allege that Penn Hardware Two impliedly warranted that Roundup® was

"of merchantable quality and safe and fit for the use for which they were intended." Compl. ¶ 225.

32.     Implied warranties of fitness for a particular purpose exist where the seller at the

time of contract has reason to know (1) any particular purpose for which the goods are required;

Case ID: 210602213
Control No.: 21076807

and (2) that the buyer is relying on the skill or judgment of the seller to select or furnish suitable goods. *Allen-Myland, Inc. v. Garmin Int'l, Inc.*, 2016 PA Super 107, 140 A.3d 677, 683 (Pa. Super. Ct. 2016) (quoting 13 Pa. C.S.A. § 2315).

33.     In Pennsylvania, "[a]n implied warranty of merchantability arises by operation of law and warrants that the goods are of reasonable quality and are fit for the ordinary purpose for which they are sold." *Whitson v. Safeskin Corp.*, 313 F. Supp. 2d 473, 480 (M.D. Pa. 2004) (citing *Hornberger v. Gen. Motors Corp.*, 929 F. Supp. 884, 887–88 (E.D. Pa. 1996)).

34.     Plaintiffs' Complaint recites generic boilerplate assertions but lacks a single fact to support an inference that Penn Hardware Two knew of a particular purpose, knew that Plaintiff was relying on Penn Hardware Two to select suitable goods, or that Penn Hardware Two selected or furnished those goods especially for Plaintiff.

35.     Where, as here, no allegations in the Complaint support a conclusion that Penn Hardware Two knew of Plaintiff's intended purposes, Plaintiffs "fail[] to advance a plausible claim as to a breach of implied warranty of fitness for a particular purpose." *Painter Tool*, *Inc. v. Dunkirk Specialty Steel, LLC*, No. CV 17-206. 2017 WL 2985578, at *4-5 (W.D. Pa. July 13, 2017).

36.     Additionally, Plaintiffs fail to state a claim for implied warranty because they do not allege that the Products failed to accomplish the "ordinary purpose" for which they were sold.

37.     Based on Plaintiffs' own allegations, the "ordinary purpose" of the Products stated in Monsanto's advertising is a "general-purpose herbicide." Compl. ¶ 56. Plaintiffs do not contend the Products did not accomplish this purpose.  Thus, the harm they complain of is not a harm that they can recover for under a theory of breach of an implied warranty. *Whitson*, 313 F. Supp. 2d at 480 n.9.

Case ID: 210602213
Control No.: 21076807

38.     Based on the foregoing, Plaintiffs have not and cannot state a cause of action against Penn Hardware Two based in implied warranty and Count Six is legally and factually insufficient.

WHEREFORE, Defendant requests that the Court sustain its Preliminary Objections and strike Count Six of Plaintiffs' Complaint with prejudice.

### Fourth Preliminary Objection Pursuant to Pa.R.C.P. 1028(4) -- Legal Insufficiency

39.     Penn Hardware Two incorporate the averments in paragraphs 1 through 38 inclusive as though fully set forth herein.

**A.     Plaintiffs Are Not Entitled to Punitive Damages**

40.     Plaintiffs have sought punitive damages in each *ad damnum* clause of each Count in the Complaint.  *See* Compl. at *ad damnum* clauses.

41.     The causes of action against Penn Hardware Two consist of negligence, strict liability, implied warranty, and fraud-based claims.  These claims do not contain allegations of outrageous conduct necessary for recovery of punitive damages.

42.     Punitive damages are referred to as "exemplary damages" which have been defined as damages awarded to "punish the defendant for his evil behavior or to make an example of him. *G.J.D. v. Johnson,* 713 A.2d 1127 (Pa. 1998) (*citing* BLACKS LAW DICTIONARY 390 (6th ed. 1990) (emphasis added)).  When assessing the viability of a punitive damages claim, "the state of mind of the actor is vital" and the tortfeasor's act or failure to act "must be intentional, reckless or malicious." *Hutchinson v. Luddy,* 870 A.2d 766, 770-71 (Pa. 2005).

43.     The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care.  *Albright v. Abington Mem. Hosp.*, 696 A.3d 1159, 1164 (Pa. 1997).  A showing of mere negligence, or even gross negligence, will not suffice to establish that punitive damages should be imposed.  *Phillips v. Cricket Lighters*, 883 A.2d 439, 445 (Pa. 2005).

15040237-1

Case ID: 210602213
Control No.: 21076807

44.     The Pennsylvania Supreme Court established that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey,* 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, 12-13 (2006) (*quoting Phillips v. Cricket Lighters,* 883 A.2d 439, 445 (Pa. 2005)). In fact, punitive damages are specifically designed "to heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Id.* at 446.

45.     A punitive damages claim must be supported by evidence sufficient to establish that: (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted or failed to act in conscious disregard of that risk. *Hutchinson,* 870 A.2d at 772.

46.     Plaintiffs have failed to set forth any allegations against Penn Hardware Two which rise to the level of extreme, outrageous, and evil behavior or motive such that the Defendants should be subject to punitive damages. *See* Compl.

47.     Each request for punitive damages in the *ad damnum* clauses must be stricken and dismissed.

### B.     Plaintiffs Are Not Entitled to Costs and the Request for Delay Damages is Premature

48.     Plaintiffs' Complaint also improperly seeks recovery for pre-judgment interest, delay damages and costs in the ad damnum clause for each Count. *See generally, id.*

49.     Pursuant to the "American Rule," litigants are responsible for their own litigation costs and may not recover them from an adverse party unless there is express statutory authorization, a clear agreement of the parties, or some other established exception." *In re Farnese*, 17 A.3d 357, 370 (Pa. 2011).

50.     Plaintiffs set forth no basis for seeking costs and each request must be stricken.

15040237-1

Case ID: 210602213
Control No.: 21076807

51.     Pennsylvania statutes do not provide for pre-judgment interest.  Any award of damages is subject to *post*-judgment interest from the date on which the judgment is finally entered. 42 Pa. Stat. § 8101.

52.     In addition, Plaintiffs' request for delay damages is premature.

53.     Pa.R.C.P. 238(a)(2) provides that delay damages only begin to accrue from "a date one year after original process was served in the action," which has not yet occurred in this matter.

54.     Because delay damages have not yet accrued, Plaintiffs' request for the same are premature and legally insufficient.

WHEREFORE, Penn Hardware Two, Inc. respectfully requests this Honorable Court sustain the within Preliminary Objections by filing the Order filed herewith.

Respectfully Submitted,

**RAWLE & HENDERSON** LLP

Dated:  July 30, 2021          By:   */s/ John C. McMeekin II*
                                     John C. McMeekin II, Esquire (No. 81250)
                                     Anisha S. Abraham, Esquire (No. 205538)
                                     The Widener Building
                                     One South Penn Square
                                     Philadelphia, Pennsylvania  19107
                                     Telephone: (215) 575-4200
                                     jmcmeekin@rawle.com
                                     aabraham@rawle.com

                                     *Attorneys for Penn Hardware Two, Inc.*

15040237-1

Case ID: 210602213
Control No.: 21076807

**RAWLE & HENDERSON** LLP
By:     John C. McMeekin II, Esquire
          Anisha S. Abraham, Esquire
Identification Nos.: 81250 / 205538
The Widener Building
One South Penn Square
Philadelphia, Pennsylvania  19107
Telephone:     (215) 575-4200
Facsimile:     (215) 563-2583
jmcmeekin@rawle.com
aabraham@rawle.com
*Attorneys for Defendant Penn Hardware Two, Inc.*

| | |
|---|---|
| ERNEST CARANCI and | : COURT OF COMMON PLEAS |
| CARMELA CARANCI | : PHILADELPHIA COUNTY |
| | : |
| Plaintiffs, | : |
| v. | : JUNE TERM, 2021 |
| | : |
| MONSANTO COMPANY, BAYER AG, | : NO. 02213 |
| S&H HARDWARE & SUPPLY CO., PENN | : |
| HARDWARE, INC. and PENN HARDWARE | : |
| TWO, INC. | : |
| | : |
| Defendants. | : |

**BRIEF IN SUPPORT OF DEFENDANT PENN HARDWARE TWO, INC.'S
PRELIMINARY OBJECTIONS TO PLAINTIFFS' COMPLAINT**

**I.       MATTER BEFORE THE COURT**

Defendant Penn Hardware Two, Inc. ("Penn Hardware Two") hereby submits its Brief in

Support of its Preliminary Objections to the Complaint filed by Plaintiffs Ernest Caranci

("Plaintiff") and Carmela Caranci ("Plaintiffs").  A true and correct copy of Plaintiffs' Complaint

is attached as Exhibit "A."

15040237-1

Case ID: 210602213
Control No.: 21076807

II.   **QUESTIONS PRESENTED**

A.   Does Plaintiffs' Complaint fail to state a cause of action against Penn Hardware Two for Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (Count Four)?

Suggested Answer: **Yes.**

B.   Does Plaintiffs' Complaint fail to state a cause of action against Penn Hardware Two for Fraudulent Concealment (Count Seven)?

Suggested Answer: **Yes.**

C.   Does Plaintiffs' Complaint fail to state a cause of action against Penn Hardware Two for Negligence (Count Five)?

Suggested Answer: **Yes.**

D.   Does Plaintiffs' Complaint fail to state a cause of action against Penn Hardware Two for Breach of Implied Warranty (Count Six)?

Suggested Answer: **Yes.**

III.   **BACKGROUND**

This is a product liability action in which Plaintiffs sued Penn Hardware Two in its capacity as a retail vendor of Roundup®-branded herbicides manufactured by Monsanto Company ("Monsanto").   In their Complaint, Plaintiffs allege that Plaintiff Ernest Caranci developed Non-Hodgkin's Lymphoma ("NHL") allegedly caused by his exposure to Monsanto's Roundup®-branded herbicides, which he purchased from Penn Hardware Two within the Commonwealth of Pennsylvania and City of Philadelphia, including this county. Compl. at ¶ 6. Plaintiffs bring claims against Penn Hardware Two sounding in Strict Liability (Count One); Strict Liability for Failure to Warn (Count Three); Violation of Pennsylvania Unfair Trade Practices Act and Consumer

Case ID: 210602213
Control No.: 21076807

Protection Law (Count Four); Negligence (Count Five); Breach of Implied Warranties (Count Six); Fraudulent Concealment (Count Seven); and Loss of Consortium (Count Eight).

Counts Four, Five, Six and Seven of the Complaint should be dismissed because they fail to set forth allegations sufficient to establish causes of action for violation of Pennsylvania Unfair Trade Practices Act and Consumer Protection Law, for negligence, for breach of implied warranty, and fraudulent concealment. Containing only vague and boilerplate accusations, these Counts are legally and factually insufficient. Plaintiffs' Complaint also contains legally insufficient requests for punitive damages, pre-judgment interest, delay damages and costs, all of which much be stricken.  As set forth herein, Penn Hardware Two objects on these grounds.

### IV.    **LEGAL ARGUMENT**

Any party may file preliminary objections to any pleading for a variety of reasons, including (1) lack of jurisdiction over the subject matter or the person of the defendant, improper venue or improper form of service of a writ of summons or a complaint (2) failure of a pleading to conform to law or rule of court; (3) insufficient specificity in a pleading; and/or (4) legal insufficiency of a pleading (demurrer).  Pa. R.C.P. 1028(a).

The Court should sustain preliminary objections if the pleading is "legal[ly] insufficient." Pa. R.C.P. 1028(a)(4).  "Preliminary objections in the nature of a demurrer test the legal sufficiency of the complaint.  When considering preliminary objections, all material facts set forth in the challenged pleadings are admitted as true, as well as all inferences reasonably deducible therefrom."  *Adams v. Hellings Builders, Inc.*, 146 A.3d 795, 798 (Pa. Super. Ct. 2016) (internal quotation marks omitted).  When adjudicating preliminary objections in the nature of a demurrer, the trial court need not accept any unwarranted inferences, argumentative allegations, or expressions of opinion.  *Silo v. Ridge*, 728 A.2d 394, 398 (Pa. Commw. Ct. 1999); *Griffin v.*

Case ID: 210602213
Control No.: 21076807

*Chronister*, 616 A.2d 1070 (Pa. Commw. Ct. 1992).  The court also may not supply missing facts. *Linda Coal and Supply Co. v. Tasa Coal Co.*, 204 A.2d 451 (Pa. 1964).  If facts have not been (or cannot be) pled to sustain a cause of action, the Court should sustain the preliminary objections.

Additionally, pursuant to Rule 1028(a)(3), a party's preliminary objections must be sustained if the pleading in question is insufficiently specific. Pa. R.C.P. 1028(a)(3).  Pennsylvania Rule of Civil Procedure 1019(a) requires a complaint to contain the "material facts on which a cause of action or defense is based," and Rule 1019(b) further requires that fraud be "averred with particularity."  Pa. R.C.P. 1019(a)-(b).  To survive a demurrer, a complaint must contain more than a "generic, barebones claim*." Donaldson v. Davidson Bros., Inc.*, 144 A.3d 93, 103 (Pa. Super. Ct. 2016).  *See also Landau v. W. Pennsylvania Nat'l Bank*, 282 A.2d 335, 339 (Pa. 1971) ("The purpose of [Pa. R. C. P. 1019(a)] is to require the pleader to disclose the 'material facts' sufficient to enable the adverse party to prepare his case.") (citations omitted).

As explained more fully below, the Court should apply these standards and dismiss Counts Four, Five, Six and Seven of the Complaint, with prejudice, because they are not cognizable against Penn Hardware Two under established Pennsylvania law.

**A.**     **Plaintiffs' UTPCPL and Fraudulent Concealment Claims Fail Because they Lack the Particularity Required for Fraud Based Claims Under Pennsylvania Law**

Plaintiffs' allegations assert two causes of action based in fraud, both of which must be dismissed for failure to conform with Pennsylvania Rule of Civil Procedure 1019(b).  *See* Counts Four (Violation of Unfair Trade Practices and Consumer Protection Law) and Seven (Fraudulent Concealment).

In order to protect defendants from generalized and unsupported fraud allegations, Pennsylvania Rule of Civil Procedure 1019(b) requires that averments of fraud be pled with

Case ID: 210602213
Control No.: 21076807

particularity. *Bata v. Central-Penn National Bank of Philadelphia*, 224 A.2d 174 (Pa. 1966) (discussing the purpose of Rule 1019b and the requirements for Plaintiff to "adequately explain the nature of the claim…so as to permit [defendant] to prepare a defense"), *cert. denied*, 386 U.S. 1007, (1967); Pa. R. C.P. 1019(b) ("Averments of fraud or mistake shall be averred with particularity.").  To adequately plead a claim of fraud, Pennsylvania requires that plaintiffs must specifically allege all facts constituting fraud including: the material misrepresentation of an existing fact, scienter, justifiable reliance on the misrepresentation, and damages. *Booze v. Allstate Ins. Co.*, 750 A.2d 877, 880 (Pa. Super.Ct. 1999) (citation omitted).  Additionally, under Pennsylvania law, "a plaintiff alleging violations of the Consumer Protection Law must prove the common law fraud element of justifiable reliance." *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 208 (Pa. 2007). Plaintiffs must prove "the traditional common law elements of reliance and causation" because "[t]he UTPCPL's 'underlying foundation is fraud prevention." *Weinberg v. Sun Co., Inc.*, 777 A.2d 442, 446 (Pa. 2001) (quoting *Commw. v. Monumental Props., Inc.*, 329 A.2d 812, 816 (1974)).

In Count Four, Plaintiffs allege generic fraud-based claims under Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"). *See* Compl. at Count Four.  Plaintiffs allege that Penn Hardware Two "intentionally used deception, fraud, false pretenses, false promises, misrepresentations, misleading statements, and unfair trade practices in order to mislead consumers…" *Id*. at ¶ 199.  Plaintiffs also allege that Plaintiff Ernest Caranci was deceived by "intentional misrepresentations and omissions, including by the orchestrated claims made on or in television commercials, advertising materials, websites, and on product labels and packaging regarding the usage and safety of Roundup." *Id*. at ¶ 201.

Case ID: 210602213
Control No.: 21076807

Plaintiffs' bald accusations of fraud are insufficient to satisfy Rule 1019 because they do not furnish any specific, let alone material facts, that could enable Penn Hardware Two to prepare a defense. Absent from their Complaint are any facts specifying the actual alleged statements made, when they were made, or how they were made to Plaintiff. *See generally* Compl. Plaintiffs' complaint merely tracks the elements of the UTPCPL statute but fails to plead any facts supporting the when, where and how with the requisite particularity. *Id*. at ¶¶ 198-203. This lack of specificity fails to satisfy Rule 1019 and renders Plaintiffs unable to state a claim under Count Four for which relief can be granted.

Similarly, in Count Seven, Plaintiffs allege that defendants "fraudulently concealed their wrongful conduct from Plaintiff." Compl. at ¶¶ 239-248. However, like Count Four, Count Seven includes only vague and conclusory statements that Penn Hardware Two engaged in fraud but fail to quote any specific statement of fact that which they assert was fraudulently made, and fail to plead specific dates from which Penn Hardware Two can begin to ascertain when the alleged fraudulent misrepresentations were made to Plaintiff. *Id*. Plaintiffs' recitation of the elements of fraud amounts to insufficient pleading for which they cannot sustain a cause of action for fraudulent concealment against Penn Hardware Two under Count Seven.

Accordingly, Counts Four and Seven must be dismissed as insufficient for failure to conform with Rule 1019.

**B. Plaintiffs' Negligence Claim Must be Dismissed as Legally Insufficient**

Plaintiffs' allegations are legally insufficient to state a claim that Penn Hardware Two is liable for negligence. To establish a negligence claim, a plaintiff must plead and prove (1) the existence of a duty or obligation recognized by law, (2) a breach of that duty, (3) a causal connection between the breach and the resulting injury, and (4) actual loss or damage suffered. *Atcovitz v. Gulph Mills Tennis Club, Inc.*, 812 A.2d 1218, 1222 (Pa. 2002). A negligence claim

15040237-1

fails if the law imposes no duty of care on the defendant to the plaintiff.  *See Gerace v. Holmes Protection of Phila*, 357 Pa. Super 467, 472, 516 A.2d 354, 357 (1986).

Pennsylvania law is clear that retail vendors are not liable to customers for injuries caused by latent defect in the article when resold in its original sealed package with the manufacturer's warnings and direction for use.  *Kratz v. Am. Stores Co.,* 59 A.2d 138, 139 (Pa. 1948). "The rule of the nonliability of vendors in 'original package' cases is firmly established in the law." *Id*. at 139-40 (Pa. 1948) (noting it would be "wholly impractical" to require a "vendor of a manufactured article" to inspect every single item the vendor sells that is made by another).  *See also* Restatement (Second) of Torts § 402 (1965) (Cmt. e) ("When the seller reasonably believes the chattel is safe, his representation in good faith to that effect is neither fraudulent, reckless, nor negligent.").

Plaintiffs' negligence claim fails for the reason that Penn Hardware Two, a retailer of the products of another, has no duty to inspect, test, or research the products of another.  *See id*; *see also Gerace v. Holmes Protection of Phila*, 357 Pa. Super at 472 (negligence claim fails in the absence of duty of care).  Notably, Plaintiffs do not and cannot allege that Penn Hardware Two, as the merchandise retailer, manufactured or designed the fertilizer product at issue, or had any control over its manufacture, design, or development of warnings.  Compl. ¶ 23 (alleging Penn Hardware Two as the retailer that sold the Product).   Nor are there any allegations by Plaintiffs that Penn Hardware Two in any way altered the Product's original packaging before selling it to Plaintiff.  Thus there are no facts supporting Plaintiffs' conclusory allegation that Penn Hardware Two had any "duty" regarding testing or labeling Roundup®-branded Products to warn of risks.

In addition, Plaintiffs assert generic, boilerplate allegations that Penn Hardware Two breached a duty to exercise reasonable care in the "design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup products."

Compl. at ¶ 207.  These allegations parrot the elements of a negligence claim but contain no specific facts, let alone material facts to explain with specificity the core allegations of their negligence claim.   Plaintiffs' negligence claim further alleges that Penn Hardware Two purportedly harmed Plaintiff by selling Roundup®-branded Products and failing to warn of a supposed danger that Penn Hardware Two "knew or, in the exercise of reasonable care, should have known" about.  Compl. ¶¶ 209-214.  But these allegations cannot create liability where it does not exist under Pennsylvania law.  *See Johnston v. Dick,* 165 A.2d 634, 644–45 (Pa. 1960) (holding that a kerosene vendor had no duty to inspect the kerosene prior to delivery to ensure that no gasoline had become mixed) *Kratz v. Am. Stores Co.,* 59 A.2d 138, 139 (Pa. 1948); *see also* Restatement (Second) of Torts§ 402 (1965) (cmt. e) ("When the seller reasonably believes that the chattel is safe, his representation in good faith to that effect is neither fraudulent, reckless, nor negligent.").  Moreover, Plaintiffs' bald statements, unsupported by any facts that Penn Hardware Two "knew" of an alleged danger, are nothing more than conclusory allegations, which the Court need not accept as true.  *See Silo,* 728 A.2d at 398 (court need not accept as true "unwarranted inferences from the facts, argumentative allegations, or expressions of opinion").

Accordingly, Count Five fails to state a claim against Penn Hardware Two and should be dismissed with prejudice pursuant to Rule 1028.

**C.    Plaintiffs' Breach of Implied Warranty Claim Must be Dismissed as Factually and Legally Insufficient**

Plaintiffs' claim that Penn Hardware Two is liable for breach of an implied warranty also fails for legal and factual insufficiency under Pa.R.C.P. 1028(a)(3) and (4). Implied warranties of fitness for a particular purpose exist where the seller at the time of contract has reason to know (1) any particular purpose for which the goods are required; and (2) that the buyer is relying on the skill or judgment of the seller to select or furnish suitable goods.  *Allen-Myland, Inc. v. Garmin*

Case ID: 210602213
Control No.: 21076807

*Int'l, Inc.*, 2016 PA Super 107, 140 A.3d 677, 683 (Pa. Super. Ct. 2016) (quoting 13 Pa. C.S.A. § 2315).  In Pennsylvania, "[a]n implied warranty of merchantability arises by operation of law and warrants that the goods are of reasonable quality and are fit for the ordinary purpose for which they are sold." *Whitson v. Safeskin Corp.*, 313 F. Supp. 2d 473, 480 (M.D. Pa. 2004) (citing *Hornberger v. Gen. Motors Corp.*, 929 F. Supp. 884, 887–88 (E.D. Pa. 1996)).

Plaintiffs allege that Penn Hardware Two impliedly warranted that Roundup® was "of merchantable quality, safe, or fit for their intended use." Compl. ¶ 225.  Although their Complaint recites generic boilerplate assertions, it lacks a single fact to support an inference that Penn Hardware Two knew of a particular purpose, knew that Plaintiff was relying on Penn Hardware Two to select suitable goods, or that Penn Hardware Two selected or furnished those goods especially for Plaintiff.  Where, as here, no allegations in the Complaint support a conclusion that Penn Hardware Two knew of Plaintiff's intended purposes, Plaintiffs "fail[] to advance a plausible claim as to a breach of implied warranty of fitness for a particular purpose." *Painter Tool*, *Inc. v. Dunkirk Specialty Steel, LLC*, No. CV 17-206. 2017 WL 2985578, at *4-5 (W.D. Pa. July 13, 2017).

Additionally, Plaintiffs fail to state a claim for implied warranty because they do not allege that the Products failed to accomplish the "ordinary purpose" for which they were sold.  Based on Plaintiffs' own allegations, the "ordinary purpose" of the Products stated in Monsanto's advertising is a "general-purpose herbicide." Compl. ¶ 56. Plaintiffs do not contend the Products did not accomplish this purpose.  Thus, the harm they complain of is not a harm that they can recover for under a theory of breach of an implied warranty. *Whitson*, 313 F. Supp. 2d at 480 n.9. For these reasons, Plaintiffs have not and cannot state a cause of action against Penn Hardware Two based in implied warranty and Count Six is legally and factually insufficient.

Case ID: 210602213
Control No.: 21076807

D.     **Plaintiffs' Claims for Punitive Damages, Pre-Judgment Interest, Delay Damages, and Costs Must be Dismissed as Legally Insufficient.**

     1.     **Plaintiffs Are Not Entitled to Punitive Damages**

Plaintiffs have sought punitive damages in each *ad damnum* clause of each Count in the Complaint. *See* Compl. at *ad damnum* clauses. The causes of action against Penn Hardware Two consist of negligence, strict liability, implied warranty, and fraud-based claims. These claims do not contain allegations of outrageous conduct necessary for recovery of punitive damages.

Punitive damages, also referred to as "exemplary damages," have been defined as damages awarded to "punish the defendant for his evil behavior or to make an example of him. *G.J.D. v. Johnson,* 713 A.2d 1127 (Pa. 1998) (*citing* BLACKS LAW DICTIONARY 390 (6th ed. 1990) (emphasis added)). When assessing the viability of a punitive damages claim, "the state of mind of the actor is vital" and the tortfeasor's act or failure to act "must be intentional, reckless or malicious." *Hutchinson v. Luddy,* 870 A.2d 766, 770-71 (Pa. 2005). The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care. *Albright v. Abington Mem. Hosp.*, 696 A.3d 1159, 1164 (Pa. 1997). A showing of mere negligence, or even gross negligence, will not suffice to establish that punitive damages should be imposed. *Phillips v. Cricket Lighters*, 883 A.2d 439, 445 (Pa. 2005).

The Pennsylvania Supreme Court case established that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey,* 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, 12-13 (2006) (*quoting Phillips v. Cricket Lighters,* 883 A.2d 439, 445 (Pa. 2005)). In fact, punitive damages are specifically designed "to heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Id.* at 446. A punitive damages claim must be supported by evidence sufficient to establish that: (1) a

Case ID: 210602213
Control No.: 21076807

defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted or failed to act in conscious disregard of that risk. *Hutchinson,* 870 A.2d at 772.

The Pennsylvania Superior Court has noted that, at the pleadings stage, a critical fact needed to support any claim for punitive damages is that the defendant's conduct must have been outrageous. *Smith v. Brown,* 423 A.2d 743, 745 (Pa. Super. Ct. 1980). Outrageous conduct is an "act done with a bad motive or with a reckless indifference to the interests of others." *Id.* quoting *Focht v. Rabada,* 217 Pa. Super. 35, 38, 268 A.2d 157 (1970) and citing comment (b) to section 908 of the Restatement of Torts.

In the instant case, Plaintiffs have failed to set forth any allegations against Penn Hardware Two which rise to the level of extreme, outrageous, and evil behavior or motive such that the Defendants should be subject to punitive damages. *See* Compl. As such, each request for punitive damages in the *ad damnum* clauses must be stricken and dismissed.

### 2.     Plaintiffs Are Not Entitled to Costs and the Request for Delay Damages is Premature

Plaintiffs' Complaint also improperly seeks recovery for pre-judgment interest, delay damages and costs in the ad damnum clause for each Count. *See generally, id.*

Pursuant to the "American Rule," litigants are responsible for their own litigation costs and may not recover them from an adverse party unless there is express statutory authorization, a clear agreement of the parties, or some other established exception." *In re Farnese*, 17 A.3d 357, 370 (Pa. 2011). Plaintiffs set forth no basis for seeking costs and therefore each request must be stricken. Moreover, an award of damages is subject only to post-judgment interest from the date on which the judgment is finally entered. *Id*. Pennsylvania statutes do not provide for pre-judgment interest. Any award of damages is subject to *post*-judgment interest from the date on which the judgment is finally entered. 42 Pa. Stat. § 8101.

Case ID: 210602213
Control No.: 21076807

In addition, Plaintiffs' request for delay damages is premature because Pa.R.C.P. 238(a)(2) provides that delay damages only begin to accrue from "a date one year after original process was served in the action," which has not yet occurred in this matter.  Because delay damages have not yet accrued, Plaintiffs' request for the same are premature and legally insufficient.

## V.     RELIEF REQUESTED

In light of the foregoing, Penn Hardware Two, Inc. respectfully requests this Honorable Court sustain the within Preliminary Objections by filing the Order filed herewith.

Respectfully Submitted,

**RAWLE & HENDERSON LLP**

Dated:  July 30, 2021                    By:   */s/ John C. McMeekin II*
                                         John C. McMeekin II, Esquire (No. 81250)
                                         Anisha S. Abraham, Esquire (No. 205538)
                                         The Widener Building
                                         One South Penn Square
                                         Philadelphia, Pennsylvania  19107
                                         Telephone: (215) 575-4200
                                         jmcmeekin@rawle.com
                                         aabraham@rawle.com

                                         *Attorneys for Defendant Penn Hardware Two, Inc.*

15040237-1

## CERTIFICATE OF SERVICE

I, John C. McMeekin II, hereby certify that on July 30, 2021 I served a true and correct

copy of the foregoing Preliminary Objections to Plaintiffs' Complaint via the Court's e-filing

system on the following counsel of record:

> Thomas R. Kline, Esquire
> Kila B. Baldwin, Esquire
> Thomas E. Bosworth, Esquire
> Philip M. Pasquarello, Esquire
> Kline & Specter, PC
> 1525 Locust Street, 19th Floor
> Philadelphia, PA  19102
> *Attorneys for Plaintiff*


*/s/ John C. McMeekin II*
John C. McMeekin II

*Attorneys for Defendant Penn Hardware Two, Inc.*

15040237-1

# EXHIBIT A

Case ID: 210602213
Control No.: 21076807

**Court of Common Pleas of Philadelphia County**
**Trial Division**

# Civil Cover Sheet

For Prothonotary Use Only (Docket Number)

**JUNE 2021**
E-Filing Number: 2106055896

**002213**

| | |
|---|---|
| **PLAINTIFF'S NAME**<br>ERNEST CARANCI | **DEFENDANT'S NAME**<br>MONSANTO COMPANY |
| **PLAINTIFF'S ADDRESS**<br>1235 SEROTA PLACE<br>PHILADELPHIA PA 19115 | **DEFENDANT'S ADDRESS**<br>800 N. LINDBERGH BOULEVARD<br>ST. LOUIS MO 63167 |
| **PLAINTIFF'S NAME**<br>CARMELA CARANCI | **DEFENDANT'S NAME**<br>BAYER AG |
| **PLAINTIFF'S ADDRESS**<br>1235 SEROTA PLACE<br>PHILADELPHIA PA 19115 | **DEFENDANT'S ADDRESS**<br>100 BAYER BOULEVARD<br>WHIPPANY NJ 07981 |
| **PLAINTIFF'S NAME** | **DEFENDANT'S NAME**<br>S&H HARDWARE & SUPPLY CO. |
| **PLAINTIFF'S ADDRESS** | **DEFENDANT'S ADDRESS**<br>6700 CASTOR AVENUE<br>PHILADELPHIA PA 19149 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 2 | 5 | ☒ Complaint   ☐ Petition Action   ☐ Notice of Appeal<br>☐ Writ of Summons   ☐ Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | |
|---|---|---|---|
| ☐ $50,000.00 or less<br>☒ More than $50,000.00 | ☐ Arbitration<br>☒ Jury<br>☐ Non-Jury<br>☐ Other: | ☐ Mass Tort<br>☐ Savings Action<br>☐ Petition | ☐ Commerce   ☐ Settlement<br>☐ Minor Court Appeal   ☐ Minors<br>☐ Statutory Appeals   ☐ W/D/Survival |

**CASE TYPE AND CODE**

2P - PRODUCT LIABILITY

**STATUTORY BASIS FOR CAUSE OF ACTION**

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | **FILED**<br>**PRO PROTHY**<br><br>**JUN 29 2021**<br><br>**M. RUSSO** | IS CASE SUBJECT TO<br>COORDINATION ORDER?<br>YES          NO |
|---|---|---|

**TO THE PROTHONOTARY:**

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: ERNEST CARANCI , CARMELA CARANCI

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY<br>THOMAS E. BOSWORTH | ADDRESS<br>KLINE & SPECTER, PC<br>1525 LOCUST STREET<br>19TH FL<br>PHILADELPHIA PA 19102 |
|---|---|
| PHONE NUMBER<br>(215)772-1000 | FAX NUMBER<br>(215)735-5827 | |
| SUPREME COURT IDENTIFICATION NO.<br>323350 | E-MAIL ADDRESS<br>thomas.bosworth@klinespecter.com |
| SIGNATURE OF FILING ATTORNEY OR PARTY<br>*THOMAS BOSWORTH* | DATE SUBMITTED<br>Tuesday, June 29, 2021, 02:01 pm |

FINAL COPY (Approved by the Prothonotary Clerk)

## COMPLETE LIST OF DEFENDANTS:

1. MONSANTO COMPANY
   800 N. LINDBERGH BOULEVARD
   ST. LOUIS MO 63167
2. BAYER AG
   100 BAYER BOULEVARD
   WHIPPANY NJ 07981
3. S&H HARDWARE & SUPPLY CO.
   6700 CASTOR AVENUE
   PHILADELPHIA PA 19149
4. PENN HARDWARE, INC.
   7404 FRANKFORD AVENUE
   PHILADELPHIA PA 19136
5. PENN HARDWARE TWO, INC.
   7404 FRANKFORD AVENUE
   PHILADELPHIA PA 19136

**KLINE & SPECTER, P.C.**
By:    THOMAS R. KLINE, ESQUIRE
          KILA B. BALDWIN, ESQUIRE
          THOMAS E. BOSWORTH, ESQUIRE
          PHILIP M. PASQUARELLO, ESQUIRE
Attorney I.D. Nos. 28895/94430/323350/326263
1525 Locust Street
Philadelphia, PA 19102
(215) 772-1000
Attorneys for Plaintiffs

Filed and Attested by the
Office of Judicial Records
29 JUN 2021 02:01 pm
M. RUSSO

| | |
|---|---|
| **ERNEST CARANCI** and<br>**CARMELA CARANCI**,<br>1235 Serota Place<br>Philadelphia, PA 19115<br><br>    *Plaintiffs*<br><br>**v.**<br><br>**MONSANTO COMPANY**<br>800 N. Lindbergh Blvd.<br>St. Louis, MO 63167<br><br>*And*<br><br>**BAYER AG**<br>100 Bayer Blvd.<br>Whippany, NJ 07981<br><br>*And*<br><br>**S&H HARDWARE & SUPPLY CO.**<br>6700 Castor Ave.<br>Philadelphia, PA 19149<br><br>*And*<br><br>**PENN HARDWARE, INC.**<br>7404 Frankford Ave.<br>Philadelphia, PA 19136<br><br>*And* | **COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY,<br>PENNSYLVANIA**<br><br>**JUNE TERM, 2021**<br><br>**CIVIL ACTION NO.**<br><br>**JURY TRIAL DEMANDED**<br><br>**CIVIL ACTION –<br>PRODUCT LIABILITY**<br><br>**NOTICE TO PLEAD AND<br>COMPLAINT**<br><br><br>(continued on next page) |

1

Case ID: 210602213

**PENN HARDWARE TWO, INC.**
7404 Frankford Ave.
Philadelphia, PA 19136

*Defendants.*

## NOTICE TO PLEAD

### NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

**Lawyer Referral Service**
**Philadelphia Bar Association**
**1101 Market Street, 11th Floor**
**Philadelphia, PA 19107**
**(215) 238-6338**

### ADVISO

Le han demandado a used en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte pueda decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

**Lawyer Referral Service**
**Philadelphia Bar Association**
**1101 Market Street, 11th Floor**
**Philadelphia, PA 19107**
**(215) 238-6338**

2

Case ID: 210602213

## COMPLAINT

## INTRODUCTION

Plaintiffs bring this cause of action against Defendants.  Plaintiff, Ernest Caranci, suffered significant injuries, including, but not limited to, Non Hodgkin's Lymphoma ("NHL"), as a direct and proximate result of Defendants' negligent, reckless, willful, and otherwise wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or sale of the product known as Roundup®("Roundup").  Plaintiffs in this action seek recovery for damages as a result of Ernest Caranci's developing NHL and his resulting injuries, damages, and pain and suffering, all of which was directly and proximately caused by such wrongful conduct by Defendants, the unreasonably dangerous and defective nature of Roundup, and its active ingredient, glyphosate, and the attendant effects of developing NHL.

## THE PARTIES

### PLAINTIFFS

1.      Plaintiff, Ernest Caranci, is an adult citizen and resident of the Commonwealth of Pennsylvania, residing at 1235 Serota Place, Philadelphia, Pennsylvania 19115.

2.      Plaintiff, Carmela Caranci, wife of Ernest Caranci, is an adult citizen and resident of the Commonwealth of Pennsylvania, residing at 1235 Serota Place, Philadelphia, Pennsylvania 19115.

3.      Plaintiffs bring this action for personal injuries and damages sustained due to exposure to Roundup containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"). As a direct and proximate result of being exposed to Roundup, Ernest Caranci developed NHL.

4.      Ernest Caranci was exposed to Roundupthroughout the 1990s and 2000s,.

3

Case ID: 210602213

5.    During that time period, Mr. Caranci would spray Roundup, while wearing gloves, two to three times per week for four to six months of each year.

6.    Ernest Caranci purchased the Roundup he used from S&H Hardware & Supply Co.'s, Penn Hardware, Inc.'s, and Penn Hardware Two, Inc.'s stores, all of which were at all times located in Philadelphia County, Pennsylvania.

7.    All of Plaintiff Ernest Caranci's purchases of Roundup were made in and occurred in Philadelphia County, Pennsylvania.

8.    All of Plaintiff Ernest Caranci's usage of Roundup occurred in Philadelphia County, Pennsylvania.

9.    Plaintiff, Ernest Caranci, developed NHL due to his use of Roundup in Philadelphia County.

10.    Following years of routine and repeated usage of Roundup, Ernest Caranci was diagnosed with NHL. Following his diagnosis, Ernest Caranci suffered numerous effects attendant to NHL, including chemotherapy, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup and Defendants' wrongful conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup.

11.    As a direct and proximate result of being exposed to Roundup, plaintiff Ernest Caranci developed NHL.

12.    As a direct and proximate result of these injuries, Ernest Caranci incurred medical expenses, endured pain and suffering and loss of enjoyment of life, lost wages, lost earning capacity, and has otherwise been damaged in a personal and pecuniary nature.

13.    During the entire time that Ernest Caranci was exposed to Roundup, he did not know that exposure to Roundup was injurious to his health or the health of others.

4

## DEFENDANTS

### MONSANTO

14.     Defendant, Monsanto Company ("Monsanto"), is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.   At all relevant times, Monsanto regularly conducted, transacted, and solicited business in Pennsylvania, including in Philadelphia County.

15.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

### BAYER AG

16.     Defendant, Bayer AG, is a German multinational corporation with its global headquarters located in Leverkusen, Germany. At all relevant times, Bayer AG regularly conducted, transacted, and solicited business in Pennsylvania, including in Philadelphia County. Bayer AG's U.S. headquarters is located at 100 Bayer Blvd., Whippany, New Jersey. Bayer AG regularly conducts business in the Commonwealth of Pennsylvania, including in Philadelphia County.

17.     In June of 2018, Bayer AG acquired Defendant Monsanto, including its assets and liabilities, which, in turn, include the Roundup brand, for $66 billion. Through the merger, Bayer AG became the sole shareholder of Monsanto.

18.     Although Monsanto has continued to sell, distribute, and market the Roundup products at issue after the Bayer AG acquisition, on information and belief, Bayer AG undercapitalized Monsanto, exerted substantial control over Monsanto, and/or jointly participated in the commission of tortious and/or fraudulent activity with Monsanto, such that recognizing Bayer AG's distinct corporate form and shielding Bayer AG from liability would defeat public

5

policy and bring about injustices to plaintiffs, like Ernest Caranci herein, and others similarly situated. Alternatively, following the acquisition, Monsanto has been a mere alter-ego of Bayer. Alternatively, Bayer has been named as a successor to Monsanto.

### S&H HARDWARE & SUPPLY CO.

19.     Defendant, S&H Hardware & Supply Co., is a corporation that was and is incorporated under the laws of and in the Commonwealth of Pennsylvania, with its principal place of business and a registered office located at 6700 Castor Avenue, Philadelphia, Pennsylvania 19149. S&H Hardware & Supply Co. engaged in the marketing, sale, and distribution of a product line of herbicide Roundup, which contains the active ingredient glyphosate.

20.     At all relevant times, S&H Hardware & Supply Co. sold Roundup products to users, including Ernest Caranci, within the Commonwealth of Pennsylvania and City of Philadelphia, including this county, and derived substantial revenue from such sales.

21.     At all relevant times, S&H Hardware & Supply Co. regularly conducted business in Philadelphia County.

### PENN HARDWARE INC. AND PENN HARDWARE TWO, INC.

22.     Defendant, Penn Hardware, Inc., was at all times relevant hereto incorporated under the laws of and in the Commonwealth of Pennsylvania, with its principal place of business and a registered office located at 7404 Frankford Avenue, Philadelphia, Pennsylvania 19136.

23.     At all relevant times, Penn Hardware, Inc., sold Roundup products to users, including Ernest Caranci, within the Commonwealth of Pennsylvania and City of Philadelphia, including this county, and derived substantial revenue from such sales.

24.     At all relevant times, Penn Hardware, Inc. regularly conducted business in Philadelphia County.

6

25.     Defendant, Penn Hardware Two, Inc., was at all times relevant hereto incorporated under the laws of and in the Commonwealth of Pennsylvania, with its principal place of business and a registered office located at 7404 Frankford Avenue, Philadelphia, Pennsylvania 19136.

26.     At all relevant times, Penn Hardware Two, Inc., sold Roundup products to users, including Ernest Caranci, within the Commonwealth of Pennsylvania and City of Philadelphia, including this county, and derived substantial revenue from such sales.

27.     At all relevant times, Penn Hardware Two, Inc. regularly conducted business in Philadelphia County.

## JURISDICTION AND VENUE

28.     At all relevant times, Monsanto had, and continues to have, regular and systematic contact with and conducts business in and from the Commonwealth of Pennsylvania, such that it has purposefully availed itself of the laws of the Commonwealth and expects to both sue and be sued in Pennsylvania.  Additionally, Monsanto's presence in the Commonwealth of Pennsylvania satisfies the due process requirements for Pennsylvania courts to exercise jurisdiction over it. Additionally, Monsanto has consented to the exercise of jurisdiction over it by Pennsylvania courts by registering to and conducting business from the Commonwealth of Pennsylvania.

29.     At all relevant times, Monsanto has transacted business in the Commonwealth of Pennsylvania including by: (1) selling and distributing products and merchandise, including Roundup products, in the Commonwealth of Pennsylvania for the purpose of realizing pecuniary benefit from those sales and distributions; (2) shipping products and merchandise, including Roundup products, directly into and through the Commonwealth of Pennsylvania; (3) engaging in business in the Commonwealth of Pennsylvania; and/or (4) owning, using, and/or possessing real property situated in the Commonwealth of Pennsylvania.

7

30.     At all relevant times, Monsanto has contracted to supply services or things, including Roundup products, in the Commonwealth of Pennsylvania.

31.     At all relevant times, Bayer AG had, and continues to have, regular and systematic contact with and conducts business in and from the Commonwealth of Pennsylvania, such that it has purposefully availed itself of the laws of the Commonwealth and expects to both sue and be sued in Pennsylvania.  Additionally, Bayer AG's presence in the Commonwealth of Pennsylvania satisfies the due process requirements for Pennsylvania courts to exercise jurisdiction over it. Additionally, Bayer AG has consented to the exercise of jurisdiction over it by Pennsylvania courts by registering to and conducting business from the Commonwealth of Pennsylvania.

32.     At all relevant times, Bayer AG has transacted business in the Commonwealth of Pennsylvania including by: (1) selling and distributing products and merchandise, including Roundup products, in the Commonwealth of Pennsylvania for the purpose of realizing pecuniary benefit from those sales and distributions; (2) shipping products and merchandise, including Roundup products, directly into and through the Commonwealth of Pennsylvania; (3) engaging in business in the Commonwealth of Pennsylvania; and/or (4) owning, using, and/or possessing real property situated in the Commonwealth of Pennsylvania.

33.     At all relevant times, Bayer AG has contracted to supply services or things, including Roundup products, in the Commonwealth of Pennsylvania.

34.     At all relevant times, S&H Hardware & Supply Co. had, and continues to have, regular and systematic contact with and conducts business in and from the Commonwealth of Pennsylvania, such that it has purposefully availed itself of the laws of the Commonwealth and expects to both sue and be sued in Pennsylvania.  Additionally, S&H Hardware & Supply Co.'s presence in the Commonwealth of Pennsylvania satisfies the due process requirements for

8

Pennsylvania courts to exercise jurisdiction over it.  Additionally, S&H Hardware & Supply Co. has consented to the exercise of jurisdiction over it by Pennsylvania courts by registering to and conducting business from the Commonwealth of Pennsylvania.

35.     At all relevant times, S&H Hardware & Supply Co. has transacted business in the Commonwealth of Pennsylvania including by: (1) selling and distributing products and merchandise, including Roundup products, in the Commonwealth of Pennsylvania for the purpose of realizing pecuniary benefit from those sales and distributions; (2) shipping products and merchandise, including Roundup products, directly into and through the Commonwealth of Pennsylvania; (3) engaging in business in the Commonwealth of Pennsylvania; and/or (4) owning, using, and/or possessing real property situated in the Commonwealth of Pennsylvania.

36.     At all relevant times, S&H Hardware & Supply Co. has contracted to supply services or things, including Roundup products, in the Commonwealth of Pennsylvania.

37.     At all relevant times, Penn Hardware, Inc., had, and continues to have, regular and systematic contact with and conducts business in and from the Commonwealth of Pennsylvania, such that it has purposefully availed itself of the laws of the Commonwealth and expects to both sue and be sued in Pennsylvania.   Additionally, Penn Hardware, Inc.'s presence in the Commonwealth of Pennsylvania satisfies the due process requirements for Pennsylvania courts to exercise jurisdiction over it. Additionally, Penn Hardware, Inc. has consented to the exercise of jurisdiction over it by Pennsylvania courts by registering to and conducting business from the Commonwealth of Pennsylvania.

38.     At all relevant times, Penn Hardware, Inc. has transacted business in the Commonwealth of Pennsylvania including by: (1) selling and distributing products and merchandise, including Roundup products, in the Commonwealth of Pennsylvania for the purpose

Case ID: 210602213

of realizing pecuniary benefit from those sales and distributions; (2) shipping products and merchandise, including Roundup products, directly into and through the Commonwealth of Pennsylvania; (3) engaging in business in the Commonwealth of Pennsylvania; and/or (4) owning, using, and/or possessing real property situated in the Commonwealth of Pennsylvania.

39.   At all relevant times, Penn Hardware, Inc. has contracted to supply services or things, including Roundup products, in the Commonwealth of Pennsylvania.

40.   At all relevant times, Penn Hardware Two, Inc., had, and continues to have, regular and systematic contact with and conducts business in and from the Commonwealth of Pennsylvania, such that it has purposefully availed itself of the laws of the Commonwealth and expects to both sue and be sued in Pennsylvania.  Additionally, Penn Hardware Two, Inc.'s presence in the Commonwealth of Pennsylvania satisfies the due process requirements for Pennsylvania courts to exercise jurisdiction over it. Additionally, Penn Hardware Two, Inc. has consented to the exercise of jurisdiction over it by Pennsylvania courts by registering to and conducting business from the Commonwealth of Pennsylvania.

41.   At all relevant times, Penn Hardware Two, Inc. has transacted business in the Commonwealth of Pennsylvania including by: (1) selling and distributing products and merchandise, including Roundup products, in the Commonwealth of Pennsylvania for the purpose of realizing pecuniary benefit from those sales and distributions; (2) shipping products and merchandise, including Roundup products, directly into and through the Commonwealth of Pennsylvania; (3) engaging in business in the Commonwealth of Pennsylvania; and/or (4) owning, using, and/or possessing real property situated in the Commonwealth of Pennsylvania.

42.   At all relevant times, Penn Hardware Two, Inc. has contracted to supply services or things, including Roundup products, in the Commonwealth of Pennsylvania.

10

43.     Venue is proper in Philadelphia County under Pennsylvania Rule of Civil Procedure 2179 because: (1) one or more defendants has a registered office and/or principal place of business located in Philadelphia County; (2) one or more defendants regularly conducts business in Philadelphia County; (3) the cause of action in this case arose in Philadelphia County; and/or (4) one or more transactions or occurrences took place in Philadelphia County out of which the cause of action arose.

## LACK OF FEDERAL SUBJECT MATTER JURISDICTION

44.     This case is not removable because Plaintiffs do not make or allege any claims that implicate a federal question. Additionally, the parties are not completely diverse, as is required to make a case removable on the basis of 28 U.S.C. § 1332 and § 1446. And finally, multiple defendants are residents and citizens of the Commonwealth of Pennsylvania. Any attempts to remove this case to federal court would be frivolous and without legal basis.

## ALLEGATIONS COMMON TO ALL COUNTS

45.     In 1970, Defendant Monsanto Company, Inc. ("Monsanto") discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup.  Roundup is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops.  In addition to the active ingredient glyphosate, Roundup contains the surfactant Polyethoxylated tallow amine (POEA) and/or adjuvants and other so-called "inert" ingredients.  In 2001, glyphosate was the most-used pesticide active ingredient in American agriculture with 85–90 million pounds used annually.  That number grew to 185 million pounds in 2007.[1]  As of 2013, glyphosate was the world's most widely used herbicide.

---

[1] Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006–2007 Market Estimates* 14 (2011), *available at* http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.

Case ID: 210602213

46.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware.  It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2] The majority of these seeds are of the Roundup Ready® brand.  The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, because glyphosate can be sprayed in the fields during the growing season without harming the crops.  In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States were Roundup Ready®.[3]

47.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[4]  They are ubiquitous in the environment.  Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup is used.[5]  It has been found in food,[6] in the urine of agricultural workers,[7] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[8]

---

2 ETC Group, *Who Will Control the Green Economy?* 22 (2011), *available at* http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.

3 William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.

4 Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.
5 *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), *available at* http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also* U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate, available at* http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

6 Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup®Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), *available at* http://www.sciencedirect.com/science/article/pii/S0308814613019201.

7 John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), *available at* http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

8 Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), *available at* http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

Case ID: 210602213

48.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate.  That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

49.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate.  In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

50.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*.  The IARC Working Group concluded that the cancers most associated with glyphosate exposure are Non-Hodgkin's Lymphoma ("NHL") and other hematopoietic cancers, including lymphocytic lymphoma / chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[9]

51.     The IARC evaluation is significant.  It confirms what has been believed for years: that glyphosate is toxic to humans.

52.     Nevertheless, Monsanto, since it began selling Roundup, has represented it as safe to humans and the environment.  Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment.

---

9 *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra.*

Case ID: 210602213

## FACTS

53.    Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

54.    Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.  Treated plants generally die within two to three days.  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

55.    For nearly 40 years, farms across the world have used Roundup without knowing of the dangers its use poses.  That is because when Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment.  Of course, history has shown that not to be true.  According to the WHO, the main chemical ingredient of Roundup—glyphosate—is a probable cause of cancer.  Those most at risk are farm workers and other individuals with workplace exposure to Roundup, such as garden center workers, nursery workers, and landscapers.  Agricultural workers are, once again, victims of corporate greed.  Monsanto assured the public that Roundup was harmless.  In order to prove this, Monsanto has championed falsified data and has attacked legitimate studies that revealed Roundup's dangers.  Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup is safe.

### *The Discovery of Glyphosate and Development of Roundup*

56.    The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the

14

mid-1970s under the brand name Roundup.[10]  From the outset, Monsanto marketed Roundup as a "safe" general-purpose herbicide for widespread commercial and consumer use.  It still markets Roundup as safe today.[11]

57.     In addition to the active ingredient glyphosate, Roundup formulations also contain adjuvants and other chemicals, such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing.  Growing evidence suggests that these adjuvants and additional components of Roundup formulations are not, in fact, inert and are toxic in their own right.

### *Registration of Herbicides under Federal Law*

58.     The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.*  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act.  7 U.S.C. § 136a(a).

59.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.  Registration by the EPA, however, is not an assurance or finding of safety.  The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the

---

10 Monsanto, *Backgrounder, History of Monsanto's Glyphosate Herbicide* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.
11 Monsanto, *What is Glyphosate?* (Sep. 2, 2015), http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

Case ID: 210602213

product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

60.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).  FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted, or a pesticide allowed to continue to be sold in commerce.

61.     The EPA and the State of California registered Roundup for distribution, sale, and manufacture in the United States and the State of California.

62.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup, conducts the health and safety testing of pesticide products.  The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation.  The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

63.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time.  The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's recent review and evaluation.

64.     In the case of glyphosate, and therefore Roundup, the EPA had planned on releasing its preliminary risk assessment—in relation to the reregistration process—no later than

16

July 2015.  The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup

65.     Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985.  After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991.  In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[12]

66.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed fraud.

67.     In the first instance, Monsanto, in seeking initial registration of Roundup by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup.[13]  IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup.

68.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating

---

12 U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.
13 Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

Case ID: 210602213

to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup herbicide to be invalid.[14] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[15]

69.    Three top executives of IBT were convicted of fraud in 1983.

70.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[16]

71.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup in 115 countries.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

72.    The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year

---

14 U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru +1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QF ieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles %5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=an onymous&SortMethod=h%7C- &MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=p%7Cf&De fSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyE ntry=1&SeekPage=x&ZyPURL.

15 Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch, Washington, D.C.* (August 9, 1978)).

16 Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories, supra.*

Case ID: 210602213

2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

73.    In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996.  Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds.  It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup herbicide.

74.    Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready® seeds, Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[17]   Today, glyphosate remains one of the world's largest herbicides by sales volume.

*Monsanto has known for decades that it falsely advertises the safety of Roundup*

75.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products.  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds, and fish.  Among the representations the NYAG found deceptive and

---

17 David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

Case ID: 210602213

misleading about the human and environmental safety of glyphosate and/or Roundup are the following:

a)   "Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences ..."

b)   "And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem."

c)   "Roundup® biodegrades into naturally occurring elements."

d)   "Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e)   "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f)   "You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

g)   "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h)   "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i)   "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j)   "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[18]

---

18 Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

Case ID: 210602213

76.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance

with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing

or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)     its glyphosate-containing pesticide products or any component thereof are
       safe, non-toxic, harmless or free from risk.

b)     its glyphosate-containing pesticide products or any component thereof
       manufactured, formulated, distributed or sold by Monsanto are
       biodegradable

c)     its glyphosate-containing pesticide products or any component thereof stay
       where they are applied under all circumstances and will not move through
       the environment by any means.

d)     its glyphosate-containing pesticide products or any component thereof are
       "good" for the environment or are "known for their environmental
       characteristics."

e)     glyphosate-containing pesticide products or any component thereof are
       safer or less toxic than common consumer products other than herbicides;

f)     its glyphosate-containing products or any component thereof might be
       classified as "practically non-toxic."

77.     Monsanto did not alter its advertising in the same manner in any state other than

New York, and on information and belief it still has not done so today.

78.     In 2009, France's highest court ruled that Monsanto had not told the truth about the

safety of Roundup.  The French court affirmed an earlier judgement that Monsanto had falsely

advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[19]

---

19 *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at*
http://news.bbc.co.uk/2/hi/europe/8308903.stm.

Case ID: 210602213

*Classifications and Assessments of Glyphosate*

79.    The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent.  Over time, the IARC Monograph program has reviewed 980 agents.  Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

80.    The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[20]  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

81.    One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts.  Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members.  One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment.  Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation.  Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in *The Lancet Oncology*, and within a year after the meeting, the finalized Monograph is published.

82.    In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data.  The studies must be publicly available and

---

20 World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

Case ID: 210602213

have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

83.     In March 2015, IARC reassessed glyphosate.  The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

84.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate.  The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

85.     The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

86.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

87.     Exposure pathways are identified as air (especially during spraying), water, and food.  Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

23

Case ID: 210602213

88.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden.  These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

89.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

90.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells.  One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

91.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma.  A second study reported a positive trend for hemangiosarcoma in male mice.  Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.  A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

92.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption.  Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA).  Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

93.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

94.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[21]  Essentially, glyphosate inhibits the biosynthesis of aromatic

---

21 Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra* at 77.

24

amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

95.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[22] While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

96.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate.  This technical fact sheet predates IARC's March 20, 2015 evaluation.  The fact sheet describes the release patterns for glyphosate as follows:

#### Release Patterns

> Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

> It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

> Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure

---

22 Anneclare J. De Roos et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Envt'l Health Perspectives 49–54 (2005), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

25

may also occur during glyphosate's manufacture, transport storage, and disposal.[23]

97.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[24]

### The Toxicity of Other Ingredients in Roundup

98.     In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendants' Roundup products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[25]

99.     In 2002, a study by Julie Marc, entitled "Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[26]

100.    A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads genomic instability and

---

23 U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate, supra.*
24 Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects,* 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report,* Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).
25 Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup® herbicide,* PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).
26 Julie Marc, et al., *Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation,* 15 CHEM. RES. TOXICOL. 326–331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.

Case ID: 210602213

subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[27]

101.    In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup's effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone.  The Peixoto study further suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup formulation.[28]

102.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.  The study tested dilution levels of Roundup and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food.  The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone.  The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide.  The study confirmed that the adjuvants present in

---

27 Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

28 Francisco Peixoto, *Comparative effects of the Roundup® and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *available at* https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mitochondrial_oxidative_phosphorylation.

Case ID: 210602213

Roundup are not, in fact, inert and that Roundup is potentially far more toxic than its active ingredient glyphosate alone.[29]

103.   The results of these studies were at all times available to Defendants.

104.   Monsanto's chief toxicologist Donna Farmer has admitted that she cannot say that Roundup does not cause cancer because Monsanto has not performed carcinogenicity studies with the formulated product Roundup, the very product that caused Ernest Caranci's NHL.[30]  Indeed, she further admitted that in the 35 years that Monsanto has marketed Roundup to the public, Monsanto has conducted no chronic carcinogenicity studies on the formulated Roundup product merely because EPA did not require that such a study be performed for registration of glyphosate.[31]

105.   Defendants thus knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies of Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Ernest Caranci from Roundup.

106.   Despite its knowledge that Roundup is considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe.

### *Monsanto's Industry Ties*

107.   Monsanto has been able to leverage its contacts within the EPA to protect glyphosate and Roundup from scrutiny and review.

108.   Internal Monsanto documents, including email communications, demonstrate that Jess Rowland, former Deputy Division Director, Health Effects Division of the EPA's OPP, and

---

29 Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008), *available at* http://big.assets.huffingtonpost.com/france.pdf.
30 *See* Plaintiffs' Submission in Response to Pretrial Order No. 8, Ex. 7, *In re: Roundup® Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 187-7.
31 *See id.*

28

Case ID: 210602213

formerly the chair of the CARC (the same committee that inadvertently leaked the EPA's glyphosate report in April 2016), repeatedly and directly intervened on Monsanto's behalf. These same documents reveal that Monsanto was secure in the knowledge that it had allies within the EPA.

109.    To begin, in the months following IARC's initial March 2015 announcement that it had classified glyphosate as a probable carcinogen, Monsanto turned its attention to the EPA's review of glyphosate.  In one April 27, 2015 email, Monsanto official Bill Heydens wrote to colleagues to suggest "approaching EPA and…. ask if there is anything that would help them defend the situation?"  His colleague Dan Jenkins responded: "I think you and I could get on the phone w Jess Rowland and discuss this pretty openly. He'll give us straight talk."[32]

110.    The following day, Mr. Jenkins spoke to Mr. Rowland by telephone and then relayed the substance of the conversation for his colleagues in an April 28, 2015 email. Specifically, he reported back that with respect to the CARC investigation, Mr. Rowland had stated: "We have enough to sustain our conclusions.  Don't need gene tox or epi . . . . I am the chair of the CARC and my folks are running this process for glyphosate in reg review. I have called a CARC meeting in June."[33] Thus, even though the ostensible purpose of the CARC review was to evaluate the exhaustive IARC assessment on glyphosate, and even though the full IARC monograph on glyphosate would not be completed until July 2015, Mr. Rowland had already formed his conclusion months earlier—in April 2015.

111.    Mr. Rowland also intervened to halt another agency's review of glyphosate.  When the Agency for Toxic Substances and Disease Registry (ATSDR), a federal public health agency

---

32 *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. D, In re: Roundup® Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-4.
33 *Id.*

Case ID: 210602213

of the U.S. Department of Health and Human Services, announced in February 2015 that it planned to publish a toxicological review of glyphosate, it was Mr. Rowland who helped Monsanto stop the ATSDR's investigation.  In the same April 28, 2015, email discussed above, Mr. Jenkins explained that Mr. Rowland wanted to help Monsanto stop an investigation concerning the carcinogenicity of glyphosate being conducted by ATSDR.[34]  Since ATSDR is not controlled by the EPA, according to Mr. Jenkins, Mr. Rowland had bragged: "If I can kill this I should get a medal."[35]  Jenkins cautioned, however, that Monsanto should not "get your hopes up, I doubt EPA and Jess can kill this; but it's good to know they are going to actually make the effort now to coordinate due to our pressing and their shared concern that ATSDR is consistent in its conclusions with the EPA."[36]  The ATSDR never published its toxicological profile of glyphosate.

112.    Further, the released documents reveal Monsanto's confidence that its allies within the EPA would continue to support glyphosate.  In an internal memo on glyphosate, Monsanto executives wrote: "We know, *but cannot say*, that EPA's Office of Pesticide Program scientists strongly feel that glyphosate does not cause cancer and have defended their written determination internally for months."[37]  Notably, when Mr. Rowland attended the IARC glyphosate meetings as an observed for the EPA, internal communications indicate Monsanto was not displeased with his attendance since, "we all know Jess."[38]

---

34 See id.

35 Id.

36 *Id.*

37 See Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. E, In re: Roundup® Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-5 (emphasis original).

38 *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. G, *In re: Roundup® Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-7.

Case ID: 210602213

### *Recent Worldwide Bans on Roundup/Glyphosate*

113.    Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup become more widely known.   The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which will take effect by the end of 2015.  In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons.  In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are.  Especially children are sensitive to toxic substances and should therefore not be exposed to it."[39]

114.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[40]

115.    France banned the private sale of Roundup and glyphosate following the IARC assessment for Glyphosate.[41]

116.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup.  The Bermuda government explained its ban as follows: "Following a recent scientific

---

[39] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, *available at* http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[40] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, GLOBAL RESEARCH, May 14, 2015, *available at* http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; *see* Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do mercado nacional*, April, 14, 2015, *available at* http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

[41] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup® in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen'*, NEWSWEEK, June 15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

31

Case ID: 210602213

study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[42]

117.    The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[43]

118.    The government of Colombia announced its ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[44]

*Statement of Concern Regarding Glyphosate-Based Herbicides*

119.    On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs).[45]   The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[46] The researchers drew seven factual conclusions about GBHs:

    1.    GBHs are the most heavily applied herbicide in the world
           and usage continues to rise;

---

42 *Health Minister: Importation of Roundup® Weed Spray Suspended*, Today in Bermuda, May, 11 2015, *available at* http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weed-spray-suspended.

43 *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, *available at* http://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/#.VeduYk3bKAw.

44 *Colombia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, *available at* http://www.bbc.com/news/world-latin-america-32677411.

45 John P. Myers, et al, *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), *available at* http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

46 *Id.*

32

Case ID: 210602213

2.   Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

3.   The half-life of glyphosate in water and soil is longer than previously recognized;

4.   Glyphosate and its metabolites are widely present in the global soybean supply;

5.   Human exposures to GBHs are rising;

6.   Glyphosate is now authoritatively classified as a probable human carcinogen; and

7.   Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[47]

120.   The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[48]

121.   The paper attributed uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes

---

47 *Id.*

48 *Id.*

33

between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[49]

122.   Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[50]

123.   The researchers also critiqued the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[51]

124.   The researchers also called for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.[52]

---

49 *Id.*

50 *Id.*

51 *Id.*

52 *Id.*

34

125.     The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> "[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects."[53]

126.     Despite these stated concerns, Monsanto, to date, has failed to test its formulated Roundup products.

## TOLLING OF THE STATUTE OF LIMITATIONS

127.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

### *Discovery Rule Tolling*

128.     Plaintiff Ernest Caranci suffers from, has suffered from, and acquired an illness and disease, NHL, that has a latency period and does not arise until years after exposure.

129.     Plaintiff Ernest Caranci had no way of knowing about the risks of serious illness associated with the use of and/or exposure to Roundup and glyphosate and/or reasonably discovering his causes of action and/or that his causes of action were attributable to conduct of

---

[53] *Id.*

35

another – Defendants – until he was made aware that his NHL could be caused by his use of and/or exposure to Roundup.

130.    Consequently, the discovery rule applies to this case, and the statute of limitations has been tolled and thus does not being to run until the day that Plaintiff and/or Ernest Caranci knew or had reason to know through the exercise of reasonable diligence that Ernest Caranci's NHL was linked to his use of and/or exposure to Roundup.

131.    Within two years of being diagnosed with NHL, Plaintiff Ernest Caranci could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup and glyphosate is injurious to human health.

132.    Plaintiff Ernest Caranci did not know or have reason to know that he suffered his NHL due to the fault of another or due to his use of and/or exposure to Roundup until 2021.

133.    The very first time plaintiff Ernest Caranci knew or had reason to believe that he developed NHL due to the fault of another or due to his use of and/or exposure to Roundup occurred within 2021.

134.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

### *Fraudulent Concealment*

135.    The running of the statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and conduct, as alleged above.  Through their affirmative misrepresentations and omissions upon which Ernest Caranci justifiably relied, Defendants actively concealed from Ernest Caranci the true risks associated with use of or exposure to Roundup.

Case ID: 210602213

136.    As a result of Defendants' actions, Ernest Caranci was unaware, and could not reasonably have known or have learned through reasonable diligence, that Ernest Caranci had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

137.    Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of Roundup.  Defendants were under a duty to disclose the true character, quality and nature of Roundup because this was non-public information over which they continue to have exclusive control.  Defendants knew that this information was not available to others, including Ernest Caranci, Ernest Caranci's medical providers and/or their health facilities, yet they failed to disclose the information to the public.

138.    Defendants had the ability to and did spend enormous amounts of money in furtherance of their purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks.  Plaintiff Ernest Caranci and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and they were forced to rely on Defendants' representations.

*Estoppel*

139.    Defendants were under a continuous duty to disclose to consumers, users and other persons coming into contact with their products, including Plaintiff Ernest Caranci, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup and glyphosate.

140.    Instead, Defendants' knowingly, affirmatively, and actively concealed safety information concerning Roundup and glyphosate and the serious risks associated with the use of and/or exposure to its products.

37

Case ID: 210602213

141. Based on the foregoing, Defendants' estopped from relying on any statutes of limitations in defense of this action.

142. The defendants' negligence, recklessness, fraudulent concealment, strict liability, and all other wrongful conduct as alleged throughout the entirety of this Complaint were factual causes of and/or placed plaintiff Ernest Caranci at an increased risk of harm for and/or were substantial factors in causing and did in fact directly and proximately cause the severe, permanent and grievous personal injuries and damages to Ernest Caranci previously described herein which include:

a) Cancer;

b) NHL;

c) Multiple medical tests and procedures for treatment of NHL;

d) Increased risk of developing NHL;

e) Development of NHL;

f) Multiple hospitalizations;

g) Past and future conscious physical pain and suffering;

h) Past and future conscious mental and psychological pain and suffering;

i) Past and future mental anguish, severe emotional distress, disfigurement, embarrassment, humiliation, depression, anxiety, and fear;

j) Past and future loss of life's pleasures;

k) Past and future medical expenses;

l) Past and future loss of income and wages;

m) Past and future loss of earning capacity;

n) Past and future pecuniary losses and damages;

o) Loss of consortium;

38

p)   Increased risk of harm; and

q)   All injuries and damages set forth in Ernest Caranci's medical records and otherwise permissible under Pennsylvania law.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

## COUNT ONE: STRICT LIABILITY
### (Plaintiffs v. All Defendants)

143.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

144.   All Defendants are in the business of selling Roundup products.

145.   All Defendants had a nondelegable duty to place into the stream of commerce only those products that were free of defects and dangers and, further, to refrain from placing into the stream of commerce products that were in a defective condition, were unreasonably dangerous, that fail to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, and/or for which, on balance, the risks of their design outweigh the benefits of the same.

146.   Defendants Monsanto and/or Bayer AG expected their Roundup products to reach consumers, users, and other persons coming into contact with them, including Ernest Caranci, without substantial change in their condition from when those products were designed and manufactured.

147.   Defendants Monsanto and Bayer AG did, in fact, sell their Roundup products to S&H Hardware & Supply Co., Penn Hardware, Inc., and Penn Hardware Two, Inc. knowing that those Roundup products would reach consumers, users, and other persons coming into contact with

39

Case ID: 210602213

them, including Plaintiff Ernest Caranci, without substantial change in their condition from when those products were designed and manufactured.

148.    S&H Hardware & Supply Co., Penn Hardware, Inc., and Penn Hardware Two, Inc., in turn, sold those Roundup products to consumers, users, and other persons who came into contact with them, including Ernest Caranci, without substantial change in their condition from when those products were designed and manufactured.

149.    At all relevant times, those Roundup products were in a defective condition, were unreasonably dangerous, failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, and/or on balance, the risks of their design outweighed the benefits of the same, once those products reached consumers, users, and other persons who came into contact with them, including Ernest Caranci.

150.    At all times relevant to this litigation, Ernest Caranci used and/or was exposed to Roundup products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

151.    Plaintiff Ernest Caranci could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure.

152.    The harm caused by Roundup products far outweighed their benefit, rendering the products dangerous to an extent beyond that which an ordinary consumer would contemplate. The Roundup products were and are more dangerous than alternative products and Defendants could have avoided selling the Roundup products in such a dangerous form. Indeed, at the time that Defendants placed these Roundup products into the stream of commerce, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

Case ID: 210602213

153.    Placing these Roundup products into the stream of commerce amounts to willful, wanton, and/or reckless conduct by Defendants.

154.    As a direct and proximate result of the defective design and manufacture of Roundup products, Ernest Caranci developed NHL and was injured catastrophically, including severe pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, death, economic damages, and all the damages alleged throughout the entirety of this complaint.

155.    Therefore, as a result of the unreasonably dangerous condition of the Roundup products, Defendants are strictly liable to Plaintiffs.

156.    The defects in the Roundup products were substantial and contributing factors in causing Ernest Caranci's grave injuries, and, but for Defendants' misconduct and omissions, Plaintiff Ernest Caranci would not have sustained their injuries.

157.    As a direct and proximate result of the defective design and manufacture of Roundup products, Ernest Caranci developed NHL and was injured catastrophically and caused to suffer severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, death, and economic damages, giving rise to Plaintiffs' damages herein.

WHEREFORE, Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

### COUNT TWO:  STRICT LIABILITY FOR DEFECTIVE MANUFACTURE AND DESIGN
#### (Plaintiffs v. Defendants Monsanto and Bayer AG)

158.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

41

Case ID: 210602213

159.    Plaintiffs bring this strict liability claim against Defendants Monsanto and Bayer AG for defective manufacture and design.

160.    At all relevant times, Defendants Monsanto and Bayer AG engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, users, and other persons coming into contact with them, including Plaintiff Ernest Caranci, thereby placing Roundup products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendants Monsanto and Bayer AG.

161.    At all times relevant to this litigation, Defendants Monsanto and Bayer AG designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by Ernest Caranci, and/or to which Ernest Caranci was exposed, as described above.

162.    At all times relevant to this litigation, Defendants Monsanto and Bayer AG's Roundup products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Ernest Caranci.

163.    At all times relevant to this litigation, Defendants Monsanto and Bayer AG's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Pennsylvania and throughout the United States, including Ernest Caranci, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants Monsanto and Bayer AG.

164.    Defendants Monsanto and Bayer AG's Roundup products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and

42

marketed by Defendants Monsanto and Bayer AG, were defectively manufactured and designed by Defendants Monsanto and Bayer AG in that when they left the hands of the Defendants Monsanto and Bayer AG's manufacturers and/or suppliers, they were unreasonably dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

165.    Defendants Monsanto and Bayer AG Roundup products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants Monsanto and Bayer AG, were defective in manufacture, design, and formulation in that when they left the hands of Defendants Monsanto and Bayer AG's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

166.    At all relevant times, Defendants Monsanto and Bayer AG's Roundup products created significant risks to the health and safety of consumers and others who were exposed to the products that far outweigh the risks posed by other products on the market used for the same or similar purpose.

167.    Therefore, at all relevant times to this litigation, Defendants Monsanto and Bayer AG's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants, were defective in design and formulation, in one or more of the following ways:

a)    When placed in the stream of commerce, the Roundup products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect.

b)    When placed in the stream of commerce, the Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

43

c)   When placed in the stream of commerce, the Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d)   Defendants Monsanto and Bayer AG did not sufficiently test, investigate, or study its Roundup products and, specifically, the active ingredient glyphosate.

e)   Defendants Monsanto and Bayer AG failed to test, investigate, or study its formulated Roundup products.

f)   Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

g)   Defendants Monsanto and Bayer AG knew or should have known at the time of marketing its Roundup products that exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

h)   Defendants Monsanto and Bayer AG did not conduct adequate post-marketing surveillance of its Roundup products.

i)   Defendants could have employed safer alternative designs and formulations.

168.   At all times relevant to this litigation, Ernest Caranci used and/or was exposed to Defendants Monsanto and Bayer AG's Roundup products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

169.   Ernest Caranci could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure.

170.   The harm caused by Defendants Monsanto and Bayer AG's Roundup products far outweighed their benefit, rendering Defendants Monsanto and Bayer AG's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants Monsanto and Bayer AG's Roundup products were and are more dangerous than alternative products and Defendants Monsanto and Bayer AG could have designed its Roundup products to make them less dangerous. Indeed, at the time that Defendants Monsanto and Bayer AG designed their Roundup

44

products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

171. Defendants Monsanto and Bayer AG's defective design of Roundup amounts to willful, wanton, and/or reckless conduct by Defendants.

172. As a direct and proximate result of the defective design and manufacture of Roundup products, Ernest Caranci developed NHL and was injured catastrophically and caused to suffer severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, death, and economic damages, giving rise to Plaintiffs' damages herein.

173. Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Defendants Monsanto and Bayer AG are strictly liable to Plaintiff.

174. The defects in Defendants Monsanto and Bayer AG's Roundup products were substantial and contributing factors in causing Plaintiffs' damages, and, but for Defendants Monsanto and Bayer AG's misconduct and omissions, Plaintiffs would not have sustained these damages.

175. As a direct and proximate result of Defendants Monsanto and Bayer AG placing their defective Roundup products into the stream of commerce, Plaintiff suffered the damages set forth herein.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

## COUNT THREE: STRICT LIABILITY FOR FAILURE TO WARN
### (Plaintiffs v. All Defendants)

176. Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

45

Case ID: 210602213

177.    Plaintiffs bring this strict liability claim against Defendants for failure to warn.

178.    At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and/or promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Ernest Caranci, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and specifically, the active ingredient glyphosate.  These actions were under the ultimate control and supervision of Defendants.

179.    Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and/or otherwise released into the stream of commerce its Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Ernest Caranci and persons responsible for consumers like him, and Defendants therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

180.    At all times relevant to this litigation, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn users, like Ernest Caranci, of the dangers associated with Roundup use and exposure, and a continuing duty to instruct on the proper, safe use of these products.  Defendants, as manufacturers, sellers, and/or distributors of chemical herbicides, are held to the knowledge of experts in the field.

46

181.   At the time of manufacture and sale, Defendants could have provided warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

182.   At all times relevant to this litigation, Defendants failed to investigate, study, test, or promote the safety of their Roundup products.  Defendants also failed to minimize the dangers to users and consumers of their Roundup products and to those who would foreseeably use or be harmed by Defendants' herbicides, including Plaintiff Ernest Caranci.

183.   Despite the fact that Defendants knew or should have known that Roundup products posed a grave risk of harm, they failed to warn of the dangerous risks associated with their use and exposure.  The dangerous propensities of their products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied, and/or sold the product, and not known to end users and consumers, such as Ernest Caranci.

184.   Defendants knew or should have known that their Roundup and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products.  Defendants have wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

185.   At all times relevant to this litigation, Defendants' Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products

47

Case ID: 210602213

throughout Pennsylvania and the United States, including Ernest Caranci, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

186.    At all times relevant to this litigation, Ernest Caranci used and/or was exposed to the use of Defendants' Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

187.    Ernest Caranci could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of his exposure. Ernest Caranci relied upon the skill, superior knowledge, and judgment of Defendants.

188.    Defendants knew or should have known that the minimal warnings disseminated with their Roundup products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

189.    The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Ernest Caranci to utilize the products safely and with adequate protection.  Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to aggressively promote the efficacy of their products, even after they knew or should have known of the unreasonable risks from use or exposure; and/or

48

concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

190.    To this day, Defendants have failed to adequately and accurately warn of the true risks injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate, a carcinogen.

191.    To this day, Defendants have failed to test, investigate, or study their formulated Roundup products.

192.    As a result of their inadequate warnings, Defendants' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed and sold by Defendants, and used by consumers including Ernest Caranci.

193.    Defendants are liable to Plaintiffs for injuries caused by their failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their Roundup products and the risks associated with the use of or exposure to Roundup and glyphosate.

194.    The defects in Defendants' Roundup products were substantial and contributing factors in causing Plaintiffs' damages, and, but for Defendants' misconduct and omissions, Plaintiffs would not have sustained these damages.

195.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup products, Ernest Caranci could have avoided the risk of developing injuries as alleged herein and he could have obtained alternative herbicides.

196.    As a direct and proximate result of Defendants placing their defective Roundup products into the stream of commerce and failing to warn Ernest Caranci of the increased risk of

49

cancer associated with the use of and/or exposure to Roundup products as described herein, Ernest

Caranci has developed NHL and was injured catastrophically, including having been caused severe

and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss

of comfort, death, and economic damages, including for medical care and treatment.  Plaintiffs

will continue to incur damages associated with these Defendants' failures in the future.

WHEREFORE, Plaintiffs demand damages, including punitive damages, against all

Defendants, individually, jointly, and severally, in an amount in excess of the prevailing

arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

### COUNT FOUR:  VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES ACT AND CONSUMER PROTECTION LAW, 73 P.S. §§201-1 et seq.
### (Plaintiffs v. All Defendants)

197.    Plaintiffs incorporate by reference each and every other paragraph of this

Complaint as if each were set forth fully and completely herein.

198.    At all relevant times, Defendants knew or should have known of the unreasonably

dangerous and carcinogenic nature of the use of and/or exposure to Roundup.

199.    At all relevant times, Defendants, through labeling, advertisements, public

representations and marketing of Roundup, intentionally used deception, fraud, false pretenses,

false promises, misrepresentations, misleading statements, and unfair trade practices in order to

mislead consumers that Roundup products are safe for use.

200.    At all relevant times, Defendants also engaged in the concealment, suppression

and/or omission of material facts in connection with the sale and/or advertisement of Roundup

products in trade or commerce.  In particular, Defendants failed to disclose to the public that

Roundup is unsafe and poses serious health hazards, particularly NHL and similarly cancers like

B-Cell, which Ernest Caranci had.  Defendants were aware of the hazardous risks posed by

50

Roundup and yet failed to inform the public of these risks through their advertisements, labeling, or other means available to them.  Defendants' failure to state material facts about Roundup constitutes a violation of 73 P.S. §§ 201-1 *et seq*.

201.   At all relevant times, Plaintiff Ernest Caranci was deceived by Defendants' intentional misrepresentations and omissions, including by the orchestrated claims made on or in television commercials, advertising materials, websites, and on product labels and packaging regarding the usage and safety of Roundup.

202.   At all relevant times, Plaintiff Ernest Caranci acted in reasonable reliance upon Defendants' unlawful trade practices, and had the Defendants not engaged in the deceptive conduct described herein, Ernest Caranci would not have purchased Roundup® and/or would have protected himself from exposure to Roundup.

203.   As a direct and proximate result of Defendants' unlawful trade practices, Ernest Caranci developed NHL and was injured catastrophically, having been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, death and economic damages.

WHEREFORE, Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

## COUNT FIVE: NEGLIGENCE
### (Plaintiffs v. All Defendants)

204.   Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

51

205.    At all relevant times, Defendants breached their duty to Plaintiff Ernest Caranci and were otherwise negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing Roundup products.

206.    Defendants, directly or indirectly, caused Roundup products to be purchased and/or used by Ernest Caranci.

207.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

208.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of Roundup products.  Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup and, in particular, its active ingredient glyphosate.

209.    At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

210.    Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup products could cause Plaintiff Ernest Caranci's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff Ernest Caranci.

211.   Defendants knew or, in the exercise of reasonable care, should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff Ernest Caranci from Roundup.

212.   Defendants knew or, in the exercise of reasonable care, should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

213.   Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup and glyphosate-containing products.

214.   As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Roundup products, in that Defendants manufactured, produced, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

215.   Defendants failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect consumers like Ernest Caranci from Roundup.

216.   Despite their ability and means to investigate, study, and test Roundup products and to provide adequate warnings, Defendants have failed to do so.  Indeed, Defendants have

53

wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

217.   Defendants' negligence included:

a)   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup products without thorough and adequate pre- and post-market testing;

b)   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c)   Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d)   Failing to test, investigate, or study formulated Roundup products;

e)   Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f)   Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

g)   Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

h)   Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use and/or be exposed to Roundup products;

i)   Failing to disclose to Plaintiff Ernest Caranci, users, consumers, and the general public that the use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

j)   Failing to warn Plaintiff Ernest Caranci, and other users, consumers, and the general public that the product's risk of harm was unreasonable and that

54

Case ID: 210602213

there were safer and effective alternative herbicides available to Plaintiff, Ernest Caranci, and other users or consumers;

k) Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-containing products;

l) Representing that Roundup products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended use;

m) Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup and glyphosate;

n) Advertising, marketing, and recommending the use of Roundup products, while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of or exposure to Roundup and glyphosate;

o) Continuing to disseminate information to its consumers, which indicate or imply that Roundup products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

p) Continuing the manufacture and sale of Roundup products with the knowledge that the products were unreasonably unsafe and dangerous.

218.   Defendants knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiff Ernest Caranci, would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup.

219.   Plaintiff Ernest Caranci did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

220.   Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff Ernest Caranci suffered, and will continue to suffer, as described herein.

221.    Defendants' conduct, as described above, was reckless.  Defendants regularly risk the lives of consumers and users of Roundup products, including Plaintiff Ernest Caranci, with full knowledge of the dangers of these products.  Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff Ernest Caranci, with respect to the dangers of Roundup about which Defendants knew but the public, including Plaintiff Ernest Caranci, did not. Defendants' reckless conduct therefore warrants an award of punitive damages.

222.    As a proximate result of Defendants' wrongful acts and omissions in placing defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Ernest Caranci developed NHL and was injured catastrophically, having been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, death, and economic damages, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

### COUNT SIX:  BREACH OF IMPLIED WARRANTIES
### (Plaintiffs v. All Defendants)

223.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

224.    At all relevant times, Defendants engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to users, consumers and those

56

in proximity to users, including Plaintiff Ernest Caranci, thereby placing Roundup products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendants.

225.    Before the time that Ernest Caranci was exposed to the use of the aforementioned Roundup products, Defendants impliedly warranted to its consumers and users—including Plaintiff Ernest Caranci —that its Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

226.    Defendants, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' damages.

227.    Defendants further failed to test, investigate, or study its formulated Roundup products.

228.    Upon information and belief, Plaintiff Ernest Caranci reasonably relied upon the skill, superior knowledge and judgment of Defendants and upon their implied warranties that the Roundup products were of merchantable quality and fit for their intended purpose or use.

229.    Upon information and belief, Plaintiff Ernest Caranci reasonably relied upon the skill, superior knowledge and judgment of Defendants and upon their implied warranties that the Roundup products were of merchantable quality and fit for their intended purpose or use.

230.    The Roundup products were expected to reach and did in fact reach consumers, users and those in proximity to users, including Plaintiff Ernest Caranci, without substantial change in the condition in which they were manufactured and sold by Defendants.

231.    At all relevant times, Defendants were aware that consumers, users, and those in proximity of users of its products, including Plaintiff Ernest Caranci, would use Roundup products

Case ID: 210602213

as marketed by Defendants, which is to say that Plaintiff Ernest Caranci was a foreseeable user of Roundup.

232.   Defendants intended that their Roundup products be used in the manner in which Ernest Caranci in fact used or was exposed to them and Defendants impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

233.   In reliance upon Defendants' implied warranty, Ernest Caranci used or was in proximity to the use of Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendants.

234.   Plaintiff Ernest Caranci could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

235.   Defendants breached their implied warranties to Plaintiff Ernest Caranci in that their Roundup products were not of merchantable quality, safe, or fit for their intended use, or adequately tested.  Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

236.   The harm caused by Defendants' Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

237.   As a direct and proximate result of Defendants' wrongful acts and omissions Ernest Caranci suffered severe and permanent physical and emotional injuries, including but not limited to and untimely death.  Plaintiffs will continue to incur these expenses in the future.

Case ID: 210602213

**WHEREFORE,** Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

### COUNT SEVEN: FRAUDULENT CONCEALMENT
#### (Plaintiffs v. All Defendants)

238.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

239.    Defendants are estopped from asserting a statute of limitations defense because they fraudulently concealed their wrongful conduct from Plaintiff Ernest Caranci with the intent that Plaintiff Ernest Caranci, as well as other consumers and users of Roundup, would justifiability rely on such material representations, on which Plaintiff, Ernest Caranci, and others similarly situated did justifiability rely.

240.    Defendants had actual knowledge that exposure to Roundup and, specifically, its active ingredient, glyphosate, could result in cancer and other severe illnesses and injuries. Defendants knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies of Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff Ernest Caranci from Roundup.

241.    Defendants failed to conduct adequate testing of glyphosate and the Roundup formulation.

242.    Defendants had actual knowledge of its misrepresentations, negligence, breach of warranties, and false, misleading, deceptive, and unconscionable conduct. Even so, Defendants perpetuated its wrongful conduct with the intent and fixed purpose of concealing its wrongs from Plaintiff, Ernest Caranci, and the public at large. Despite their knowledge that Roundup is

59

considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe.

243.    Plaintiff Ernest Caranci was unaware of the falsity of these representations, acted in actual and justifiable reliance on such material misrepresentations, and were injured as a direct and proximate result.

244.    Additionally, Defendants knowingly omitted material information and remained silent regarding said misrepresentations despite the fact that they had a duty to inform Plaintiff Ernest Caranci, and the general public, of the inaccuracy of said misrepresentations, which omission constitutes a positive misrepresentation of material fact, with the intent that Plaintiff, Ernest Caranci, and the general public would rely on Defendants' misrepresentations.

245.    Plaintiff, Ernest Caranci, and the general public did, in fact, act in actual and justifiable reliance on Defendants' representations, and Plaintiff Ernest Caranci suffered damages as a result.

246.    Defendants, as the manufacturers and sellers of Roundup, were in a position of superior knowledge and judgment regarding any potential risks associated with its products.

247.    Defendants committed constructive fraud by breaching one or more legal or equitable duties owed to Plaintiff, Ernest Caranci, and the general public relating to Roundup, said breach or breaches constituting fraud because of their propensity to deceive others or constitute an injury to public interests or public policy.

248.    In breaching its duties to Plaintiff Ernest Caranci, Defendants used their position of trust as the manufacturer and/or distributor of Roundup to increase sales of its products at the expense of informing Plaintiff, Ernest Caranci, and the general public, that use of or exposure to Roundup® carries the risk of serious illness, such as NHL and other similar cancers.

60

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

### COUNT EIGHT: LOSS OF CONSORTIUM
#### (Plaintiff Carmela Caranci v. All Defendants)

249.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

250.    At all material times hereto, Plaintiff, Carmela Caranci, was and is married to Ernest Caranci.

251.    As a direct and proximate result of the Defendants' negligence, recklessness, fraudulent concealment, strict liability, and all other wrongful conduct as alleged throughout the entirety of this Complaint and as described and incorporated by reference as though fully set forth herein, Carmela Caranci suffered the loss of services, society, comfort and companionship of her husband, Ernest Caranci, in the past and will continue to do so indefinitely into the future.

252.    As a direct and proximate result of the Defendants' negligence, recklessness, fraudulent concealment, strict liability, and all other wrongful conduct as alleged throughout the entirety of this Complaint and as described and incorporated by reference as though fully set forth herein, Carmela Caranci claims the full measure of damages allowable under Pennsylvania law for the loss of consortium of her husband.

253.    Carmela Caranci suffered a loss of consortium for the loss of their spouse's service, society, companionship, aid, affection, and sexual relations as a direct and proximate result of their spouse's injuries due to the acts and/or omissions of the Defendants as outlined throughout the entirety of this Complaint, to which they are entitled compensation.

Case ID: 210602213

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

Respectfully submitted,
**KLINE & SPECTER, P.C.**

By: _____

THOMAS R. KLINE, ESQUIRE
**KILA B. BALDWIN, ESQUIRE**
THOMAS E. BOSWORTH, ESQUIRE
**PHILIP M. PASQUARELLO, ESQUIRE**
*Attorneys for Plaintiffs*

Date: 6/29/21

62

Case ID: 210602213

## VERIFICATION

I, Ernest Caranci, hereby verify that I am the plaintiff in the foregoing action; that the attached Complaint is based upon information which I have furnished to my counsel and information which has been gathered by my counsel in the preparation of the lawsuit. The language of the Complaint is that of counsel and not of affiant. I have read the Complaint and to the extent that the allegations therein are based upon information I have given counsel, they are true and correct to the best of my knowledge, information, and belief. To the extent that the contents of the Complaint are that of counsel, I have relied upon counsel in making this Verification. I understand that false statements made herein are made subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsifications to authorities.

_Ernest Caranci_

ERNEST CARANCI

Case ID: 210602213